E6JKJENC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NORMAN JENKINS,

                    Plaintiff,

          v.                              13 CV 3405 (KPF)

NEW YORK CITY POLICE
DEPARTMENT, et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          June 19, 2014
                                          1:35 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                          District Judge

                         APPEARANCES

ROBERT J. BOYLE
     Attorney for Plaintiff
     -AND-
GIDEON ORION OLIVER

ZACHARY W. CARTER
     Corporation Counsel of the City of New York
BY:  BRIAN JEREMY FARRAR
     Assistant Corporation Counsel

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
BY:  CHRISTINA ANTE

E6JKJENC

1          THE DEPUTY CLERK:  In the matter of Norman Jenkins

2     versus New York City Police Department, et al.

3          Counsel, if you could please identify yourselves for

4     the record, beginning with the plaintiff.

5          MR. BOYLE:  For Mr. Jenkins, Robert Boyle, 351

6     Broadway.  Good afternoon, your Honor.

7          THE COURT:  Good afternoon, sir.

8          MR. OLIVER:  And also for Mr. Jenkins, Gideon Oliver,

9     351 Broadway.  Good afternoon, your Honor.

10          MR. FARRAR:  Good afternoon, your Honor.  Brian

11     Farrar, for the defendant, Police Officers Victor Charles,

12     Robert Agate and Ramiro Ruiz.

13          THE COURT:  Good afternoon, sir.

14          MS. ANTE:  And Assistant District Attorney Christina

15     Ante of the New York City County District Attorney's Office.

16     We are a nonparty in this proceeding, your Honor.

17          THE COURT:  I would consider you an interested party

18     in the proceeding.

19          MS. ANTE:  Yes.

20          THE COURT:  All right.  Thank you.

21          I don't think my luck is this strong, but has there

22     been a finding, a citing, of Mr. Jenkins' criminal court case

23     file?

24          MR. FARRAR:  No, your Honor.  The last correspondence

25     that we received from the criminal court, I forwarded to

E6JKJENC

1    plaintiff's counsel basically stating that they, for whatever

2    reason, cannot find it.  I have been following up with them,

3    and it's been difficult getting -- for whatever reason, having

4    them locate it.

5         THE COURT:  OK.  I was given a privilege log as an

6    attachment to one of these letters, and it listed nine or so

7    categories of documents.

8         Can I assume before we begin this discussion, that the

9    parties have reached agreement on none of these categories?

10        MR. OLIVER:  No, your Honor.  Actually, we have

11   reached -- we are just going to be talking today about numbers

12   2, 3 and 6.

13        THE COURT:  Wait.  The Court notes, sir?  I want to

14   make sure we're talking about the same thing.

15        MR. OLIVER:  Exactly, your Honor, the court notes.

16   And number 2, the grand jury subpoenas and accompanying cover

17   letters identified in item 3 in the privilege log, and the

18   notification for the officers to appear in number 6 of the

19   privilege log.  All of the other items, we have either resolved

20   or we're no longer going to pursue.

21        THE COURT:  All right.  Well, I thank the parties,

22   because that means that progress has been made since the

23   letter-writing, and I appreciate that very much.

24        It seems to me that the third and the sixth categories

25   can be discussed at the same time, Mr. Oliver.  If you're

E6JKJENC

taking the laboring oar, sir, because, really, you want

information about who appeared before the grand jury, and they

wish not to tell you.

Am I understanding that correctly?  Mr. Boyle?

MR. BOYLE:  Good afternoon, your Honor.  I'm going to

address the grand jury matter.

THE COURT:  Yes.

MR. BOYLE:  We are primarily interested in number 3,

with respect to had these defendants; that is, the named

defendants, actually received subpoenas to appear before the

grand jury.  There is an issue here with respect to why this

criminal case was never presented, why it was allowed to die,

what they call a speedy trial statute, New York statutory

speedy trial death.  And we have a situation where it was

alleged that Mr. Jenkins had a large number of crack vials on

his person discovered after his arrest.  We also allege that it

was planted.  It was something that could have very easily been

indicted.

We understand that there is a concession that the case

was never presented, but we do think it's -- the officers could

not recall in their depositions whether they ever received

subpoenas, whether they ever received notifications.

I guess we're thinking forward to trial, is there a

going to be a claim that, well, it was just logistics, this is

why it was never presented, or was there a strategic decision

E6JKJENC

1   made just to let this case go away for other reasons.

2              And that's why we would at least like to know whether

3   these officers -- only the named officers, because we

4   understand that there is some secrecy that attached here --

5   received subpoenas and received and/or notifications to come to

6   court.

7              THE COURT:  And, actually, to make sure I understand

8   your inquiry, Mr. Boyle, you don't care whether they abided by

9   or followed those notifications, you don't care whether they

10  showed up or testified, you just want to know whether they were

11  asked to show up, sir?

12             MR. BOYLE:  Yes, your Honor.

13             THE COURT:  And can I -- just so my recollection is

14  refreshed, there is a malicious prosecution claim here?

15             MR. BOYLE:  Yes.

16             THE COURT:  Is there a denial of fair trial claim

17  here?

18             MR. BOYLE:  No, your Honor, because it was statutorily

19  dismissed.  So there was no denial-- there was no trial that

20  took place.  There was -- in other words, no Brady or any of

21  those legal grounds have come up in a denial of a fair

22  pretrial.  It's malicious prosecution.

23             THE COURT:  Let me understand, before I speak to the

24  folks at the back table, a little bit more about how the

25  presence or absence of these subpoenas relates to your

E6JKJENC

1    malicious prosecution claim.

2         MR. BOYLE:  It relates to it in this way:  I think it

3    would come up in terms to rebut any defense that they might put

4    forward that, well, we would have shown up if we were only

5    notified.  And so to that extent, it might lead to admissible

6    evidence if we could show, well, in fact, they were served, it

7    was pursued, or there was a decision not to do that.

8         I think clearly here, because the case was

9    dismissed -- I mean, that's a predicate for the malicious

10   prosecution claim, and that's going to be conceded, but the

11   issue is going to be why and whether there was probable cause

12   to begin with, because that's obviously -- even though the case

13   was dismissed, we have to show lack of probable cause for the

14   prosecution.

15        THE COURT:  I'm even with you on that front, sir.  I

16   guess my question is:  I see as analytically distinct the

17   question of the existence or not of probable cause and whether

18   or not these gentlemen were summoned to the grand jury.  I

19   wonder if perhaps it may go to an -- I'm not sure where it

20   goes, let me stop saying that.  But I see your point, but it

21   seems to me that if the City or the officers were to prove that

22   probable cause existed for the offense, however they chose to

23   do that, I don't know how it would matter whether or not they

24   were given the subpoenas to go to the grand jury.

25        I do understand your argument, which I think is a

E6JKJENC

```
 1    little bit different than the probable cause argument, which is
 2    you are trying to know in advance or trying to avoid being
 3    blindsided on the issue of whether or not -- whether they will
 4    say, oh, we would have shown up if only we had known.  That I
 5    get, but I guess I don't see the interrelationship with the
 6    probable cause inquiry in the way that you do.
 7              MR. BOYLE:  And also, the question of malice, I
 8    think --
 9              THE COURT:  Yes.
10              MR. BOYLE:  -- as well, whether they were notified to
11    show up, whether the prosecutor issued those subpoenas and were
12    they served, or did they receive the notification.
13              Actually, I don't even know if these grand jury
14    subpoenas -- at this point we don't even know if they relate to
15    the defendants because sometimes police officers are just
16    issued notification to appear in court, which I think less of a
17    privilege would apply to, frankly, because it's just a
18    notification to come to court.  It also may go to malice as
19    well.
20              THE COURT:  Assume that Mr. Farrar tells me that they
21    are not going to make the argument at trial that they would
22    have come to the grand jury if only they had known, what, then,
23    is the relevance of this material to your case?
24              MR. BOYLE:  May I have a moment?
25              THE COURT:  Of course.
```

E6JKJENC

1        (Pause)

2        MR. BOYLE:  It may very well go to their credibility

3   and also to be able to argue to the jury if they --

4        THE COURT:  You're not moving me on that one, sir.

5   I've got to tell you.  Try again.

6        MR. BOYLE:  We want to be able to argue to the jury,

7   if they were informed -- let's say that there was a subpoena in

8   their name or they did receive notification, we would want to

9   be able to argue to the jury, well, you got notification, and

10  for some reason, you didn't show up.  Why was it that you

11  didn't show up, Officer Charles?  Is it because you didn't want

12  to repeat a false story under oath, and you scheduled your

13  regular day off?

14       These are all the kinds of things -- and it's hard at

15  this point when we're in this posture, because we don't know

16  what, in fact, they're going to say or what the arguments would

17  be, to put it any more specifically, but I can certainly say

18  that would be something we would be able to or would want to

19  argue in that regard.

20       THE COURT:  OK.  Thank you.

21       Mr. Farrar, may I hear from you first, sir?

22       MR. FARRAR:  Yes, your Honor.

23       THE COURT:  In your letter to me of June 3rd, you say

24  that plaintiff's statement about what it is you have implied

25  that you will do is inaccurate and incorrect.  What is accurate

E6JKJENC

1   and what is correct, sir?

2           MR. FARRAR:  Your Honor, I won't speak to the

3   privilege issues, I'll leave that to Ms. Ante here.

4           THE COURT:  Absolutely.

5           MR. FARRAR:  But it's been our position all along that

6   the district attorney's file it, and their reasons for doing

7   something or not doing something are not relevant at all to

8   this action.  We never intended to make that an issue because

9   it's our position that plaintiff's false arrest, and to some

10  extent, his malicious prosecution claim, they turn on whether

11  or not the jury is going to believe the officers' version of

12  events regarding what their testimony is.

13          So turning first to the false arrest claim, the issue

14  is -- the only issue for the jury to decide is whether there

15  was probable cause to arrest the plaintiff at the time of his

16  arrest, which would be determined not by any decision made by

17  the district attorney's office.

18          THE COURT:  Is the existence of probable cause a

19  complete defense to the malicious prosecution charge even if

20  the officers acted with malice?

21          MR. FARRAR:  It's my understanding in order for the

22  plaintiff to prevail on a malicious prosecution claim, there

23  are several elements they have to prove.  The first would be

24  that the defendants commenced a criminal proceeding against the

25  plaintiff.  The second is they would have to show that in doing

E6JKJENC

1   so, the officers forwarded false information to the district

2   attorney.  And I believe the third element is that it was a

3   favorable termination, which is not -- the third element is not

4   in dispute.

5            THE COURT:  No, the third element is not in dispute.

6   The element of commencing proceedings is not in dispute.  I

7   thought there was a --

8            MR. FARRAR:  Your Honor, if I may --

9            THE COURT:  Yes.

10            MR. FARRAR:  -- we still argue that it's the district

11   attorney that commences prosecution for purposes of these

12   matters.

13            THE COURT:  OK.  I understand that point.  But then

14   we're just going to get into a jury issue as to whether they

15   assisted to such a degree, that they can be brought within that

16   ambit, because that's what I understand the jury instructions

17   on malicious prosecution to specify.

18            Do I understand from what you have just said, sir,

19   that you are not going to be arguing on behalf of the officers

20   that they would have shown up if only they had known about

21   these requests?

22            MR. FARRAR:  It's a little hard to think about it, I

23   guess, in hypothetical terms.  Right now, that's not our

24   intention to put that forward, and I can't imagine any

25   situation where that argument would come out.  We would be

1   proving probable cause based on the testimony of the officers.

2           And I think there's case law that even says the

3   opinions of the district attorney's are not admissible.  And

4   certain opinions about the credibility of the officers is even

5   reversible error should the district attorney put forth

6   evidence in a 1983 action about their view of the credibility

7   of the officers.  So we would argue that that should be

8   precluded at trial.

9           THE COURT:  Well, I didn't think they were asking for

10  those materials.  I think they just want a yes-or-no answer as

11  to whether these folks were summoned to the grand jury or not,

12  whether formally or informally.  So I'd like you to speak to

13  the question of why that's not relevant.  You've started to do

14  that.

15          MR. FARRAR:  I think in doing so, their argument will

16  be -- eventually I think the road that they're trying to go

17  down is that the DA didn't believe these officers, and the

18  reason that the prosecution didn't go forward was because for

19  some reason, the DA found that the officers were not credible.

20          I don't know if that's their intention, but it seems

21  to me based on what's been represented thus far, that that is

22  going to be their argument.  We would argue that that is

23  inadmissible, and that the opinions of the office of the

24  district attorney are not admissible, and why they did or

25  didn't notify an officer is not relevant.

E6JKJENC

1    THE COURT:  I guess I have two responses to that.  The

2    first is going back to your prior answer to me.  To the extent

3    that I make the decision not to produce these materials -- and

4    I haven't decided yet -- based on my understanding that at the

5    present time, your office is not going to make any argument

6    that these folks would have come if only they had known, please

7    understand that it would be unfortunate if you were to reverse

8    yourself at trial and suddenly make this an argument.

9    MR. FARRAR:  No, I completely understand your

10   Honor's --

11   THE COURT:  There's sort of an estoppel point on my

12   side.

13   Secondly, I think the argument they're making is not

14   what you have just said, but a little bit different.  It may be

15   that they care about the district attorney's office's views of

16   the credibility of the individual defendants in this case, but

17   what they've just articulated to me as a second reason why they

18   believe they need this information is that they want to

19   demonstrate that the officers knew that they had been summoned,

20   and that the officers, irrespective of what the district

21   attorney's office might have viewed as their credibility or

22   lack thereof, that they elected not to -- they decided not to

23   show because they did not want to be put in the position of

24   having to repeat a false submitted that had already been stated

25   to the district attorney's office.  That's what I understand

E6JKJENC

```
 1    one of their arguments to be, and I'd like you to respond to

 2    that, please, sir.

 3            MR. FARRAR:  If the argument, as I understand that,

 4    would be that the officers were notified for grand jury, and

 5    then they didn't show up, your Honor, at the moment --

 6            THE COURT:  You could argue very speculative Rule 403,

 7    all of those things.  Those answers, I know.  If you have

 8    another answer --

 9            MR. FARRAR:  Those are the first that came to mind, so

10    I can't think of anything else besides that.  It would just get

11    back to our original point that this is not relevant and, I

12    think, getting outside really the scope of discovery some of

13    the discovery that the plaintiff is pursuing.

14            THE COURT:  OK.  Mr. Farrar, a second issue:  If,

15    indeed, this is not relevant material, why were the officers

16    permitted to answer questions about whether they had been

17    summoned to testify, formally or informally, by which I mean

18    the summons not the testimony, before the grand jury?

19            MR. FARRAR:  Well, I have to check the transcript of

20    the deposition.  I don't recall if there was an objection to

21    those questions.  There may have been.  But I think in that

22    point, it would still be their answer -- it would be, if they

23    were giving testimony, that that's their recollection, but as

24    far as whether or not they were summoned to testify, I don't

25    know what the documents will show.
```

E6JKJENC

```
 1              THE COURT:  My point, sir, is:  You all are here now
 2    because you wish not to produce documents evidencing a
 3    summons -- I use that term broadly -- to come to testify before
 4    the grand jury.  And I understand that.  Your argument is
 5    weakened, sir, or at least your position with respect to the
 6    argument is weakened if you are letting them answer a series of
 7    questions about being summoned, formally or informally, to
 8    testify before the grand jury.  That's my point.
 9              MR. FARRAR:  Yes, your Honor.
10              THE COURT:  So that is what is of interest to me.
11              Were you there for those depositions, sir?
12              MR. FARRAR:  I was.  I defended the depositions.  And
13    off the top of my head, I don't recall if I objected to those
14    questions.  I would have to review the transcript to see.  But
15    I understand your Honor's point in that regard.
16              THE COURT:  Thank you.
17              Let me hear from Ms. Ante, please.
18              MS. ANTE:  Yes, your Honor.  With regard to the
19    privilege log, first off with number 3, the grand jury
20    subpoenas, it is the People's -- the district attorney's
21    position that any disclosure of grand jury materials, any
22    requests for that has to be directed to the state court and not
23    the federal court, and that's under Douglas Oil versus Petrol,
24    441 U.S. 211 (1979), and also Ruther v. Boyle, 879 F. Supp.
25    247, 250 (E.D.N.Y. 1995).
```

E6JKJENC

1              So it's the district attorney's position that any

2      request regarding grand jury material should be made before the

3      grand jury judge that supervised this.  Regardless -- and from

4      hearing from the parties, there was no actual grand jury

5      testimony, so this is -- any subpoenas that were issued in the

6      name of the grand jury, it should go before the supervising

7      grand jury judge at the state level.

8              And second of all, even putting that aside, the party

9      seeking materials may have to show a particularized and

10     compelling need for the grand jury materials.  And based on

11     what I have just been hearing, I don't see how the plaintiffs

12     have made out those particularized and compelling need for the

13     grand jury --

14             THE COURT:  Let me stop you for a moment, please.

15             If the criminal case file were to have been located,

16     and if it had been produced, would it reflect in any way

17     whether these individuals were called, formally or informally,

18     to testify before the grand jury?

19             MS. ANTE:  Yes, your Honor.

20             THE COURT:  It would?

21             MS. ANTE:  Yes.

22             THE COURT:  And would that material have been produced

23     to the plaintiff as part of this case file, or would that have

24     been redacted?

25             MS. ANTE:  Whether they were notified or subpoenaed,

E6JKJENC

1    the individuals, that's the bone of contention, yes or no, with

2    number 6.  And I have documents, if the Court wants to review

3    it in-camera, what the subpoenas actually were as well as

4    notifications.

5             THE COURT:  OK.  I'm sorry, I'll ask my question again

6    because I'm not sure I understood your answer.

7             MS. ANTE:  OK.

8             THE COURT:  One of the things that you were just

9    saying is that the request should be made in the court where

10   the grand jury was convened.

11            MS. ANTE:  That is correct.

12            THE COURT:  And another thing that you were saying was

13   that there has to be a particularized need.  One of the

14   particularized needs that has been advanced -- and I am saying

15   nothing about whether it's enough or not, I'm just exploring it

16   with you -- is that the file is now lost, and there is no way

17   for them to get this information otherwise.

18            So my question to you is:  Had this criminal file been

19   found, and, more particularly, had it been produced to

20   plaintiff in discovery in this case, would the plaintiff have

21   received the information it now seeks; namely, whether any of

22   the individual defendant officers was summoned formally or

23   informally to testify before the grand jury?

24            MS. ANTE:  No -- well, the criminal file in this case,

25   the district attorney's office, we possess it.

E6JKJENC

1        THE COURT:  OK.

2        MS. ANTE:  All right.

3        THE COURT:  Are we speaking of the same file,

4   Mr. Farrar?  What's the thing that was lost?

5        MR. FARRAR:  That was the file from the criminal

6   court.

7        THE COURT:  So the answer is, no.  The answer to my

8   question is, no, the file that is lost did not have that

9   information in it, did it?  It would have just had the

10  prosecution of the case, or not?

11       MR. FARRAR:  It's my understanding that the criminal

12  court files would note when a court date was held, and any

13  notes from that, as well as the indictment and the disposition

14  of charges, but it would not have anything regarding the grand

15  jury.

16       THE COURT:  OK.  So, Ms. Ante, I wasn't clear with my

17  question.  That's why I asked it a second time.

18       What I was trying to get at was, I wanted to make sure

19  that they were not prejudiced by not receiving the court file,

20  for lack of a better term, because of information that would be

21  produced in the court file, but you're not going to produce

22  now.  So now that I understand that's not an issue, please tell

23  me again the reasons why you feel a particularized need has not

24  been shown.

25       MS. ANTE:  Well, again, the district attorney's

E6JKJENC

1    office, we're not a party to this, but they have to show a

2    particularized and compelling need to go beyond the secrecy of

3    the grand jury.  They have to -- well, first of all, they have

4    to show relevance.  And they have almost the entire case file

5    here, it has been produced to both parties.  They have had

6    depositions.  They were allowed to ask the officers about

7    whether they spoke with the district attorney, whether they

8    were notified of the grand jury or not.  They already have

9    those documents.

10          So now they want -- we want proof from the grand jury,

11   but they have everything else already.  So they haven't made

12   that showing, because they have other documents --

13          THE COURT:  In fairness, Ms. Ante, what they're saying

14   is the officers could not recall whether that notification had

15   been made.  That was the reason for my questioning to

16   Mr. Farrar about why these folks were allowed to answer these

17   questions, because if the point of grand jury secrecy is grand

18   jury secrecy, then I would think you should be jumping up and

19   down directing them not to answer if it's a question of whether

20   they have been summoned or not.  They've already been -- as

21   I've been told -- I don't know, I have not read the

22   transcripts -- they've already been asked those questions, and

23   they've answered "I don't know," and that's why -- according to

24   the plaintiff's counsel, that's why they believe they need this

25   information, because they've asked the question, the witness

E6JKJENC

1    does not know, there is an answer, and you all have it.

2             So if you could respond to that.

3             MS. ANTE:  Well, they could pursue it from the

4    criminal defense attorney whether they showed up for the grand

5    jury and no one came.  The criminal defense attorney that

6    represents the plaintiff in this civil matter, she would know

7    that, and they could have deposed the criminal defense

8    attorney.

9             They could have called the assistant district

10   attorney.  Nobody subpoenaed from my office the Assistant DA

11   for depositions in this case.

12            THE COURT:  Had the assistant district attorney been

13   subpoenaed for a deposition in this case, would he or she have

14   been permitted to give that information?

15            MS. ANTE:  It depends if it was in regard with grand

16   jury subpoenas, is it notifications, is it work product?  I

17   can't answer that question, your Honor, because that's very

18   speculative.

19            THE COURT:  I understand, but why I'm probing you on

20   this, though, is, if you're offering these alternative routes

21   as something where they could obtain the equivalent

22   information, I need to know that they can obtain the equivalent

23   information, and to the extent they can't, I need to know that

24   as well.

25             So telling me they could have called the ADA is great,

E6JKJENC

1   except if we're going to be in the same position where they

2   seek to depose this person, and the person says I can't tell

3   you, then we're in the exact same position we're in now.

4          So that's not -- and it may be that that is legally

5   appropriate.  I'm just saying to offer that as a viable

6   alternative is false or misleading because they can't actually

7   get the information from that person.

8          MS. ANTE:  There's also the -- if it is a notification

9   as opposed to a subpoena, the notification is done through the

10  police department, so there may be records from the police

11  department regarding the receipt of the notification.

12         THE COURT:  And you would not suggest that the

13  schedules of the officers for a particular time period when the

14  grand jury was in session would be subject to any of the

15  privileges we have been discussing?

16         MS. ANTE:  No, no.

17         THE COURT:  I understand.  All right.

18         Anything else?

19         MS. ANTE:  In regard for the grand jury matters?  No,

20  your Honor.

21         THE COURT:  OK.

22         MS. ANTE:  And, again, I have the documents if you

23  want to look at them.

24         THE COURT:  I might.  OK.  Thank you very much.

25         Mr. Boyle or Mr. Oliver, may I hear you in reply on

E6JKJENC

1  this point, please?

2          MR. BOYLE:  Yes, your Honor.  One or two things:

3  First, the defense counsel wouldn't know, because when -- or if

4  the lawyers showed up, because defense counsel, by and large,

5  aren't informed of that, the defense lawyer isn't in the grand

6  jury.  And sometimes in a criminal court case, particularly one

7  that dragged on so long as this, you show up in court, and the

8  district attorney gets up and says it's scheduled for

9  presentation next term, your Honor, because the judge wants to

10  know what's happening on the case.  That's something that's

11  routinely disclosed.

12          Obviously without the court file, we don't know

13  whether those kind of representations were made.  So to a

14  certain extent, it is speculative, but there could have been

15  some things in the court file which at least spoke about

16  whether the case was going, what was going on with it, because

17  certainly the criminal court judge wants to know -- this man is

18  in jail -- what's going on with the presentation to the grand

19  jury, and that's what we lack with the criminal court file as

20  opposed to the -- the court file having been lost somewhere.

21          THE COURT:  OK.

22          MR. BOYLE:  Because we can't -- I don't mean to cut

23  your Honor off.  We can't even request the minutes of the

24  various appearances because we can't learn who the court

25  reporters were because that's in the court file.

E6JKJENC

1           THE COURT:  I understand.

2           Let's just stand for a little bit longer, sir.  I need

3      to address the threshold issue that Ms. Ante has raised

4      regarding what court this request needs to be made in.  So I'm

5      not going to talk about that with you because I haven't really

6      looked at the issue, but I agree with her that for grand jury

7      materials, it is typically the standard that one must make a

8      particularized and compelling showing.

9           I was speaking with Ms. Ante, and you've heard me

10     speak with her about what I thought your arguments were.  To

11     the extent I have misperceived them, I just want to make sure I

12     understand what you identify as your compelling, particularized

13     need.

14          MR. BOYLE:  Yes, the Court has.

15          THE COURT:  OK.

16          MR. BOYLE:  If I could just add one other thing to

17     that, though.  I think before we get to the issue of what court

18     it goes to, there has to be -- is this a matter occurring

19     before the grand jury?  For example, there's a whole slew of

20     cases -- and I recognize it's not quite on point -- under FOIA

21     where documents were requested from an agency and --

22     preexisting documents, and then they were put into the grand

23     jury.  The courts have held, well, that's not a matter

24     occurring before the grand jury because it's preexisting

25     material.  And also, it applies to certain ministerial things,

E6JKJENC

which I would submit the notice to go to the grand jury -- even
if the subpoenas were deemed to fall within grand jury secrecy,
the administrative notice to Officer Charles to show up on a
particular day certainly is not --

THE COURT:  OK.

MR. BOYLE:  -- and it would be appropriate --

THE COURT:  You're not challenging, sir, that the
subpoena would be a matter occurring before the grand jury?

MR. BOYLE:  In a very -- I think there's a wrinkle to
this case because it was never a presentation.  And, frankly, I
tried to look some of this up to see if there was no
presentation, is it a matter occurring before the grand jury or
was it just an administrative matter of an assistant district
attorney as an officer of the grand jury filling out a
subpoena.

So I wouldn't concede that totally, but clearly, if
there was a presentation, certainly probably it would fall
within the grand jury secrecy, the subpoenas would fall under
the grand jury secrecy rules.

THE COURT:  And it is only by dint of the fact that
the presentation didn't happen, that you say it might not?

MR. BOYLE:  It might not.  And there also might have
been waiver here as well by the fact that they did answer
those -- the subject matter was gone into at their depositions.
We're really only looking here for the defendant themselves,

E6JKJENC

1    not anything else.

2              THE COURT:  I understand.

3              MR. BOYLE:  Thank you.

4              THE COURT:  Ms. Ante, could you speak, please -- oh,

5    wait, Mr. Oliver wants to talk first.

6              MR. OLIVER:  Very, very briefly.

7              THE COURT:  Very, very briefly, sir, yes.

8              MR. OLIVER:  Thank you.

9              Just with respect to number 3, which is the three

10   grand jury subpoenas with the accompanying cover letters, I

11   think we're actually missing a little bit of Local Rule 26.2

12   information, like dates and other information.  Some of that

13   might help either narrow the dispute or might help us in making

14   arguments to the Court if it comes to briefing.  But on the

15   privilege log, there is no grand jury privilege that's being

16   asserted for item 6, which is the notification for the officers

17   to appear before the grand jury.

18             And item number 8 on the privilege log, which we're no

19   longer pursuing, is medical records.  It's described as medical

20   records obtained by grand jury subpoena.  So I think -- I infer

21   that of the three grand jury subpoenas with the accompanying

22   cover letters, perhaps one of them was related to the medical

23   records that were obtained pursuant to a grand jury subpoena.

24             So we might really be left with two grand jury

25   subpoenas with accompanying -- with a somewhat narrower issue

E6JKJENC

1   here at the end of the day than we have been talking about.

2            THE COURT:  OK.  Thank you, sir.

3            Ms. Ante, the comments that I have just heard from

4   Mr. Boyle and Mr. Oliver suggest that there is a distinction to

5   be made for purposes of the grand jury secrecy privilege

6   between subpoenas and notifications to appear, and that one or

7   both of them might not specifically be matters occurring before

8   the grand jury.

9            If you have insight into this, particularly case law,

10  I'd be interested.

11           MS. ANTE:  I'm just going to the language of the case

12  law here where it says if grand jury materials and subpoenas

13  are issued in the name of the grand jury, an investigation has

14  to be opened.  It is a grand jury matter.

15           THE COURT:  What about the notifications?

16           MS. ANTE:  Notifications are not, your Honor.  That

17  is -- for civilian witnesses, it's typically subpoenas.  For

18  law enforcement, there's an agreement between the district

19  attorney's office and NYPD to notify officers to come, but it

20  is not deemed -- it's not a subpoena.

21           THE COURT:  All right.  But then --

22           MS. ANTE:  It's a request.

23           THE COURT:  The sixth category, notifications for

24  officers to appear, on what basis is that being withheld?

25           MS. ANTE:  It's our contention that that goes under

E6JKJENC

1  attorney work product, because it is going into our

2  investigation of the case and how to pursue it.

3          THE COURT:  No.  Now I definitely need to hear more

4  about this because I was doing fine with the grand jury

5  secrecy.  I understand this much less well as an expression of

6  attorney work product.

7          Attorney work product documents and materials prepared

8  in anticipation for litigation, you're suggesting that the

9  selection of those individuals to notify for appearance in the

10  grand jury is itself work product?

11          MS. ANTE:  Yes.  Who we choose to speak with, how

12  we're going to proceed with a case, how we're going to

13  investigate it, whether we're going to call someone, and of

14  those people, which ones we are going to call, it's all part of

15  our thought process in anticipation of litigation and whether

16  to go into the grand jury or not.

17          THE COURT:  You would agree with me, however, would

18  you not, that unlike the attorney-client privilege, which tends

19  to be waived only by things like waiver, there is -- the work

20  product protection is not nearly as broad or as sacrosanct, and

21  that showings can be made that would allow the disclosure of

22  material otherwise considered work product?

23          MS. ANTE:  That is correct, your Honor.  It's the

24  People's position under Federal Rule of Civil Procedure

25  26(b)(3)(A)(ii) that there has to be a showing of a substantial

E6JKJENC

need for the materials that bear upon the case, and without

undue hardship, obtain their substantial equivalent by other

means.

And, again, with regard to notifications, from what I

have heard, the officers have already been deposed, and they do

not recollect, but they have other avenues.  They could, again,

speak with the assistant district attorney, go speak with a

criminal defense attorney.  I believe it was said by

plaintiff's attorney they cannot obtain the minutes because the

case file has been lost, but the computer records have not.

THE COURT:  How do you propose that they get those

computer records?  Who are they --

MS. ANTE:  You go to the court clerk, and you ask,

could I print out the calendar, the dates with the reporter's

name.  It's part of the computer system, and the court clerk

can give it to you, and they can order the minutes to see what

was said, because sometimes when a case is on for grand jury,

which is what this case has been going on, it will be put on

the record witnesses didn't show, or witnesses did show, or

defense attorney consented for a disposition or -- it could be

all the reasons for the adjournment would be put on the record.

THE COURT:  That much, I understand.  This is

something I have less familiarity with.  How would they know

what days to go asking the Clerk of Court for?

MS. ANTE:  You could to the court clerk, you give them

E6JKJENC

1   the docket number, and they will pull up, and they will give

2   you the calendar, the dates that it was adjourned for, and

3   usually with the court reporter, so they could order.  So

4   that's another avenue that they can pursue in this case.

5           And I believe it was also said that plaintiff believes

6   that the officers may have waived the whole issue of grand jury

7   confidentiality because there are questions about it.  It's not

8   whether a person can personally waive it, it's for a court to

9   decide with the secrecy.  So they do talk about it, but that

10  doesn't mean there's a waiver of the grand jury privilege.

11          THE COURT:  OK.  Thank you.

12          Mr. Boyle or Mr. Oliver, can I hear from you on the

13  court notes issue?

14          MR. OLIVER:  Yes, your Honor.  In part, because there

15  is no criminal court file, there is nothing that we have that

16  reflects what happened on the individual dates that the case

17  was calendared for --

18          THE COURT:  And let me stop you for a moment, sir.

19          MR. OLIVER:  Of course.

20          THE COURT:  Right now in this system, I can pull up

21  this docket, and I can tell you what days there was a court

22  proceeding and what has happened each time.  There was an index

23  number assigned to Mr. Jenkins' case, was there not?

24          MR. OLIVER:  Well, there is a docket number, yes.

25          THE COURT:  A docket number, excuse me.

E6JKJENC

1        So that particular docket number, one could go to a

2   clerk and say, I would like the docket for this case; is that

3   correct?

4        MR. OLIVER:  It's sealed.

5        THE COURT:  It is sealed?

6        MR. OLIVER:  Right.  The case is sealed, so with an

7   unsealing order, we could perhaps obtain that information from

8   the Office of Court Administration's computer system.  That

9   might be possible.

10        THE COURT:  OK.  I don't know that I have the ability

11   to unseal, nor am I being asked to, but you have the ability to

12   get a docket report of what happened?

13        MR. OLIVER:  I mean, I think it's possible.  The

14   answer -- my answer is, I think it's possible.  I'm not a

15   hundred percent sure, but I presume it should be possible to

16   pull that information from the system -- from the OCA system

17   even though the case is sealed.  What you would get would be a

18   list, presumably what you usually get if you go onto the

19   WebCrims system online, is a list of the appearances, the dates

20   of the appearances, what part it was in, who the judge was, and

21   who the court reporter was.

22        THE COURT:  All right.  And then what you are saying

23   is you'd have to go back and --

24        MR. OLIVER:  With unsealing orders.  We would then

25   need to go to the individual court reporters presumably with

E6JKJENC

1  unsealing orders to get them to transcribe each of the

2  appearances.

3          It looks to me, based on the privilege log, like aside

4  from the initial appearance, there were at least five

5  appearances that -- or there were at least five appearances

6  that there appear to be notes, court notes, from in the

7  prosecutor's file.

8          THE COURT:  OK.  And your point to me, sir, is that

9  you want the court notes because you don't have a court file?

10         MR. OLIVER:  Well, we don't have a court file.  The

11 officers weren't present -- I assume they weren't present.

12 They certainly didn't have any recollection as to what happened

13 during the life of the case.  And the court file would, at a

14 minimum, reflect -- the court action sheet and the court file

15 would, at a minimum, reflect some information about what

16 happened on each appearance, what representations were made by

17 the parties, but without access to the court file, we don't

18 have access to any of that information.

19         And typically, I think the court notes include

20 information from the assigned ADA to the ADA who's going to

21 stand up in the part with what to say to the judge basically.

22 And then I think sometimes the notes -- there are notes that

23 also come back from the ADA who's standing in the part that go

24 to the assigned ADA that reflect what the defense attorney said

25 or what the judge said.  All of that information, if this is

E6JKJENC

1    the only way that we have to get it, are these court notes at

2    this point.

3            THE COURT:  Well, absent the unsealing order and what

4    we have just been talking about?  As a theoretical matter,

5    sir -- and I can appreciate there may be more difficulty in

6    this than you wish to undertake -- you have the ability to find

7    out the court dates, get the things transcribed, and see what

8    happened, correct, sir?

9            MR. OLIVER:  Theoretically.  I think theoretically.

10           THE COURT:  Again, without talking about the burdens

11   involved.  Let me speak to Ms. Ante on this.

12           Ms. Ante, I am less familiar than the parties here

13   with the concept of court notes.  I assume that they're being

14   withheld on work product grounds?

15           MS. ANTE:  That is correct, your Honor.

16           THE COURT:  And, again, because I'm not sure what's in

17   them, to my mind, to the extent that they are summaries of what

18   happened -- the judge said this, the judge said that -- they're

19   sort of work product that I would think would be less worthy of

20   protection than other forms of work product.  Is it your

21   position -- and by you, I mean your employer -- your position

22   that the mere selection of what to write down in these notes is

23   itself work product?

24           MS. ANTE:  That is correct, your Honor, because it

25   would be a summary sometimes of what happened in the court.  It

E6JKJENC

1    could be also a little directives, oh, pay attention to that or

2    this may be a problem.

3              So it's our position that it's not opinion work

4    product, but it is definitely fact work product.  And, again,

5    it's still controlled under 26(b)(3) where interest has to be

6    showing of at least undue hardship.  And there is -- there's

7    been what's called a 160.50 waiver under the CPL in the state

8    where the plaintiff has waived -- he wants his case unsealed,

9    so it's quite easy to get an unsealing order, and just to go to

10   the clerk and get the minutes.

11             THE COURT:  Who actually can sign the unsealing order,

12   a state court judge?  Do I get to do one now based on this --

13   I'm not offering, I'm just wondering if it's -- no, I didn't

14   think I could.

15             MS. ANTE:  No, no.  No, it's a state -- well, let me

16   think about that.

17             MR. FARRAR:  Your Honor, if I may respond to that?

18             THE COURT:  Yes.

19             MR. FARRAR:  The criminal court file can be obtained

20   just with a release signed by the plaintiff, which is what

21   we -- like, for instance, in this case, that's what we received

22   from plaintiff's counsel.  We forwarded it to the criminal

23   court.  Unfortunately, they couldn't find the file.  However,

24   had they found it, they would have produced it simply based on

25   a signed release from the plaintiff pursuant to 160.50.  So it

E6JKJENC

```
1    would seem to me that any records kept -- any computerized
2    records kept by the Court would be able to be obtained by the
3    same release.
4              THE COURT:  Mr. Farrar, do you have the ability to
5    access the electronic docket of this case, even though it is
6    sealed?
7              MR. FARRAR:  The criminal case?
8              THE COURT:  You, sir, yes.
9              MR. FARRAR:  No, your Honor.
10             THE COURT:  Who does?
11             MR. FARRAR:  My understanding would be the clerk of
12   the criminal court.
13             THE COURT:  OK.  Fair enough.
14             So the release that was signed earlier in this
15   litigation would not cover or would not permit the Clerk of the
16   Court to produce this electronic docket of this information?
17             MR. FARRAR:  I've never specifically sought the
18   electronic information, but it's my understanding that it would
19   still apply.  If the entire court file can be obtained by a
20   release signed by the plaintiff or whoever was the defendant in
21   the criminal case, if that file can be obtained based on a
22   release from them, logic would follow that any computerized
23   records maintained by the same custodian would also be able to
24   be released.
25             THE COURT:  OK.  Thank you.
```

E6JKJENC

1          MS. ANTE:  I'm sorry, the criminal matter was pending

2     in Part F.  You would just go to the clerk of Part F and either

3     give the waiver, or you go to the Part F judge and have him

4     sign the unsealing order, or it may be a stipulation that all

5     parties agree that it can be...

6          THE COURT:  Before you sit down, these court notes, it

7     seems to me that to the extent that there's a directive from

8     the judge or so-and-so, you know, this attorney was present,

9     this attorney was present, I just don't see the work product --

10    how that becomes work product.  You're telling me it's fact.

11    So I am going to ask you again:  Is there nothing that can be

12    excised from the court notes and produced to the plaintiff?

13         MS. ANTE:  Can I have a moment?

14         THE COURT:  Please.

15         (Pause)

16         THE COURT:  I can understand the directive saying you

17    should watch out for this because the judge is concerned about

18    something or another, but a mere recitation of what happened,

19    I'm not sure that's your strongest claim for work product, and

20    I am not sure why that can't be produced.

21         MS. ANTE:  Your Honor, there are directives to do this

22    or to do that.

23         THE COURT:  From whom to whom?

24         MS. ANTE:  Some of them are from the assistant that

25    was assigned the case, and some of them have the writing of the

E6JKJENC

1     assistant that was in the court part at the date giving it

2     back -- what happened in the court back to the assistant, the

3     assigned assistant.

4              THE COURT:  Take what time you need to do this, but

5     you're telling me now that there are no summaries, no

6     recitations of fact that can be excised and produced to the

7     plaintiff?

8              MS. ANTE:  I could delete those things, your Honor.

9              THE COURT:  There is something you can give them?

10             MS. ANTE:  Yes, your Honor.

11             THE COURT:  OK.  Then, please, not right now, but

12    please give that to them.

13             MS. ANTE:  OK.

14             THE COURT:  Thank you.

15             Let me suggest this:  There are a number of issues

16    that have been raised today, and I wanted to think about them,

17    but I don't want to wait too long.  So can the parties get me a

18    transcript of this conference within the next week -- I wish

19    not to kill the court reporter -- and then I will very promptly

20    thereafter issue something deciding this.  And certainly if the

21    parties want to agree to some accommodation, I'm not going to

22    stop you.

23             But let me understand what comes next because this, as

24    I understand it, is the last thing in fact discovery.

25             Mr. Boyle, is that correct?

E6JKJENC

1          MR. BOYLE:  It's the last thing in fact discovery.  I

2     do have an application regarding expert discovery when we're

3     through with this.

4          THE COURT:  Oh, no.  Let's talk about it now.

5          MR. BOYLE:  Your Honor, I served a few days ago

6     Mr. Farrar the report of our neurological expert.  It was

7     untimely.  It was untimely for this reason:  The plaintiff saw

8     the neurologist on April 15th of 2014.  And this is -- and I

9     will also say this was my responsibility in the case.  Around

10    mid-May, I started getting pretty ill.  You probably can still

11    hear it in my voice.  I came down with first a viral, and then

12    a bacterial bronchial infection, and was laid up for a few

13    weeks and actually was with family in Florida.  I made a

14    mistake of before I was well, getting on a plane, that

15    proceeded to turn into a sinus infection, which I'm still

16    taking antibiotics for.  I had high fever for several days and

17    was basically out of commission.

18         I knew that this -- I was expecting this report, and

19    when I finally did get to the office late last week -- and I

20    have only been working full time this week -- I contacted the

21    doctor, and his office faxed me the report, and it looked like

22    it was sent to my old address, 299 Broadway, not 351 Broadway.

23         THE COURT:  Yes, which, by the way, is still your

24    address for ECF purposes.

25         MR. BOYLE:  And, you know, I tried -- actually, that's

E6JKJENC

1    a long story.  I tried to talk to the ECF clerk the other day

2    about that.

3              So this is why -- his report was dated a few weeks

4    ago.  This was why I didn't get it.  I spoke to Mr. Farrar

5    prior to today's proceeding.  He was going to leave it to the

6    discretion of your Honor.  But I did mention to Mr. Farrar,

7    should the City want their own expert, I could produce

8    Mr. Jenkins whenever that's available and whenever they can

9    arrange that, and would consent to any further -- consent to

10   their needs.  This was something that was totally my

11   responsibility.  I would ask the Court to consider.  It was

12   primarily because it was health related, and it was just

13   something I didn't get to in the mess that I was going through.

14             So it is --

15             THE COURT:  How late was it, sir?

16             MR. BOYLE:  It was about two and a half weeks late.

17             MR. FARRAR:  I believe in the last order, your Honor

18   had ordered expert discovery to close on June 3rd.  I got this

19   report yesterday from plaintiff's counsel.

20             THE COURT:  All right.  Let's start with the easy

21   question.

22             Mr. Farrar, do you object to this late disclosure of

23   an expert witness -- or expert witness report?  Excuse me.

24             MR. FARRAR:  I would note my objection.  Of course,

25   I'll defer to your Honor, and I would ask that should the Court

E6JKJENC

1    consider this, that we be offered an opportunity to examine the

2    plaintiff and conduct some additional discovery on this

3    subject.

4            THE COURT:  Let me hear -- I'm inclined, given the

5    recitation I've just received of why it was late, and given

6    that there's no sense that this was in any way strategic, or

7    malicious, or even underhanded, to let it go in late.  I don't

8    wish to prejudice you, and I'm not going to do that.  The

9    question is what are you contemplating in terms of additional

10   discovery?

11           MR. FARRAR:  Yes, your Honor.  I would need -- having

12   just received this yesterday, I would need a little bit more

13   time to consider that and discuss with my office about what

14   potential additional discovery we may be seeking.  But I can

15   say at this point, I think we would certainly want the option

16   to have Mr. Jenkins appear for a medical exam at some point,

17   and have those reports reviewed by potentially a defendants'

18   expert and reserve the right to reopen Mr. Jenkins' deposition

19   for purposes of this issue.

20           THE COURT:  How long a period of time are you seeking,

21   sir?  And don't be greedy.

22           MR. FARRAR:  Yes, your Honor.  I would probably need a

23   little more time just to figure out exactly how long all this

24   would take.  It's certainly not our intention to drag this out

25   any longer than needs to be.  I understand that there are

E6JKJENC

1     several steps that need to happen.

2             First, we would need to confer -- first, I would need

3     to confer with my office and find out exactly what type of

4     discovery we do intend to take.  Then we would need to

5     coordinate with plaintiff's counsel to create a date for

6     plaintiff to appear, and I don't know where -- I'm sorry, I

7     don't know where plaintiff is right now, if he can be

8     produced --

9             THE COURT:  He can be.

10            MR. FARRAR:  -- quickly.

11            MR. BOYLE:  He can be.

12            THE COURT:  Yes, he can.

13            MR. FARRAR:  And once he is examined, it will probably

14    take 30 days for an expert to get an expert report, at least in

15    previous cases.

16            THE COURT:  See, this is the trouble:  Did you have no

17    idea that this report was coming, sir, or is it simply that it

18    was late?

19            MR. FARRAR:  Well, plaintiff's counsel had previously

20    indicated they were considering an expert report.

21            THE COURT:  Exactly.  So I don't wish to give you what

22    I think you're asking for, which is like 60 days.  I was going

23    to give you a maximum of 30, so I was going to tell you to get

24    your expert now or decide in the next 24 hours whether you need

25    it, because I appreciate it's two, maybe three weeks late, but

E6JKJENC

1  you knew for some period before then that they were

2  contemplating having an expert.  It could not have surprised

3  you when the expert witness report came in.  Simply its

4  lateness, not its fact.  So I think you'll get 30 days and not

5  more than that.  And use it wisely, sir.

6          MR. FARRAR:  Yes, your Honor.  I would just add, when

7  the deadline had passed, and I hadn't heard from them -- and I

8  had made several attempts to contact plaintiff's counsel by

9  email to find out if they were still intending to proceed with

10  expert discovery -- having not gotten a response, I was a

11  little surprised to get the report yesterday.  But I understand

12  your Honor's point, and we will work as quickly as we can.

13          THE COURT:  All right.  Thank you.

14          What are --

15          MR. BOYLE:  Thank you.

16          THE COURT:  So assuming -- look, you'll get my

17  decision regarding the fact materials in about a week or so.

18  Expert witness discovery will close in about 30 days.  What are

19  the next steps?  Does either side contemplate dispositive

20  motion practice, or does either side contemplate a fruitful

21  settlement discussion, or should I just set a trial date?

22          Mr. Farrar?

23          MR. FARRAR:  Your Honor, we do contemplate a partially

24  dispositive motion and are prepared to proceed with that once

25  all -- any outstanding issues are resolved.

E6JKJENC

 1              With respect to settlement, we have been open and

 2      hopeful to try to reach a resolution in this case for a long

 3      time.  We remain willing to engage in settlement discussions.

 4      I haven't gotten any indication from plaintiff's counsel, at

 5      least not lately, that that's something that they would be open

 6      to, but I'm still hopeful that a resolution can be reached.

 7              THE COURT:  All right.  Stay there for just a moment.

 8              Mr. Boyle, what's up with settlement?  Do you not wish

 9      to?  Now that you're well, sir.

10              MR. BOYLE:  That would make me much better quickly.

11              Your Honor, we're always open, and it's a give -- I'll

12      be frank with the Court, and maybe -- it's a lot of

13      give-and-take with my client, and I would rather just not go

14      any further than that.  But those efforts will continue on my

15      end, and then I'm certainly amenable to any discussion with

16      Mr. Farrar.  It may be best, to show that it's moving along,

17      that any dispositive motion date be set, and if that happens,

18      at least that's moving along.

19              THE COURT:  Yes.  Are the parties in a position where

20      they could now -- and I hope the folks for my 2:30 will wait

21      just a few moments.  Can I have an understanding now of what

22      the parameters of your partial dispositive motion will be?  I

23      think I know, but I want to hear, and assuming that they are

24      what I think they are, I can dispense with my premotion

25      conference requirement and just build into the order I

E6JKJENC

1  ultimately issue in this case a schedule for summary judgment

2  motions.

3              So, Mr. Farrar, would this be on the issue of probable

4  cause, sir?

5              MR. FARRAR:  Yes, your Honor.  And particularly it

6  would be in regards to the parole violation that's at issue

7  here.  Much of plaintiff's incarceration damages are the result

8  of a parole violation, not as the result of these criminal

9  charges, and we would certainly move to remove those damages

10  from consideration at trial.  That's the main one I'm

11  contemplating at this point.

12             THE COURT:  Can you just explain to me with a little

13  more detail how you can distinguish between the damages

14  relating to the arrest in this case and the damages relating to

15  the parole violation?

16             MR. FARRAR:  Yes, your Honor.  After plaintiff was

17  arrested, shortly after his arrest, his parole officer filed

18  a -- I believe the term is a pre-violation report, something

19  along those lines, and plaintiff was -- there were essentially

20  charges -- it's a charging instrument for violating plaintiff's

21  parole.

22             A hearing was held before a state court judge, and

23  ultimately, it was determined that plaintiff did violate his

24  parole.  He, as a result, was incarcerated for a period of, I

25  believe, around three years as a result of that violation.

E6JKJENC

1   Plaintiff was on parole at the time regarding a conviction for,

2   I believe, manslaughter about 20 years prior to this incident.

3          THE COURT:  I'm sorry for requesting this

4   clarification, but the parole violation was found to be valid

5   irrespective of the progress or lack of progress of the

6   criminal action that is at issue in this case?

7          MR. FARRAR:  Yes, your Honor.  And we would argue that

8   as a result, that the parole violation, which is not being

9   contested in this lawsuit, was the reason for many of his

10  damages and his incarceration, not the arrest by the defendant

11  officers.

12         THE COURT:  OK.  Thank you.

13         And Mr. Boyle or Mr. Oliver, do you want -- if you

14  have a response to that, I'd be interested in it.  I certainly

15  understand, sir, that this may be the first you're hearing of

16  these arguments, so I won't expect the most detailed of

17  responses.

18         MR. BOYLE:  We have been aware of this issue, and

19  actually, I've done some preliminary research into it and have

20  several arguments as to why, notwithstanding -- and I think one

21  of the claims would be Heck versus Humphrey -- that that claim

22  does survive in this case.

23         THE COURT:  Oh, because of -- especially because of

24  the Poventud decision that just came out from the Second

25  Circuit en banc.

E6JKJENC

1            MR. BOYLE:  I think it's an interesting legal issue,

2     and it is a discrete one, if that's the only thing that's going

3     to be in their dispositive motions, but there are certainly

4     ways around Heck versus Humphrey, I believe, in this case which

5     we would address.

6            THE COURT:  Sir, just going back to your prior point

7     about dealing with your client, and I understand that that is a

8     relationship you wish to preserve and have happy, if and to the

9     extent that you need to tell him that you are before an

10    especially irascible, nasty judge, and that that will aid you

11    in resolving this case and thereby improving your health,

12    please do so, because it may be easier than the summary

13    judgment briefing schedule we're setting up and the summary

14    judgment practice we're all going to be embarking upon.

15           MR. BOYLE:  And I will certainly order the transcript

16    now, so I can cover this.

17           THE COURT:  All right.  I appreciate that.

18           Yes, Mr. Farrar.

19           MR. FARRAR:  Just very briefly to follow up as far as

20    the scheduling goes, and I appreciate Mr. Boyle's comments and

21    concerns with regard to settlement, however, to the extent that

22    that is still an option on the table -- and I hope that it

23    is -- I would ask that any settlement conference or anything of

24    that nature occur as soon as possible before additional

25    briefings take place and additional costs and expenses incur.

E6JKJENC

1          THE COURT:  I'm not disagreeing with you, sir, and I

2     think it should happen before you figure out what to do with

3     the expert discovery.  But the problem is, I can't make his

4     client want to have a settlement conference.  He needs to talk

5     to his client about whether it is an option that he's

6     interested in pursuing.

7          So know this:  When I set the schedule in the order

8     that I will eventually issue, I will keep that in mind and try

9     to have a little bit, although not too long a period, of a

10     cooling off period to allow the folks to consider whether this

11     is a possibility.

12          I will just tell the parties that to the extent you

13     would like me to participate in the settlement discussions as a

14     mediator or an objective third party, I am here.  To the extent

15     you would like the magistrate judge assigned to the case to do

16     it, that is absolutely fine as well, and I see that it is Judge

17     Peck.  So let me know, and within a day of your letting me

18     know, I can issue the order of referral.  And I can also -- if

19     it is appropriate and the parties want me to, I can place a

20     call to him personally to ask that this be moved up to sort of

21     the top of his docket because of the issues that you've just

22     raised with me.  I cannot guarantee that he will, but I can

23     certainly ask him nicely.

24          So just know that all of these things exist because

25     I'm not interested in the parties wasting their own resources,

E6JKJENC

1    and, more importantly, wasting mine if, ultimately, we're just

2    going to have a settlement.  And as I've said to someone

3    earlier in the day, I enjoy trials, I'm fine with trials, we

4    can have a trial, but if the parties ultimately are not going

5    to have one, then I question, and perhaps you question, whether

6    it is worth having all of these proceedings and all of this

7    work discovery-wise, motion practice-wise, only to get to the

8    same place we were going to be anyway.

9             So you all know that already.  I don't need to tell

10   you that.  You will have the transcript, you can show your

11   respective clients that, and I will just issue an order.

12   Probably right after I resolve the discovery issue, I'll try

13   and build that into the same order.

14            So is there anything that I am not discussing with the

15   parties that I should be?

16            Mr. Boyle?

17            MR. BOYLE:  No.  Thank you, your Honor.

18            THE COURT:  Mr. Farrar?

19            MR. FARRAR:  No.  Thank you, your Honor.

20            THE COURT:  And, Ms. Ante, thank you very much.

21            Could you please leave with me the materials that we

22   were talking about in the first part of our conference?  I

23   don't think I need to see the notes because you've already

24   identified things that can be produced to Mr. Boyle, but I'd be

25   interested in the materials that you believe are subject to the

E6JKJENC

1   grand jury privilege and to work product.

2          MS. ANTE:  Yes, your Honor.

3          THE COURT:  All right.  Thank you.  And we will get

4   them back to you promptly.

5          MR. BOYLE:  Thank you, your Honor.

6          THE COURT:  Thank you very much.

7          MR. FARRAR:  Thank you.

8                              *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25