FC7JJEN1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    NORMAN JENKINS,

4                   Plaintiff,

5            v.                            13 Civ. 03405 KPF

6    NEW YORK CITY POLICE
     DEPARTMENT, et al.,
7
                  Defendants.
8
     ------------------------------x
9
                                          December 7, 2015
10                                         9:10 a.m.

11

12   Before:

13                  HON. KATHERINE POLK FAILLA,

14                                         District Judge
                                            and a jury
15

16                        APPEARANCES

17   ROBERT J. BOYLE,
     GIDEON ORION OLIVER,
18   ABRAHAM J. HASSEN,
          Attorneys for plaintiff
19
     MICHAEL A. CARDOZO,
20   Corporation Counsel for the
     City of New York
21        100 Church Street
          New York, New York  10007
22   DANIEL LOUIS PASSESER,
     TAVISH CORYELL DeATLEY,
23        Assistant Corporation Counsel

24

25

FC7JJEN1                         Trial

1           (In open court; jury not present)

2           (case called)

3           MR. BOYLE:  For the first time here I want to

4    introduce Abraham Hassen, who is admitted to New York State

5    Bar, not yet admitted to the Southern District.  With the

6    court's permission, may he sit at counsel table and assist us

7    during the trial?

8           THE COURT:  Mr. Hassen, thank you and good morning to

9    you.  Mr. Jenkins, good morning to you.

10          MR. JENKINS:  Good morning.

11          THE COURT:  Good morning to each of you.

12          I have a couple of loose ends that I thought I'd do

13   while the jury was seeing their video on jury service.  So I

14   received some materials from the parties towards the end of

15   last week, and let me try and address them in the order in

16   which I received them.

17          There is a question about the cross-examination of

18   Ms. Hamilton, and so I think, Mr. Boyle, I understand the

19   position of your letter -- yes, it is submitted by you.  I was

20   wondering if I could hear from Mr. DeAtley because it was your

21   letter in response, sir.  I guess what I would like to

22   understand, sir, how much you plan or think you're delving into

23   the elements of the offense.

24          MR. DeATLEY:  We simply want to ask Ms. Hamilton

25   whether or not intend to defraud, deceive or injure is an

FC7JJEN1                          Trial

1   element of criminal possession of a forged instrument.  That is

2   it.

3            THE COURT:  If and when she says, "I don't know"?

4            MR. DeATLEY:  Then we'll move on.

5            THE COURT:  Okay.  All right.  I will allow that one

6   question.

7            MR. DeATLEY:  Thank your Honor.

8            THE COURT:  On the issue of the IAB substantiated, not

9   so substantiated, unclear discussions, I did receive from the

10  city information indicating with greater granularity how that

11  particular IAB investigation shook out and as to whom certain

12  claims were found substantiated and certain claims were found

13  unsubstantiated.  I then received from plaintiff's counsel,

14  Mr. Oliver, in particular, a letter, dated December 4th, which

15  was submitted to me under seal.  I don't even know, was it

16  submitted to the other side?

17           MR. OLIVER:  Yes, your Honor.

18           THE COURT:  It was under seal because of the nature of

19  the statements made therein?

20           MR. OLIVER:  Yes, your Honor.

21           THE COURT:  I could hear from the parties on this if

22  you like me to.  I think I understand the positions.

23           Mr. Oliver, if there is anything I am missing you want

24  to tell me now, I will happily hear from you, sir.

25           MR. OLIVER:  I doubt there is.

FC7JJEN1                        Trial

1          THE COURT:  Mr. DeAtley or Mr. Passeser, if you want

2   to add anything to what you said to me previous, that is fine.

3          MR. DeATLEY:  We reiterated on claims substantiated as

4   to Officer Charles, based on your Honor's previous order, we

5   follow the same guidelines your Honor issued.

6          THE COURT:  Having thought about this, I am sticking

7   with my prior decision because while I was interested in the

8   materials contained herein.  I think they're still a little

9   attenuated for me to have some finding made as to Officer

10  Charles.  There is no direct allegation of his misconduct.

11  There is no jury finding of his misconduct.  I don't think I am

12  in any different position than I was with respect to the

13  information I heard from the city.  So I will deal with it in

14  that way.

15          Let me hear a little bit from Mr. Boyle, this was in

16  the second part of your letter to me -- no.  Let me look at it.

17  Maybe it is Mr. Orion.  Mr. Gideon Orion Oliver, I enjoy the

18  name.  Are you going to speak to me on the issue of force

19  performance monitoring?  You cited Judge Trager's decision to

20  me.

21          MR. OLIVER:  That was directly before the defense

22  counsel provided further information about force monitoring

23  which I hadn't had before.

24          THE COURT:  Exactly.  What I would like to know is now

25  that you and I have that additional information, what is the

FC7JJEN1                          Trial

1    plaintiff's view regarding those questions?

2              MR. OLIVER:  Well, your Honor, I think our position is

3    that we would like to be able to cross-examination the

4    defendants about being put on Level I force monitoring.

5              THE COURT:  No.  Which of them precisely were placed

6    on it?

7              MR. OLIVER:  I think all three of them were placed on.

8              THE COURT:  I didn't think all three had three

9    complaints in the one-year period.  Mr. DeAtley or Mr.

10   Passeser, perhaps you agree or disagree?

11             MR. DeATLEY:  Sergeant Ruiz was on Level I force

12   monitoring from October 13, 2009 to October 21, 2010.  Officer

13   Charles was on force monitoring February 4, 2011 to February 4,

14   2012.

15             THE COURT:  Mr. Oliver, with that in mind, let's talk

16   a little bit more about your thoughts.

17             MR. OLIVER:  We would like to be able to ask

18   defendants Ruiz and Charles limited questions about force

19   monitoring, the force monitoring; when were they placed on, why

20   were they placed on force monitoring, and I think that would

21   really be as far as we would want to go.

22             THE COURT:  Do you read from the policy that it's a

23   sheer question, simple question of number?  Whether the

24   complaints are substantiated or unsubstantiated?

25             MR. OLIVER:  I think that is true, your Honor.  I

FC7JJEN1                        Trial

1    think that is true, yes, that is how I read the policy.  It

2    doesn't have to do a substantiation or lack of substantiation.

3    I also note defendant Ruiz was on force monitoring at the time

4    of the incident, to the extent that might matter to the court?

5              THE COURT:  Keep going.

6              MR. OLIVER:  Well, to the extent that part of our

7    argument is that the information is relevant in terms of motive

8    and intent, the fact that the defendant Ruiz was on force

9    monitoring at the time of the incident would go into,

10   potentially go into motive and intent.  I think that is our

11   position.

12             THE COURT:  Thank you.

13             Mr. DeAtley or Mr. Passeser, what did it mean for

14   Officer Ruiz to be on force monitoring at the time of the

15   incident if, indeed, he was on force monitoring at the time of

16   the incident?

17             MR. PASSESER:  He wasn't on force monitoring.

18             Level I force monitoring is that there is a

19   communication between the commanding officer and the officer

20   being placed on monitoring.  They develop a plan.  It is not

21   always the same plan.

22             THE COURT:  Let's let our visitors have a seat.

23             (Pause)

24             MR. PASSESER:  I don't know the details of this

25   particular plan.  It is different in every case.  What it means

1    is the commanding officer takes an interest in the officer and

2    watches them and evaluates them according to a plan they

3    develop together.

4              THE COURT:  I am going to think about this one a

5    little bit more.  I do have a little bit of time this morning

6    to do that.  Let me raise a few more housekeeping measures with

7    the parties.  I feel better prepared for trial when I actually

8    prepare for trial, and so this weekend I read the depositions

9    of the witnesses and I read through all the parties' exhibits.

10             With respect to the exhibits issue, I wanted to note

11   just a few things.  I am sure the parties see this already, but

12   there is, for example, the duplication with respect to the

13   medical records.  I did not know if perhaps whoever introduces

14   their record in first, the other side might not just use that

15   particular designation.  Maybe one is a subset of the other,

16   but I thought they were largely co-extensive.  Think about

17   that.  I won't make you --

18             MR. BOYLE:  We spoke about it.

19             THE COURT:  You have had discussions without me

20   present?  That is fantastic.  What was the result of that?

21             MR. BOYLE:  We agreed -- and please correct me -- only

22   one set needs to go in.  In fact, in the confusing way it was

23   produced to plaintiff, the defendants' exhibits are better

24   organized in that way and we may do it on our case, but we may

25   say marked as -- I don't know how the court would do it in that

1    way.  We would have only one set would come in.  It would be

2    the way the city put them together.

3              THE COURT:  I tell the jury at the end it doesn't

4    matter who marked the exhibit, it doesn't matter who called the

5    witness.  I can say that same thing.  If it turns out you're

6    introducing a defense exhibit and it looks a little

7    incongruous, that is not a big deal.

8              Another question.  Do the parties agree on the issue

9    of authenticity or authentication of each of the exhibits?  Not

10   admissibility.  The more fundamental issue is if something is

11   supposed to be a medical record from a particular place, if

12   something is someone's notebook?  Are the parties agreeing

13   about authentication?  I ask this because that might

14   short-circuit some of the questions.  You don't have to ask

15   questions about who wrote it.

16             So I just wondered if the parties had talked about

17   that?  If you haven't, then perhaps you can while we are

18   waiting for the jury to come down.  There is a larger question

19   about admissibility.  It would not surprise me to learn the

20   parties have a dispute about admissibility of certain

21   documents.  That is why I am not asking that question.

22             I will note this, though.  You will deal with it as

23   you see fit.  This is one girl's view, if you will.  Some of

24   the exhibits that were presented to me contained information in

25   them that I understood to be the subject of in limine motions.

FC7JJEN1                          Trial

1            If you want that, if that information is in that

2    exhibit because that exhibit is there and marked to show a

3    witness, to refresh a witness's recollection or for some other

4    reason, perhaps to impeach a witness, that is great.  All I am

5    saying is, we had some pretty thoughtful discussions about why

6    certain things shouldn't be mentioned.

7            I am seeing references to them in the documents.  So

8    if that is what you want, that is fine.  If that is what you

9    don't want, please get out a black pen sometime between now and

10   the introduction of the exhibit.

11           I will ask the parties, perhaps one of you is going to

12   be handling jury charge issues.  You should understand that we

13   are trying to get together questions for the qualified immunity

14   portion, if there is a qualified immunity portion.  Please send

15   me your thoughts on that sooner rather than later.  Not now, of

16   course.

17           I have some things germinating, but I don't have it

18   completely done.  My charge is largely complete, but there are

19   a few questions I have, and we might start with that now.  I

20   just wanted you to be aware what I don't have done is the

21   qualified immunity portion, and I don't think we want to be in

22   a situation, if we are at that stage, where we are doing it on

23   the fly.  You guys may do very well on the fly.  I do better

24   again with a little bit more preparation.

25           Mr. DeAtley, you are the person from the city who gave

1    me the requests to charge.  That may have been when you were

2    doing this trial solo.  Are you still handling legal issues

3    relating to it, sir, or is it now Mr. Passeser I should talk to

4    about this?

5              MR. PASSESER:  We will be handling together.  You can

6    talk to either of us about it.

7              THE COURT:  While we are here and since we do have a

8    few moments, remain standing and let me talk to you about a few

9    things, sir.

10             With respect to the issues of things like malicious

11   prosecution, denial of fair trial and false arrest, I believe

12   that there are certain things that the parties are in agreement

13   on.  For example, there was, in fact, an arrest.  On the

14   malicious prosecution, I think the parties -- maybe they're

15   not, but there is a agreement on favorable termination?

16             MR. PASSESER:  No, there is not, your Honor.

17             THE COURT:  Fascinating!  Why not?

18             MR. PASSESER:  Plaintiff has a burden to put in

19   evidence and so the charge --

20             THE COURT:  The charges were dismissed on motion of

21   the District Attorney.

22             MR. PASSESER:  Our position is that that is not enough

23   information in itself to sustain a favorable termination.

24             THE COURT:  Will you indulge me for a moment while I

25   look at my elements.  Sir, can I understand, please, when we

1    talk about false arrest, because let me begin at the beginning,

2    that is the first of these.  What I typically am told by the

3    parties is that there are certain charges that could have been

4    satisfied by the conduct and the evidence is going to come in

5    at trial.  So I understood them to include the things for which

6    the arrest record, the arrest report mentions.

7           I guess what I am trying to figure out is, is trespass

8    in or out?  Because I did not believe it was in your charge or

9    it wasn't in both places.  Is that being proffered as a basis

10   for his arrest?

11          MR. PASSESER:  Yes.

12          THE COURT:  And obstructing governmental authority?

13          MR. PASSESER:  Yes.

14          THE COURT:  Criminal possession of a controlled

15   substance?

16          MR. PASSESER:  Yes.

17          THE COURT:  Criminal possession of marijuana?

18          MR. PASSESER:  Yes.

19          THE COURT:  "Resisting arrest" I wouldn't have thought

20   because that wouldn't justify the initial arrest.

21          MR. PASSESER:  There would be a Townes issue.

22          THE COURT:  Yes.  Is that what you want to have?

23          MR. PASSESER:  Unless I am mistaken, I think it is

24   resisting a lawful arrest which is illegal.  If there is no

25   other offense, I don't think we are going to get it on

FC7JJEN1                          Trial

1    resisting arrest.

2                THE COURT:  I think what I am doing is thinking about

3    other cases I have had with the city.  The resisting arrest is

4    something that is identified in the malicious prosecution

5    section of the case, but not as the actual basis for the

6    arrest.  So I understood you to be using those other four

7    charges as the bases for the probable cause to arrest him that

8    evening.  Is that your understanding as well?

9                MR. PASSESER:  Yes.  There is an additional attempted

10   aggravated assault on a police officer.

11               THE COURT:  Where is that in your charge?

12               MR. PASSESER:  We just came up with that.

13               THE COURT:  When were you going to tell me that was a

14   basis?

15               MR. PASSESER:  Right now.

16               THE COURT:  A little late, no?

17               MR. PASSESER:  Understood.

18               THE COURT:  What do you think?

19               MR. PASSESER:  Attempted assault on a police officer.

20               THE COURT:  Attempted?

21               MR. PASSESER:  -- assault on a police officer is

22   already in there.  We were adding the attempt element.

23               THE COURT:  We'll see.  Okay.  All right.

24               Moving then to the question of malicious

25   prosecution --

1            MR. BOYLE:  Could I be heard on that?

2            THE COURT:  Yes, Mr. Boyle.

3            MR. BOYLE:  In none of the arrest reports is the

4     charge of obstructing governmental administration.  That is not

5     what was alleged in any of the arrest reports or even in the

6     felony complaint.  I don't think at this late stage they can

7     simply add that charge.

8            THE COURT:  I understood it to be in the deposition,

9     sir.  I understood that to be one of the bases identified in

10    the depositions.  That is where I got it from.

11           MR. BOYLE:  From one of the officers?

12           THE COURT:  That's correct.

13           MR. BOYLE:  That was not an arrest charge in the

14    arrest report.  It is an afterthought.  I don't think they can

15    come up with an afterthought to justify something that happened

16    previously.

17           THE COURT:  My understanding of the false arrest law

18    is that it doesn't have to be something that was identified at

19    the time and it doesn't even have to be something that was in

20    the contemplation of the officers.  It has to be something that

21    amounts objectively to probable cause for an arrest.

22           MR. BOYLE:  I would also note they never put in their

23    requests to charge that they submitted to the court an

24    obstructing of governmental administration charge to the jury.

25    Here we are ready to start trial and it is prejudicial to the

FC7JJEN1                          Trial

1   plaintiff now to have to meet that.

2           THE COURT:  I will consider what you've just said.

3   Again I saw that in the deposition testimony.  Perhaps I am

4   misremembering that.

5           MR. BOYLE:  There is no question it is in.  I believe

6   it is now Sergeant Ruiz's or Agate's deposition testimony.

7           Ruiz was asked what could he possibly be arrested for

8   at this point, and that was proffered.  In the request for a

9   jury instructions, there is no stated basis of obstructing

10  governmental administration as a grounds for the arrest.

11          THE COURT:  May I ask how it prejudices the plaintiff?

12          MR. BOYLE:  Just in terms of strategy and in terms of

13  what was going to be the approach to the case.  There is

14  certain theories and, in fact, one of the problems in preparing

15  here was well, what was the initial basis for the stop and for

16  the arrest?  When we were putting in a charge, what are they

17  going to say is the basis for it?

18          I certainly would want to -- so I think it is

19  prejudicial in that basis, and certainly we would want, if the

20  court is inclined to allow that, as a basis to put in our own

21  charge on that issue or our own requests for charge on that

22  issue.

23          THE COURT:  Can you send that to me, get that to me by

24  tomorrow morning?  Not today.  The charge, it is just one

25  little paragraph, is it not?

1          MR. BOYLE:  It is a stated basis for the arrest.  We

2     have to go back.  The answer to the question is yes, we'll get

3     something to the court as soon as we can.

4          THE COURT:  As you're doing that, I will want to know

5     what you said regarding the prejudice.  I don't want to be in a

6     situation where I further prejudice you, as it were, by telling

7     you later than now that I am letting it in.  I am thinking

8     about whether I am going to let it in.  I am not thrilled these

9     two bases have been identified for me this morning.

10         I want to think about whether it is appropriate to let

11    it in.  I am sorry to the extent this results in extra work for

12    you, although I hope it is not a lot.  I want you to be in a

13    position to have a charge for me if I decide to let it in.

14         MR. BOYLE:  That would be both on the obstructing

15    governmental administration and attempted assault?

16         THE COURT:  Yes.  The attempted assault I don't know

17    is that much different than what is in here already and we sort

18    of knew about, but yes.

19         MR. BOYLE:  There is also an issue with respect to the

20    assault and attempted assault, which of the officers Mr.

21    Jenkins alleged to have assaulted and attempted to assault.

22         In other words, there is this -- I know the court has

23    now read everything -- there is this initially, allegedly

24    initial interface.  Now this is the officers' version of the

25    events.  This is an interface where Mr. Jenkins allegedly

FC7JJEN1                        Trial

1   pushes Officer Ruiz.  Is that the attempted assault?  Or is it

2   in the course of the ensuing scuffle, as it were?  I think we

3   should be able to, in terms of trying our case, know what is

4   their theory.

5                THE COURT:  Fair enough.

6                Mr. Passeser, is the attempted assault on Officer Ruiz

7   and no one else?

8                MR. PASSESER:  The first attempted assault would be on

9   Officer Ruiz, yes, that shove.

10               Then in the course of the struggle, I think if it is a

11  sufficiency of the evidence issue, we are going to have to wait

12  for the charge conference.  There will be evidence he assaulted

13  all three police officers.

14               THE COURT:  Here is my question.

15               The other assaults I understood to have taken place in

16  the course of attempting to subdue him to arrest him.  To me it

17  is on the same plane as resisting arrest.  In order to get the

18  probable cause to arrest him in the first instance, you're

19  limited to Officer Ruiz.  Do you disagree?

20               MR. PASSESER:  Yeah, I think that is right, your

21  Honor, yes.

22               THE COURT:  Mr. Boyle, if I am letting it in, that is

23  how I am letting it in.

24               MR. BOYLE:  Thank you, your Honor.

25               THE COURT:  Let me then please proceed to the issue of

FC7JJEN1                          Trial

1  malicious prosecution.  On the issue of the commencement or

2  continuation of a criminal prosecution against the plaintiff, I

3  think I know how things are going to shake out.  On the issue

4  of termination of proceedings, you have told me that is not

5  something -- absence of probable cause, that is something you

6  dispute.

7          Existence of malice, that is something you dispute.

8          Deprivation of liberty, do you dispute that, sir?

9          Let me be clear because it is two pieces.  I

10  understand he will say it is as well the parole hold and his

11  incarceration on the parole violation.  Separate and apart from

12  that, I am understanding one of the reasons Ms. Richman is

13  going to testify is tell us he was required to come back to

14  court repeatedly over a period of months.  I understood that

15  actually satisfies the deprivation of liberty component.

16          Are you agreeing with the plaintiffs as to none of

17  these elements, sir?

18          MR. PASSESER:  I am not sure off the top of my head.

19          If he came back, was required to come back to court on

20  criminal charges before his parole was revoked, if he was, then

21  I think that is deprivation of liberty.

22          THE COURT:  Okay.

23          MR. PASSESER:  From the point his parole is revoked, I

24  don't think there is additional deprivation of liberty to come

25  to court.  He is already incarcerated at that point.

FC7JJEN1                          Trial

1          THE COURT:  On the issue -- that is the question -- on

2     denial of fair trial, I presume again you're agreeing on

3     nothing?

4          MR. PASSESER:  As far as I understand it, the denial

5     of right to fair trial is we falsified evidence by planting

6     drugs on the plaintiff, which we dispute.

7          THE COURT:  I also understand it is the question of

8     providing false information to Assistant District Attorney

9     regarding the assault, regarding possession of cocaine,

10    regarding possession of marijuana and regarding the resistance

11    or not of the arrest.

12         MR. PASSESER:  Our position is that legally the

13    officers' testimony cannot suffice for denial of right to fair

14    trial.  It has to be fabricated evidence, the drugs in this

15    case.

16         THE COURT:  The recent run of Javanovic decisions,

17    doesn't that suggest that simply giving false information -- if

18    it is found to be false -- to the ADA which is then used to

19    influence in some way the progress of the prosecution, wouldn't

20    that count as well?

21         MR. PASSESER:  There are cases that hold that.

22         There are also cases that agree with us, and Judge

23    Gleason in the Eastern District has a decision that says in sum

24    and substance, the criminal complaint would never come in at

25    the criminal trial because it is hearsay.  The officers'

1  testimony in the grand jury or otherwise is immune under

2  absolute immunity.  Therefore, the only way you can actually

3  have denial right to fair trial claim is if you fabricated

4  physical evidence.  That is our position legally.  If the court

5  disagrees with us, so be it.

6         THE COURT:  I am not sure I agree or disagree.  I am

7  not sure it is articulated in your request to charge to me in

8  that fashion.

9         MR. PASSESER:  Yes, your Honor.

10        THE COURT:  We'll have to see about that.

11        Mr. Passeser, the plaintiffs have included in the

12  proximate cause element of the denial of fair trial claim a

13  statement about -- I understand why they did this.  I am

14  inclined to include it -- the fact that there was a deprivation

15  of liberty; namely, the parole incarceration, they argue, was

16  proximately caused by the arrest and by the statements made by

17  the officer defendants in this case.

18        I am inclined to put it in there on a theory of the

19  case idea.  When you see the charge, I will allow you -- I will

20  not have one side's position.  You will get a sentence in

21  response.  I want you, if you want to tell me now what that is,

22  fine.  I suspect you want to think about it when you see this.

23        Correct, sir?

24        MR. PASSESER:  Correct.  I anticipate that will be the

25  subject of a Rule 50 motion.

1          THE COURT:  Yes, I think it will.

2          Then that is all I have in terms of notes of myself on

3     the charge.  What I will try to do is take into account what we

4     have talked about today.  I would like to get the charge to the

5     parties tomorrow morning because while I know -- I may not be

6     able to.  I am going to try -- I know there is a school of

7     thought you just give the litigants the charge 30 minutes

8     beforehand, give them a chance to read it.

9          I care more that this charge is correct than I care

10    about you guys seeing it for 30 minutes or three days.  It

11    would be my hope that you're not going to engage in

12    wordsmithing and actually tell me what is wrong with it.  That

13    is the plan.  That is why I am giving it to you so early so I

14    can have better commentary on it.  That is all I have in terms

15    of housekeeping.

16          Is there anything the parties want to raise to my

17    attention this morning before we get the jury panel?

18          MR. BOYLE:  Is the court going to address some of the

19    exhibits issue now or wait until later?

20          THE COURT:  I guess my issue is that I don't know

21    whether these exhibits are all designed to be introduced at

22    trial and shown to the jury.  I will give you  for instance.

23    The parole records contained in the plaintiff's exhibits, there

24    are references to the plaintiff's prior conviction.  I didn't

25    think he wanted that to be shown to the jury.  That is what I

1    was saying earlier.

2              MR. BOYLE:  One of the things I did this weekend was

3    actually take the old fashioned correcting tape and made some

4    of those redactions both in some of the parole records and I

5    believe in the arraignment transcript where there was a

6    reference to it already.  I did some of that and made

7    additional exhibits.  Obviously, I did not intend that to go to

8    the jury.

9              THE COURT:  That was my question.  I assumed as much,

10   but I just figured I would ask.

11             Sir, I know you don't want to give away your theory of

12   the case so soon, but I wanted to understand a little bit

13   better because it hasn't happened in my other cases.  What is

14   Ms. Richman going to testify to?

15             MR. BOYLE:  Several things.  She, first of all, she

16   was summoned to represent Mr. Jenkins at the arraignment.  She

17   saw him.  She will testify as to her observations of him, his

18   injuries, and she also then went in front of the court and made

19   a record in front of the court, with Mr. Jenkins present,

20   saying, "Judge, look at his head, look at his hands, look at

21   the blood," which I believe laid a foundation for admission of

22   the transcript itself of the arraignment as a present

23   sense-impression.

24             She is relating what she is observing at the time that

25   she is, in fact, observing it.  So we would use her for that.

FC7JJEN1                        Trial

1    She also represented him throughout the course of the criminal

2    case and represented him at Parole.  To the extent that

3    favorable termination is an issue here --

4                THE COURT:  Apparently it is, yes.

5                MR. BOYLE:  -- and we reserve our right also at a Rule

6    50 time to not have that go to the jury, that particular

7    element of the offense.  Ms. Richman will testify to the course

8    of those proceedings and what she understood to be the motion

9    of the D.A. to dismiss.  That is what we expect her to testify

10   about.

11               THE COURT:  I understand, and that makes complete

12   sense to me.  The one question I had, sir, some of the letters

13   that are prepared to be introduced, I don't know whether they

14   are for her or for the jury.  I am looking at Exhibits 27 and

15   28.  They contain, to my mind -- well, she is having

16   discussions and understandable discussions with the District

17   Attorney about her view as to the case and their view as to the

18   case.  I didn't know how they were coming in.

19               MR. BOYLE:  Now addressing to Exhibit 28 which also

20   would incorporate Exhibit 10, in her letter of May 24th, 2010,

21   Ms. Richman informs the District Attorney that after

22   Mr. Jenkins' arraignment in court, she went back to the pens to

23   speak with him.  He then handed her his wallet which contains

24   his identification and a lot of other personal papers,

25   Metrocard, family pictures, and so forth and so on.

```
 1                  There is an issue here about the planting of the drugs
 2        and how the search at the scene took place, and without going
 3        too much, I think it is relevant that he had this on his person
 4        after that search is relevant.  In terms of it coming in, she
 5        will testify as to her interactions with Mr. Jenkins, and I
 6        expect that I will show her -- we only have photocopies -- the
 7        contents of the wallet and we would seek to introduce the
 8        contents of the wallet, not necessarily the letter.
 9                  If it becomes an issue in the case as to whether that
10        information was transmitted to the District Attorney, we would
11        certainly reserve our right to introduce the letter, Exhibit
12        28, that is.
13                  THE COURT:  I understand that.  The other side is
14        aware as well.
15                  Then I saw 29 is the retention letter.  I understand
16        why that would be coming in.  That was my question because I
17        certainly want her, she is permitted to testify about her
18        first-hand observations and the information she received in
19        terms of the materials she received and what she transmitted to
20        the District Attorney for reasons that you and I have just been
21        talking about.  I just didn't want her to become a vehicle for
22        basically "me too-ing," everything that Mr. Jenkins had told
23        her.
24                  MR. BOYLE:  I will be careful about not seeking to
25        have her testify about anything Mr. Jenkins told her.
```

FC7JJEN1                    Trial

1          THE COURT:  Attorney-client privilege and all of that.

2          MR. BOYLE:  All of that kind of poo-poo stuff.

3          THE COURT:  I understand.

4          So, sir, that was the evidentiary issues I had.  Are

5      there things the parties want to talk about now or first talk

6      between yourselves and figure out what it is you disagree with

7      and let me know?

8          You can also do that tomorrow morning, which is when I

9      think this stuff will perhaps have more immediacy.  I can do

10     whatever at this point.  Have you spoken with your adversaries

11     about the exhibits that are proposed?

12         MR. BOYLE:  I think we had a valiant attempt.  We

13     didn't reach much agreement.  I think in the pretrial order

14     under the plaintiff's exhibits, which there are many, many

15     which would be disputed which I knew it is not an issue.  It

16     becomes whether -- and I don't want to speak for counsel --

17     they had questions about relevance and maybe hearsay and so

18     forth within the documents themselves.

19         I don't think there is a dispute, for example, that

20     the documents in Exhibit 19, which is the parole file are, in

21     fact, from Parole in terms of being authentic, or the criminal

22     court complaint, the felony complaint, we agree that is the

23     felony complaint.  The issue is --

24         THE COURT:  Is it relevant?

25         MR. BOYLE:  -- is it relevant?  I don't want to speak

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FC7JJEN1                        Trial

1   for the other side.

2                THE COURT:  I will let them talk.

3                May I ask this, sir.  The hospital records, who is

4   getting them in?

5                MR. BOYLE:  I believe there is no issue as to

6   authenticity of the hospital records.

7                THE COURT:  As to authenticity, right.  I am

8   questioning about admissibility.  I didn't know who was going

9   to say these were prepared in the ordinary course of business

10  and it was the ordinary course of business to prepare these

11  records.  Perhaps the parties both want them in, and that is

12  fine.  I was trying to figure out who was going to be the

13  person through which these records were admitted.

14               Yes, Mr. Passeser?

15               MR. PASSESER:  I think they're certified.  There is a

16  certification that comes with the record.

17               THE COURT:  You're fine with that?

18               MR. PASSESER:  There is no dispute.

19               THE COURT:  You're saving me the trouble.  Thank you.

20  Mr. Passeser, let me ask you a few more questions.

21               You have just heard Mr. Boyle and I talking about some

22  of these exhibits.  Do you want to talk now about your

23  objections to them, sir?

24               MR. PASSESER:  No.  Mr. Boyle is correct, it is not

25  really about authenticity as far as the exhibits go.  It is

1    more how they're used and introduced.  A lot of them contain

2    hearsay, and I am not sure the purpose for which Mr. Boyle

3    intends to admit them right now.  I don't know if it will be

4    admissible or not.  I don't know how much progress we are going

5    to make talking about it right now.  We have to see how it is

6    being used.

7            THE COURT:  Please understand I want to keep sidebars

8    to an absolute minimum and I don't want the jury's time to be

9    wasted, for lack of a better term.  It is not because obviously

10   resolution of these issues is important.  I don't want them

11   waiting unnecessarily.  I appreciate your efforts to try to

12   work it out.  It would be nicer if you could succeed in working

13   it out.  I do understand.

14           MR. BOYLE:  There are some and not many which we would

15   like the opportunity to address whether it is today or tomorrow

16   morning because I think if we need to call a witness, for

17   example, on the parole documents, if we need to bring in

18   Mr. Watkins, and I have theories as to why, and I have an

19   argument why we don't need a witness to do it, but that is one

20   of the things I think we could address ahead of time rather

21   than waiting for the actual witness.

22           THE COURT:  Am I correct that Mr. Watkins is going to

23   be a witness for the defense in this case?

24           MR. PASSESER:  No.

25           THE COURT:  I thought he was.  We had this discussion

FC7JJEN1                    Trial

1    about Sergeant Lubrano and Mr. Watkins.  For lack of better

2    term, we split the baby, and Sergeant Lubrano was taken off the

3    witness list and Watkins is not.  Is he off the list?

4            MR. PASSESER:  Subsequent to that conference --

5            THE COURT:  You were going to tell me this when?

6            MR. PASSESER:  -- the order for a deposition for

7    officer Watkins.  We offered plaintiff's counsel to never mind,

8    we don't need to call Mr. Watkins.  We were informed by the

9    plaintiff's counsel they were intending to call officer

10   Watkins.  I believe he will be a witness for plaintiff.

11           THE COURT:  Is it your contemplation, Mr. Boyle, these

12   documents will come in through him?

13           MR. BOYLE:  They could or we believe we could offer

14   them, being that there is no issue as to authenticity and that

15   they are public records pursuant to 803 (8), they could come in

16   even without a witness.

17           THE COURT:  Except for this.  The very first thing,

18   the parolee chrono report, that is a public record?

19           MR. BOYLE:  The Division of Parole is a public agency.

20   803 (A) I believe the first subdivision says activities of the

21   agency.  That is certainly a record of the activities of the

22   agency, not necessarily all of the activities in the chrono

23   report, but certainly a few of them.  For example, there is

24   references to a discussion, and I guess we are having this

25   discussion now?

FC7JJEN1                         Trial

1              THE COURT:  Yes, sir.

2              MR. BOYLE:  There are references to discussions

3       between Mr. Peart, P E A R T, and Mr. Watkins which are

4       memorialized in these documents.  These are both people from

5       the Division of Parole.  We are not talking about third-party

6       statements made to an agency where they say okay, as a result

7       of this arrest, we have to violate Mr. Jenkins.  That is in the

8       chrono report.

9              It is also in, and I think I have a stronger argument

10      for admissibility on it, Exhibit 19, there is a Bates stamp at

11      the bottom of Defendants' 303, this was a document which was

12      submitted in opposition to the motion for the summary judgment

13      which initiated the parole warrant, violation of parole

14      proceeding and has reasons for recommended action, and it says

15      the new arrest.

16             THE COURT:  I am just saying I perceive a difference,

17      and perhaps I need to do more research on this, between

18      documents of this type, of this page you are now showing me,

19      303 and both the chron, computer chronology at 273, and the

20      handwritten notes that are later on in this exhibit.

21             I am not sure "public records" extends to the

22      handwritten notes and the analysis.  Perhaps it does.  I don't

23      know.  I don't know enough about them.

24             MR. BOYLE:  We would like to submit authorities and

25      revisit this tomorrow because I have done a little bit of

1    research on the issue.

2              THE COURT:  That would be very helpful to me.  Mr.

3    Passeser, you're standing?

4              MR. PASSESER:  One more thing.

5              Apart from the hearsay issue, I think a lot of these

6    documents are likely to confuse the jury.  They are confusing

7    to us, and especially the handwritten notes, I can't read most

8    of them.

9              THE COURT:  I didn't have a problem reading them.  Let

10   me understand how they're confusing.

11             Am I correct that these handwritten notes are the

12   notes of the individual who made the recommendation that Mr.

13   Jenkins' parole be revoked and restored?

14             Is this the recommendation that was not accepted by

15   the board?

16             MR. PASSESER:  I am referring to Defendants' 311.

17             THE COURT:  I am looking at 336.  Let me turn to 311

18   then.  Those notes, I agree, are somewhat confusing.  I am

19   talking about 336, sir.

20             MR. PASSESER:  Right.  That I am not -- as far as the

21   opinion of the court goes, I still think there is a hearsay

22   issue.  I was specifically referring to the handwritten notes

23   on the other page when I was talking about confusing to the

24   jury.

25             THE COURT:  I am not sure that Mr. Boyle is concerned

FC7JJEN1                        Trial

 1   about 311.  Maybe he is.

 2              MR. BOYLE:  I am not concerned about that.

 3              THE COURT:  I didn't think so.

 4              MR. BOYLE:  I would say just add -- and again we'll

 5   submit some authorities -- the document beginning on 336 is the

 6   actual decision of the administrative law judge.

 7              THE COURT:  Yes.

 8              MR. BOYLE:  Which is a classic public record.  It is a

 9   decision of a judicial officer lodged in the file.

10              THE COURT:  He gets to write it out longhand, yes.

11              MR. BOYLE:  As is the subsequent decision of what

12   happened on the appeal and the basis for the appeal.  Now I

13   would be referring to 330 -- actually, 329 and 330, which is

14   certainly a public record.

15              THE COURT:  329 and 330?

16              MR. BOYLE:  Yes.  It is at the back of Exhibit 19.

17              THE COURT:  That is what is confusing me.  It is out

18   of order.

19              MR. BOYLE:  I tried to put it in chronological order,

20   whereas the Bates stamps aren't.

21              MR. PASSESER:  I can save the Court some time.  We

22   have no objection to 329 and 330.

23              THE COURT:  Is there anything you object to other than

24   311?  Well, could you let me know what pages you object to, and

25   Mr. Boyle will give me the authorities he will give me.

FC7JJEN1                         Trial

1          MR. PASSESER:  Yes.

2          THE COURT:  Thank you.  Are there other documents you

3    want to talk about right now?

4          MR. BOYLE:  There can be.

5          THE COURT:  Only if you both discussed them.

6          MR. BOYLE:  I think we did.  I don't want to -- now,

7    Exhibits 1 and 2, we can start right there.  It is the

8    complaint report, and the second thing is what is called the

9    arrest report, Exhibit 2.

10          THE COURT:  Mr. Passeser, are they coming in or are

11    you objecting to their introduction?

12          MR. PASSESER:  Our objection to this, it is all

13    cumulative.  The officers will testify what happened.  To the

14    extent they're used to impeach the officers if they're

15    inconsistent, by all means.  To the extent it is more of the

16    same, the documents could confuse the jury, and they are police

17    documents, and I don't see any probative value on top of what

18    the officers already are going to say.

19          THE COURT:  You have got stronger arguments for other

20    documents.  These are coming in.

21          Mr. Boyle, on some of these others, Mr. Passeser has

22    told me he needs to hear how it comes in before he can tell you

23    whether they object or not.  You and I may be talking about

24    things ultimately they don't object to.

25          MR. BOYLE:  We might.  I am prepared to continue, but

FC7JJEN1                        Trial

1    maybe we can work it out.

2              THE COURT:  Okay.  Hope springs eternal, sir.

3              On that note, I am assuming we are going to trial?

4    This case is not settling mid-trial, correct?  All right.  I

5    see the head shaking from Mr. DeAtley.  That is fine.  I want

6    to know because I have my week set up for this.

7              MR. BOYLE:  We were very still here.

8              THE COURT:  No, no.  Mr. DeAtley, it was his

9    gentleman's way of telling me, "No, this is not happening."

10             Unless there are other issues to discuss?

11             MR. DeATLEY:  We mentioned this in the previous

12   conference.  Defendant's Exhibit B are the drugs at issue.  We

13   do have the drugs with us today.  We are wondering if, in fact,

14   there is a place in your Honor's Chambers or in this courthouse

15   to keep them, or it makes sense for us to bring them to court

16   back-and-forth each day?

17             THE COURT:  I have no place in Chambers where I am

18   comfortable keeping them.  I do not know if the marshals would

19   do me the favor of allowing me to store them there.  I can ask

20   them when I head upstairs.

21             MR. DeATLEY:  We very much appreciate it.

22             THE COURT:  Yes, let me do that.  That is a fair

23   question.  They don't give me vaults in Chambers, and I don't

24   want responsibility for that.  Thank you.

25             MR. BOYLE:  And perhaps it would save some time during

FC7JJEN1                        Trial

1    the trial if we could have a view of them.  We have never seen

2    them.

3                MR. DeATLEY:  That is perfectly fine.

4                THE COURT:  He will show them to you now while I am

5    talking with the marshals.  Anything else?  All right.  Thank

6    you very much for indulging me in these housekeeping matters.

7    I will head upstairs and call the marshals.

8                (Recess)

9                (Continued on next page)

10               (Jury Voir Dire was not ordered to be transcribed and

11   can be found under separate cover)

12               (In open court; jury not present)

13               THE COURT:  Thank you very much.  Please be seated.

14   We are in, as it were, the home stretch of jury selection.  We

15   have had our discussions and our legal conferences outside of

16   earshot.

17               THE CLERK:  Your Honor, the following jurors have been

18   selected.  If your name is called, please remain seated.

19               Juror No. 1, Jacqueline Rosen.

20               No. 2, Satyam Mallick.

21               No. 3, Adrienne Berziga.

22               No. 4, Marcella Briggs.

23               No. 5, Marcia Jones-Blake.

24               No. 6, Annette Aprea.

25               No. 7, Graciela Pena.

FC7JJEN1                         Trial

1          No. 8, George Speropoulos.

2          Those jurors whoes names I did not call, you are

3    excused from this case with the thanks of the Court.  You may

4    proceed back to 500 Pearl Street on the first floor, Room 160.

5          Thank you very much.

6          (Pause)

7          (Off-the-record discussion)

8          (Recess)

9          THE COURT:  Thank you very much.  Please remain

10   standing for the jury.  Ms. Pena, come on here, please.  We'll

11   let you join everyone else.

12         (Jury present)

13         THE CLERK:  Please be seated.

14         THE COURT:  You may be seated.  Thank you.

15         Mr. Lopez, at your convenience, would you please swear

16   in the jury.

17         THE CLERK:  Yes, your Honor.

18         (A jury of 8 was duly sworn and impaneled)

19         THE CLERK:  You may be seated.  Thank you.

20         THE COURT:  Ladies and gentlemen, what I'd like to do

21   right now is to give you some preliminary instructions that

22   will guide you as the evidence comes in, and then we're going

23   to have the opening statements in the case, and I am going to

24   let you go for the day, and tomorrow we will begin with the

25   presentation of evidence.  So I will ask you, please, to listen

1    carefully to the instructions I'm about to give.

2              I, first of all, welcome you and wish you good

3    afternoon.  This case is now officially on trial, and as I

4    stated earlier, the trial is expected to last four or five

5    days, or thereabouts, and I've explained to you already how my

6    trial day differs from other judges.  The day begins earlier

7    and the breaks are shorter, but the benefit or the tradeoff is

8    that you get out in the afternoon earlier.  We begin each

9    morning at 9:00 am sharp, so please, please, please be in the

10   jury room that you have now seen by 8:45 am at the latest so

11   that you can all be ready at the crack of 9:00.

12             We'll take a short break in the morning.  We will

13   break for lunch around 12:30 or thereabouts, and because that

14   lunch break is only going to be a 30-minute lunch break, we

15   will arrange for there to be sandwiches or food for you to eat

16   while you're there.  As a result, you won't have to really

17   leave the jury room.

18             The afternoon session will begin 30 minutes later and

19   we'll take, if necessary, a very short break in the afternoon

20   and go till about 2:30 to 2:45 pm.  I just don't ever want to

21   be accused of not giving all of my thoughts on this, so let me

22   just say if we're in the middle of a witness and need to go on

23   for five more minutes to finish that witness, I might ask for

24   your indulgence.  I sometimes ask jurors if they wish to go

25   into overtime for one reason or another, and they let me know.

FC7JJEN1                         Trial

1    The plan is to get you out between 2:30 and 2:45 each day.

2           Now that you have been sworn in, let me give you some

3    instructions about your duties as jurors.  At the end of this

4    trial I will give you more detailed instructions, especially

5    concerning the law to be applied in this case.  Those

6    instructions will control your deliberations in this case, but

7    for now let me explain how the trial is going to proceed.

8           The first step in the trial will be opening

9    statements.  You heard me mention that a few moments ago and

10   that is what you will hear after you hear my speaking.  Then

11   counsel for the plaintiff will begin by making an opening

12   statement, which is simply an outline that is designed to help

13   you understand the evidence that we anticipate is going to be

14   introduced at this trial.

15          Then counsel for the defendants will make an opening

16   statement.  Opening statements are not evidence and they're not

17   really argument.  They're designed to just give you a framework

18   within which the trial is going to proceed.

19          After opening statements, the plaintiff will present

20   his evidence.  That evidence will consist of witness testimony

21   as well as documents and other exhibits.  The plaintiff,

22   through his counsel, will examine the witnesses and then the

23   defendants' counsel may cross-examine them.

24          Now, when the plaintiff is done presenting his case,

25   the defendants may or may not, it depends on what they wish to

 1    do, present their case, and the plaintiff will have an

 2    opportunity to cross-examine any witnesses testifying for the

 3    defendants.

 4          After the presentation of evidence is completed, so

 5    after the witnesses have testified and after the documents and

 6    exhibits have been introduced in this case, counsel for the

 7    parties will deliver closing arguments.  These are designed to

 8    summarize and interpret their views of the evidence.  Just as

 9    their opening statements are not evidence, attorneys' closing

10    arguments are also not evidence.

11          After closing arguments, I will instruct you on the

12    law, and then you will retire to deliberate on your verdict

13    which must be unanimous, and it must be based only on the

14    evidence that is presented in the course of trial.  You do not

15    have to explain your verdict to any of us here.

16          It is important to remember that this is a civil case,

17    and so sometimes people have heard of the standard of beyond a

18    reasonable doubt.  Now, if you don't know this, I will tell you

19    that is the standard for criminal cases, and that doesn't apply

20    to a civil case such as this one.  In civil cases, the burden

21    is called preponderance of the evidence, and what that means is

22    that to establish a fact by a preponderance of the evidence is

23    to prove that the fact is more likely true than not true.  I

24    will give you additional instructions on the burden of proof at

25    the end of the receipt of evidence in this case.

1          Earlier when we were first together, we talked about

2     the rules that you and I play in this trial.  I will go with

3     you a little more detail about that.  I decide what rules of

4     law apply in the case.  The way I decide this is to make legal

5     rulings during the presentation of the evidence and in giving

6     the final instructions to you after the evidence and arguments

7     are completed.

8          In order to do my job correctly, I may have to

9     interrupt the proceedings from time to time to confer with the

10    parties about the rules of law that should apply here, and

11    sometimes we'll talk here just in open court, sometimes we'll

12    talk at sidebar outside of your hearing, and some of them may

13    be a little bit longer.  If I think it is going to be a longer

14    conference, what I will do I will excuse you from the courtroom

15    so you don't have to sit here and wait for us to conclude.

16         I will try to avoid these interruptions as much as

17    possible because all of us here understand your time is very

18    important and is not to be wasted.  I will ask, however, you

19    are patient and understand that these conferences are necessary

20    for several reasons, in particular to ensure the fairness of

21    the trial, to ensure the evidence is coming in according to the

22    rules of evidence.  I also think they have the effect of making

23    the trial proceed in a shorter, more streamlined fashion

24    because the parties understand what may and may not come in.

25         While I decide the law that applies to this case, you

FC7JJEN1                          Trial

1    are the triers of fact.  You weigh the evidence presented and

2    you decide whether the plaintiff has proven by a preponderance

3    of the evidence that the defendant you are considering, the

4    particular defendant you are considering, is liable to the

5    plaintiff.

6             You must pay close attention to all of the evidence

7    presented and you may base your decision only on the evidence

8    in this case and my instructions on the law.  Let me take a

9    moment to speak to you about what is and is not evidence.  This

10   ties together with some of the things I said earlier today.

11            Evidence consists only of the testimony of witnesses,

12   documents and other things that have been admitted into

13   evidence and stipulations or agreements that have been agreed

14   to by the parties.

15            For those of you who watch shows dealing with

16   courtroom procedure or criminal law, police procedure, you may

17   have heard the term "circumstantial evidence" and "direct

18   evidence" or you may have heard in other facets of your life.

19   You can understand that there is a difference between these

20   terms, but all of the evidence may be considered in this trial,

21   be it direct or circumstantial.

22            There are certain things that are not evidence and

23   they may not be considered by you.  So let me talk to you about

24   what is not evidence.  Statements and questions by counsel are

25   not evidence, nor are statements that I make or questions that

FC7JJEN1                         Trial

1    I ask of a witness.  It is the answer to those questions that

2    is evidence.  As I said a moment ago, opening and closing

3    statements by the parties, they're not evidence.

4           Second, objections to questions are not evidence.

5    Counsel for the parties are permitted to raise an objection

6    when they believe that evidence that is being offered is being

7    offered for an improper purpose under the rules of evidence.

8    Please do not be influenced by the fact of an objection or by

9    my ruling on an objection.  If I sustain the objection, then

10   you must ignore the question and any answer that may have been

11   given before I sustained the objection.

12          If the objection is overruled, then you may treat the

13   answer to that question as any other piece of evidence.  In

14   some cases, although I am not sure if I will do that here, I

15   may instruct you that some item of evidence is received only

16   for a limited purpose, you may only consider it for certain

17   purposes.  If I give you that instruction, you must follow it

18   and you may only consider that evidence for those limited

19   purposes.

20          Third, if there is testimony that I strike, if I tell

21   you to disregard it or if I exclude it, you may not consider it

22   because it is not evidence in this case.

23          Fourth, anything you may have seen and heard outside

24   the courtroom is not evidence and must be disregarded.  As you

25   have heard me say a few times now, you are to decide the case

1    based solely on the evidence presented here in the courtroom.

2              Now, in terms of evaluating the evidence you are about

3    to hear in the course of the coming few days, there is no

4    formula to evaluate testimony or exhibits.  So instead, suffice

5    it to say that you bring with you into this courtroom all of

6    the experience and background of your lives.  It is often said

7    in this courthouse you are not to leave your common sense

8    outside the courtroom because the same types of tests that you

9    use in your everyday life are the tests that you should apply

10   in deciding how much weight, if any weight, to give to the

11   evidence in this case.

12             The law does not require you to accept all of the

13   evidence admitted at trial, and in determining what evidence to

14   accept, you must make your own evaluation of the testimony from

15   each of the witnesses and your own evaluation of the exhibits

16   that are received in evidence.  It is essential, however, that

17   you keep an open mind until you have heard all of the evidence

18   in the case.

19             A case can only be presented step-by-step,

20   witness-by-witness before all of the evidence is before you.

21   As I'm sure you know from your own experiences, you may hear

22   one person give a version of events that is impressive or

23   understandable or even compelling, and yet upon hearing another

24   another person's version of the same set of events or upon

25   having the original speaker cross-examined with respect to that

FC7JJEN1                          Trial

 1    event, things may seem very different.  In other words, there

 2    may be another side to any witness' story.  You should use your

 3    common sense and your good judgment to evaluate each witness's

 4    testimony based on all of the circumstances.

 5          I cannot emphasize enough that you must keep an open

 6    mind until the trial is over.  Please do not reach any

 7    conclusions until you have all of the evidence before you.  So

 8    now let me caution you about certain rules and principles

 9    governing your conduct as jurors in this case.

10          First, you must not talk to each other about this case

11    or about anyone who has anything to do with this case until the

12    end of the case when you begin your deliberations.  The reason

13    for this requirement is that you must not reach any conclusions

14    on the claims or the defenses until all of the evidence is in.

15    Please, as I've said many times now, keep an open mind until

16    you start your deliberations at the end of the case.

17          Second, do not communicate with anyone else about this

18    case or with anyone who has anything to do with the case until

19    the trial has ended and you have been discharged as jurors.

20    When I say "anyone else," I mean anyone else.  I mean members

21    of your family and your friends.  For Goodness sake, please do

22    not communicate through Facebook, Twitter, blogs or things of

23    that nature.  You may tell family and friends you are a juror

24    in a civil case, but please do not tell them anything about the

25    specifics of the case until you have been discharged.

1          Third, do not let anyone talk to you about this case

2     or about anyone who has anything to do with this case.  If any

3     person should attempt to communicate with you about the case at

4     any time throughout the trial, either in or out of the

5     courthouse, please report that immediately to Mr. Lopez and to

6     no one else.  That means no one else.

7          To minimize the possibility of improper

8     communications, it is important that you go straight to the

9     jury room when you come in in the morning and that you remain

10    in the jury room or in this courtroom for the duration of the

11    trial day.  Please use the bathrooms in the jury room rather

12    than the bathrooms on this or any other floor.  Please do not

13    use the cafeteria and even if there were a public telephone,

14    and I am not sure there is, you should not use it.  Our breaks

15    should be short; and, therefore, it is best you remain in the

16    jury room.

17         Fourth, do not do any research or any investigation

18    about this case or about anyone who has anything to do with the

19    case on your own.  Don't go to any places you might hear

20    referred to during the trial.  Don't read or listen to or watch

21    any news reports of the case, if there are any.  I am not

22    saying there are.  Please do not go on the internet or use

23    whatever digital or PDA devices you may have to learn things

24    about this case because all the evidence that you need will be

25    presented to you here, and that is all you may consider.

FC7JJEN1                         Trial

1    Please let me know if you notice that someone else is violating

2    these rules about where the evidence may come from.

3            I have allowed each of you to be given a notebook and

4    pen because I permit jurors to take notes.  You do not have to

5    take notes.  I am not making you.  No one is making you.  Your

6    notes are an aid to your own recollections.  As you see, we

7    have Court Reporters in this case who are recording everything

8    that is said in the courtroom.  During your deliberations any

9    portion of that testimony can be read back to you.

10           I would remind you if you do take notes, note-taking

11   may distract you from something important that is happening on

12   the witness stand, but if you do take notes, please begin

13   writing on the page that is not the cover and please put your

14   juror number, if it is not already there, on the front page of

15   the pad so that we can be sure that you and only you will be

16   making and reviewing the notes that are in your particular pad.

17           Please do not share your notes with fellow jurors

18   during deliberations.  The fact that a juror has taken notes

19   will not entitle him or her to any greater voice in the

20   deliberations.  That is because a transcript will be available

21   to all jurors if there is any difficulty in remembering

22   testimony.

23           If you do take those notes, all notes you take must be

24   left each day in the jury room, and Mr. Lopez will make sure

25   that yours is there.  From this point until the time when you

FC7JJEN1                    Opening - Mr. Boyle

1    retire to deliberate, it is your duty not to discuss the case

2    and not to remain in the presence of other persons who may be

3    discussing this case.

4         Let me let you know now, as I should have let you know

5    before lunch, the parties in this case and their counsel have

6    been instructed to have no contact with any of you.  So if you

7    happen to see any of them outside the courtroom or in the

8    elevators or things of that nature, and they don't say hello to

9    you, they don't wave, it doesn't mean they're being rude.  It

10   means they're following my instruction not to have any contact

11   with you.  Please don't take offense.  It is all designed to

12   ensure that you have no communications.

13        This concludes my preliminary instructions to you, and

14   so we will now begin with the opening stage of the case which

15   is the opening statements.  We are going to begin with counsel

16   for the plaintiff, and so I am going to ask you at this time to

17   please give your undivided attention to the attorneys as they

18   make their opening statements to you.

19        Mr. Boyle, thank you.

20        MR. BOYLE:  Your Honor, okay if I move the --

21        THE COURT:  Yes.

22        MR. BOYLE:  May it please the Court.

23        THE COURT:  Thank you, sir.

24        MR. BOYLE:  Mr. Jenkins, counsel, counsel and

25   defendants.  Good afternoon, ladies and gentlemen -- man,

FC7JJEN1                          Opening – Mr. Boyle

1  singular.  My name is Robert Boyle, and along with my

2  co-counsel, Gideon Oliver and Abraham Hassen, it is our duty

3  and privilege to represent the plaintiff in this case, Norman

4  Jenkins.  Mr. Jenkins, stand for a moment.  This is

5  Mr. Jenkins.

6          As you have been told many times already, this is a

7  civil case.  Like most civil cases where damages are sought, it

8  is like writing a legal law.  The law gives an individual the

9  right to bring a lawsuit in federal court for violations of the

10  rights guaranteed to them by the United States Constitution.

11          Mr. Jenkins brought this lawsuit because, as the

12  evidence will show, the defendants Victor Charles, Ramiro Ruiz

13  and Robert Agate, all members of the New York City Police

14  Department, violated Mr. Jenkins' constitutional rights.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. BOYLE:  They falsely arrested Mr. Jenkins, used

2     excessive force during the course of that arrest, and then

3     fabricated criminal charges against him, all of which were

4     eventually dismissed.

5          You will hear how Mr. Jenkins experienced pain and

6     suffering, and continues to experience suffering, from the

7     brutal beating inflicted by the defendants, and how he was

8     wrongfully jailed for nearly a year as a direct result of the

9     false arrest and prosecution carried out by these defendants.

10         Well, what happened to Mr. Jenkins?  The evidence will

11    show that the spring of 2010, when the events in this case

12    started, was a very exciting and hopeful time for him.  He and

13    his then partner, Shaquala, were expecting their first son at

14    the end of May.  In fact, Shaquala's due date, you will hear,

15    was May 21, 2010.

16         Now, that's something that's joyous for everyone, but

17    for Norman, for Mr. Jenkins, it was particularly exciting.

18    Mr. Jenkins has two other children, Quanisha, who is now 33

19    years old, and a daughter Diamond, who is now 14.  But because

20    of the time he had spent in prison -- and I think you know from

21    the questionnaires and the questions of the Court, you know he

22    has a felony record, and that he was currently on parole and is

23    currently on parole -- he was not present for significant

24    portions of his daughters' lives.  This time, Mr. Jenkins

25    resolved, was going to be different.  He was going to be

1   present when Shaquala gave birth and be an attentive father to

2   his son.

3           This was an exciting time, but it was also an anxious

4   time.  Shaquala was having a difficult pregnancy.  She often

5   had to be taken to the doctor or the emergency room.

6   Mr. Jenkins discussed these concerns with his parole officer

7   and told him that there might be occasions when he had to take

8   Shaquala to the hospital at a moment's notice and might not be

9   at his home in Parkchester in the Bronx in time for his 9 p.m.

10  curfew.  One of the restrictions Mr. Jenkins had was that he

11  had to be in his assigned residence in Parkchester by 9 o'clock

12  each night.  But he explained to his parole officer that

13  sometimes he may not be able to be there.

14          It turned out that the night of May 21, 2010, over

15  into May 22, 2010, was one of those times.  May 21, remember,

16  was Shaquala's due date.  That evening, actually in the

17  afternoon, she began experiencing sharp pains, that everyone

18  thought was probably labor.  Norman came home from work -- he

19  was working for his father as a plumber's assistant, his father

20  had a plumbing business -- and drove Shaquala to the hospital

21  in Hackensack, New Jersey, where Shaquala herself was born and

22  where she wanted her son to be born.  It turned out to be a

23  false alarm.  What they thought were labor pains was gas.  And

24  she was able to -- she was no longer in pain, and they said,

25  come back another time, come back when the baby is about to be

1    born.

2              So they drove back to Manhattan.  And in the meantime

3    Norman had received a call from Quanisha asking him to come to

4    her apartment, which is located on 102nd Street between First

5    and Second Avenues here in Manhattan.

6              So they all drove to Shaquala's apartment.  That would

7    be Mr. Jenkins, Shaquala, and Mr. Jenkins' cousin, Jennifer

8    Hamilton, with whom he shared the Parkchester apartment.

9              They talked.  They visited.  Some of them dozed off.

10   Jennifer Hamilton, who you will hear from in this trial, was

11   the first to awaken.  She woke Mr. Jenkins, and that was about

12   2 o'clock in the morning, and told him she wanted to go back to

13   the apartment that they shared in Parkchester.  Mr. Jenkins,

14   though, didn't want to go.  He preferred to stay in Manhattan.

15   It was 2:30 in the morning.  Shaquala was there.  It would take

16   him forever to get back to Parkchester at that time.

17             But he agreed to go because Ms. Hamilton, Jennifer

18   Hamilton, wanted to go back, and you'll hear her explain this

19   to you, sleep in her own bed and be home when she got up.

20             So they both left the apartment.  Mr. Jenkins left a

21   few minutes before Ms. Hamilton did.  And they headed from

22   102nd Street between First and Second Avenue, and heading to

23   the station of the No. 6 train at Lexington Avenue and 103rd

24   Street.

25             So Mr. Jenkins is walking toward the subway.  Jennifer

FC7AJEN2ps                    Opening – Mr. Boyle

1    Hamilton is walking.  And she's about a half a block behind

2    him.

3              What Norman didn't know was that a nightmare was about

4    to occur.  The defendants, you will hear –– that's Victor

5    Charles, Ramiro Ruiz, and Robert Agate –– were on duty that

6    night, working the midnight shift as part of the 23rd

7    Precinct's so-called anticrime unit.  Dressed in plainclothes,

8    and using an unmarked police car, they were on 102nd Street

9    between Second and Third Avenues.  And Mr. Jenkins entered that

10   block.  Unaware of anyone's presence, Mr. Jenkins walked along

11   102nd Street headed from Second to Third Avenue.  All of a

12   sudden, he will describe to you, he felt a blow to the back of

13   his head.  He will describe to you how he immediately became

14   woozy and fell onto one knee, and might have blacked out for a

15   second or two.  At the same time he felt someone going through

16   his pockets.  But he didn't know what was happening.  He

17   thought he was being robbed.  At this point he did not know

18   that his attackers were police officers, dressed in

19   plainclothes.  And more specifically he didn't know that they

20   would be the defendants, Victor Charles, Robert Agate, and

21   Ramiro Ruiz.

22             Now, Mr. Jenkins will explain to you how he grew up in

23   East Harlem, and in fact he attended the grammar school, which

24   was directly across the street from where he was hit in the

25   head, right there on 102nd Street between Second and Third

FC7AJEN2ps                    Opening - Mr. Boyle

1    Avenue.  He knew because he grew up in the neighborhood that

2    the 23rd Precinct was just about a block away.

3            So when he -- he fell to one knee.  Someone went

4    through his pockets.  And he's also being beaten.  He tries to

5    get up and run towards Third Avenue, towards where he knew

6    there were police, in order to get help.  But he was only able

7    to get up and stagger a few feet before he was caught.  Because

8    he was woozy, he wouldn't make it very far.  He was thrown to

9    the ground.  Again he was punched and kicked.  He felt blows to

10   his head, his face, his upper body, and his legs.  He could now

11   feel the blood seeping from a wound in his head -- and you will

12   see pictures of the wound in his head -- onto his torso and

13   onto his clothes.

14           Now on the ground and still being beaten, he was

15   dragged by the defendants to an area just off the curb in

16   between two parked cars.  And you'll see pictures later; this

17   street had angle parking in that area, not the parallel that

18   you're used to.  And he's taken into the area in between these

19   two cars.

20           It was about this point that Mr. Jenkins heard from

21   somewhere, someone shout, "Hey, stop, we call the police."  One

22   of his attackers said something to the effect of, "We are the

23   police, mind your own business."  This was the first indication

24   to Mr. Jenkins that his attackers were police officers.

25           At this point, he will testify, one of the defendants

Case 1:13-cv-03405-DLC   Document 105   Filed 12/30/15   Page 52 of 70          52

FC7AJEN2ps                    Opening - Mr. Boyle

 1    took out a can of mace.  Seeing it, Mr. Jenkins pleaded for

 2    them not to use it because he suffers from asthma.  But in fact

 3    it was used, and his face and into his nose was sprayed with

 4    mace.

 5           Stung by the mace, Mr. Jenkins was turned over and now

 6    handcuffed on his back and laying face down on the ground.  He

 7    was placed in a marked patrol car, because another police car

 8    came to the scene, and driven to the 23rd Precinct.

 9           On the ride he was warned, by one of the defendants,

10    that he shouldn't say what happened but rather say that he was

11    attacked by some Spanish guys and then the cops came and

12    rescued him.

13           But what the defendants didn't know was that Jennifer

14    Hamilton, who was walking about a half a block behind Norman

15    Jenkins, witnessed much of what happened.  You will hear her

16    describe how she saw her cousin attacked and beaten for no

17    apparent reason by people, of course that she didn't know at

18    the time were police officers, because they're dressed in

19    plainclothes.

20           At the precinct, Mr. Jenkins was booked.  He was never

21    told what he was being charged with.  Although bleeding from

22    his head, he was given no medical treatment other than an

23    icepack.  His cellphone was returned to him, and he was able to

24    make a couple of telephone calls.  The first thing he did, or

25    one of the first things he did, as he is required to, is call

FC7AJEN2ps                    Opening - Mr. Boyle

1    his parole officer, to say, I've been arrested.  He also called

2    a close friend of his, who was a paralegal, and requested some

3    legal representation.  And eventually he got it.

4            And you will hear from that lawyer, a woman by the

5    name of Stacey Richman.  Ms. Richman will testify that the

6    following day, she went to court a few blocks away from here,

7    at 100 Centre Street, in order to represent Mr. Jenkins at his

8    arraignment.  She was given what was called a felony complaint,

9    a document she'll describe which lists the charges that are

10   lodged against people who are arrested.  You'll see that

11   complaint.  It was sworn to by defendant Victor Charles.  In

12   it, Mr. Jenkins was accused of assaulting a police officer,

13   resisting arrest, possession of crack cocaine and marijuana.

14   All of those charges, Mr. Jenkins would tell you, are false.

15   And the evidence will show that defendants Charles, Ruiz, and

16   Agate knew that these charges were false.

17           Ms. Richman will describe to you about how, after

18   getting a copy of the complaint, she went into the area they

19   call the bullpens behind the courtroom where lawyers first get

20   an opportunity to talk to their clients.

21           She knew Mr. Jenkins, or was familiar with him through

22   her friendship with the paralegal who worked for her.  When she

23   saw him, she will tell you, she was shocked.  One eye was

24   bloodshot.  He was bleeding from a gash in his head.  There was

25   a stab wound on his forearm.  There was blood on his clothes.

1   He was woozy and he was out of it, as she will state.

2            When the time came for the case to be called,

3   Ms. Richman made a perfect record.  With Mr. Jenkins standing

4   next to her, she exhibited his injuries to the court, right

5   there on the record.  She showed the court the gash in his

6   head.  She showed the court the puncture wound in his arm.  And

7   she told the court that the wounds he had were defensive and

8   not offensive, because she showed the court that on his hands

9   were no abrasions.  But despite her efforts, Mr. Jenkins was

10  held, in lieu of $30,000 bail, and sent eventually to Rikers

11  Island.

12           So he now faced felony charges, out of this false

13  arrest and false prosecution.  But that was not all.  His

14  parole officer, learning of the arrest and the charges, lodged

15  a parole violation warrant.  You will learn that that meant

16  that Mr. Jenkins could be sent back upstate to state prison,

17  pursuant to his former offense, simply because he had been

18  rearrested for a new offense.

19           So now it's around May 24, 2010, when the parole

20  warrant is lodged.  And so on May 28, 2010, when his son

21  Michael was born, Mr. Jenkins wasn't present.  He was

22  incarcerated, on Rikers Island.  Rather than being with

23  Shaquala when she gave birth, he was suffering headaches,

24  vomiting, blurry vision, and an infection, caused by the

25  beating and the, really the stabbing perpetrated by these

FC7AJEN2ps                    Opening - Mr. Boyle

1    defendants.  In fact you will hear how he didn't even lay eyes

2    on his son for a year.

3           For many months, there was no action on the criminal

4    case.  The charges weren't even presented to a grand jury.  But

5    Mr. Jenkins remained on Rikers Island due to the $10,000 bail

6    and the parole violation warrant.

7           You will hear that there was a final parole hearing on

8    August 19, 2010.  Ms. Richman, who will testify before you,

9    represented him at those proceedings too.

10          But at its beginning, something interesting happened.

11   Instead of trying to prove that Mr. Jenkins had committed new

12   crimes on May 22 -- the assault, the possession of the drugs,

13   the marijuana, the resisting arrest -- the only thing that went

14   to the hearing was whether he violated his curfew.  At the

15   start of the hearing, the parole department dismissed all of

16   the charges arising out of the arrest, and only decided to

17   prove, at the parole violation hearing, that he was out after 9

18   o'clock.

19          You will hear that although Mr. Jenkins, he was found

20   guilty of violating his curfew, but the law Judge, who noted

21   that he had made a positive adjustment to parole, issued what

22   was called a revoke and restore.  He found him guilty of the

23   parole violation but ordered that he be restored to parole.

24   But that didn't happen.  The full parole board met, and --

25   which at the time had final say -- and imposed instead a

FC7AJEN2ps                    Opening - Mr. Boyle

1    12-month hold for that curfew violation, which arose out of the

2    false arrest.

3             Eventually Mr. Jenkins was returned to state prison,

4    sent far upstate, to serve -- to re-serve and serve that time.

5             He filed an appeal, through Ms. Richman.  And you'll

6    find -- you will hear that in May 2011, almost a year after the

7    incident on 102nd Street, he succeeded in that appeal.  The

8    12-month hold was vacated, and he was ordered restored to

9    parole.  And he was released from custody after spending almost

10   a year in prison.  Remember, he still has these new criminal

11   charges pending in criminal court.

12            So he goes to court on June 1, 2011.  This is over one

13   year after the attack.  And all of the charges are dismissed on

14   the motion of the District Attorney's Office.  So all of what

15   they said he did on May 22, all of those charges are dismissed.

16            That was, you know, maybe a somewhat convoluted

17   outline of what we will prove during the course of this trial.

18   But I wanted to give you the story so, as you hear the

19   evidence, it would hopefully come in an order and in a way that

20   makes a little bit more sense than if you just heard all these

21   dates and different proceed proceedings.

22            At the conclusion of the case, we'll be able to

23   address you again and urge you to find, in accordance with

24   Judge Failla's instructions, that each of these defendants --

25   Victor Charles, Ramiro Ruiz, and Robert Agate -- each violated

FC7AJEN2ps                    Opening - Mr. DeAtley

1    Mr. Jenkins' constitutional rights.  And that is his right not

2    to be subject to false arrest, his right not to be subject to

3    excessive force, his right not to be maliciously prosecuted,

4    and his right to a fair trial.

5            At that time, we will also ask you to compensate

6    Mr. Jenkins with an award of money damages, for the beating

7    inflicted on May 22, 2010, for the one-year loss of liberty to

8    which he was subjected as a direct result of the defendants'

9    actions, and the legal fees he incurred defending against those

10   criminal charges and the parole violation.

11           Thank you very much for your time and your patience,

12   and welcome to jury duty.

13           THE COURT:  Thank you, sir.

14           Mr. DeAtley.

15           MR. DeATLEY:  Thank you, your Honor.

16           May it please the Court?

17           THE COURT:  You may.  Thank you, sir.

18           MR. DeATLEY:  Three officers were on patrol in East

19   Harlem.  They see plaintiff.  And as I will explain later, they

20   became suspicious.

21           They approached plaintiff.  They tell him they're

22   police.  And plaintiff responds by pushing an officer,

23   struggling with the officers, trying to run away and fight.

24   Why?  For two reasons.  First, because plaintiff had 41 bags of

25   crack cocaine and three bags of marijuana on his person.  And

FC7AJEN2ps                    Opening - Mr. DeAtley

1    second, because plaintiff was a convicted felon.  He was out on

2    parole.  And the condition of his parole, he wasn't allowed to

3    be out at 2:30 in the morning.  And of course he wasn't

4    supposed to be carrying 44 bags of drugs.

5         So when he is stopped, he has every reason to try and

6    run, to evade, to fight, and to struggle, because he's caught.

7    If he's arrested, the officers are going to find the drugs,

8    he's going to be found in violation of his parole, and he's

9    going to be sent back to prison.  And that's exactly what

10   happened in this case.  That's this case.  A convicted felon,

11   out on parole, out when he isn't supposed to be, carrying 44

12   bags of drugs.

13        On May 22, 2010, at approximately 2:30 in the morning,

14   the three officers sitting before you -- Officer Victor

15   Charles, now Sergeant Robert Agate, and now Sergeant Ramiro

16   Ruiz -- they're on patrol in an unmarked vehicle wearing

17   plainclothes.  It's a warm spring day, the weekend before

18   Memorial Day.  All of them are wearing T-shirts.  One of them

19   is even wearing shorts.  They're on patrol in an area of East

20   Harlem known for burglaries, robberies, and drug sales.

21        Now, as the officers are driving down the street, they

22   see plaintiff.  He's walking down the street, the sidewalk of

23   the New York City housing property.  What draws their attention

24   to him is that he's wearing a big heavy winter coat.  The

25   officers are suspicious.  They watch him.  And what aroused

1    their suspicions was simple.  It's warm, and he's wearing a

2    huge coat.

3          The officers will tell you that they're in a division

4    called anticrime.  That specific group is designed to be

5    proactive.  They're looking for street-level crimes -- drug

6    sales, burglaries -- and they'll tell you that criminals of

7    such nature routinely wear heavy clothing, several layers,

8    because they can take off a jacket, throw it in the trashcan,

9    and then no longer meet the description of a suspect.

10          They'll tell you that individuals who engage in drug

11   sales routinely wear heavy clothing, lot of pockets, more

12   places to hide money, more places to hide drugs and possibly

13   weapons.

14          Now, the officers see plaintiff.  And their instincts

15   are right.  Plaintiff recognizes them as officers.  He moodily

16   makes a sharp turn away from the officers and into the

17   property, away from the sidewalk.  As he did so, he continually

18   looks back at the officers, watching them.  And he speeds up in

19   a clear attempt to try and get away from them.

20          So what did the officers observe?  It's a warm night

21   and they see a man with a heavy winter coat.  They're already

22   on patrol in a high-crime area.  And when they see plaintiff

23   recognize them, they see him turn away from the officers and

24   keep his eye on them, continually looking back.

25          So Sergeant Robert Agate and Sergeant Ramiro Ruiz get

FC7AJEN2ps                    Opening – Mr. DeAtley

1    out of the car.  They want to approach plaintiff.  They want to

2    ask him what's going on, what's wrong, what are you doing here.

3          The officers approached plaintiff.  Their shields are

4    out, and they say, "Police, come here."  And in response,

5    plaintiff states, "You're not taking me, I'm not coming."  And

6    he pushes Sergeant Ruiz with both hands.  Officer Charles is

7    parked in the vehicle, sees this, he gets out of the car and

8    runs over.  He asked plaintiff, "What's wrong, what's going

9    on?"  And plaintiff responds, "I'm not going back."

10         He then does exactly what you think he does.  He

11   fights.  The officers attempt to grab plaintiff, grab at his

12   arms, try and control him, try and restrain him.  But he fights

13   back.

14         During the struggle, the officers fall to the floor,

15   fall to the ground with plaintiff.  He actually gets out of

16   their grasp and runs away from the officers.  Sergeant Ruiz

17   chases after plaintiff, grabs him, almost like a bear hug, and

18   takes him to the ground.

19         Throughout the struggle, the officers are yelling,

20   "Stop, police, stop resisting."  But plaintiff keeps fighting,

21   keeps elbowing, keeps pushing the officers.

22         Now, you'll learn that the officers used force that

23   day.  They don't deny that they used force.  But they used the

24   force that was necessary to gain control and restrain

25   plaintiff.  But the officers are allowed to use force.  They're

FC7AJEN2ps                    Opening - Mr. DeAtley

1    allowed to use the reasonable amount of force necessary to gain

2    control of plaintiff.  You're here because plaintiff alleges

3    that the officers used excessive force.

4            So what force did the officers use that morning?  They

5    tried grabbing his arms.  They tried tackling him to the

6    ground.  But that didn't work.  Plaintiff keeps struggling with

7    them, keeps kicking, keeps trying to run away.

8            So you will hear that an officer took out his asp, a

9    baton-like object, and he hit plaintiff in the hip area and in

10   the arms.  And when I say "hit," the officer will explain that

11   he was flicking at plaintiff, in an attempt to stun him, so

12   they could gain control of him.

13           But that doesn't work.  He keeps fighting.  He keeps

14   struggling.

15           So finally the officer takes out his pepper spray,

16   sprays it in plaintiff's face.  And that's what ends of

17   struggle.

18           Now, remember, at any point in time, this could have

19   ended.  Plaintiff could have given up.  He could have stopped

20   fighting.  He could have stopped resisting.  But he doesn't.

21   As a result, the officers had to use the force necessary to

22   stop him, to gain control of him, and to prevent him from

23   running away.

24           So plaintiff stops resisting and the officers place

25   him in handcuffs.  And when they do, they find drugs in his

FC7AJEN2ps                    Opening – Mr. DeAtley

1    pants pocket.

2              And we have the drugs.  You're going to see 41

3    individually wrapped bags of crack cocaine and three bags of

4    marijuana.  Plaintiff is going to tell you that the officers

5    planted these drugs.  But we know where the drugs are found.

6    They were found on plaintiff.  He's going to tell you that the

7    officers didn't just plant a couple of bags of crack cocaine

8    but that they planted 41 bags of crack cocaine and three bags

9    of marijuana too.

10             Now, the story doesn't end there.  Plaintiff was taken

11   back to the 23rd Precinct.  He said he was pepper sprayed.

12   Because he had a bruise to his head, an ambulance was called.

13   Plaintiff was seen by that ambulance, but he refused medical

14   attention.

15             The next day, after speaking with an attorney,

16   plaintiff saw another ambulance, another EMT.  And that EMT

17   transported plaintiff to a hospital.

18             At the hospital, he was treated by several nurses and

19   doctors.  They listened to his complaints.  They observed all

20   of what he looked like.  And they gave him one dose of Tylenol.

21             So what this means is that the medical professionals

22   who saw him, a day after the incident -- they don't see the

23   injuries that plaintiff claims, they don't see the brutal

24   beating and brutal assault that plaintiff's counsel just told

25   you about.  They prescribed him one dose of Tylenol, what's

1    appropriate for his actual injuries.

2            Now, plaintiff didn't mention this, but they might

3    show you an expert, an expert that plaintiff hired, that

4    plaintiff paid, who may get up on that stand and tell you all

5    about plaintiff's injuries.  And I want you to be careful with

6    this expert.  This expert, not only was he paid to testify at

7    this trial, he's paid for an examination of plaintiff, an

8    examination that took place four years after the incident, in

9    April of 2014.  So if that expert gets up on that stand, he's

10   going to tell you how about the injuries that plaintiff

11   suffered in May of 2010, even though he didn't see him until

12   April of 2014.

13           You also heard plaintiff's counsel describe what his

14   client is going to testify to, that he was stabbed, that blood

15   was seeping from the back of his head, there was blood all over

16   his clothes, that he was beaten, that he was dragged, punched,

17   kicked, there were blows to his face and his upper body.  And I

18   want you to think about what plaintiff must have looked like.

19   I want you to think about what plaintiff must have looked like

20   the day of the incident, the day after the incident.  And I

21   want you to remember that.  Because we have pictures.  We have

22   pictures that were taken of plaintiff the day after the

23   incident.  They show a bruise to his head, a cut to his arm,

24   and a puffy eye, all injuries consistent with what happened, a

25   struggle with police officers on pavement.

FC7AJEN2ps

1          Finally, you also heard from plaintiff's attorney

2     about the actions of these three officers, that plaintiff

3     wouldn't have spent 11 months in prison as a result of a parole

4     violation.  But let me remind you that plaintiff spent those 11

5     months in prison because of his choices.  He was a convicted

6     felon, out on parole, who wasn't supposed to be out at 2:30 in

7     the morning.

8          So what happens?  The parole board violated him for

9     his curfew and he spent 11 months in prison as a result.  It's

10    not the officers' fault that he is a convicted felon.  It's not

11    the officers' fault that plaintiff was on parole.  And it's

12    certainly not the officers' fault that plaintiff was out at

13    2:30 in the morning, five and a half hours past his curfew.

14         So you know who is responsible?  It's plaintiff.

15    Thank you.

16         Thank you, your Honor.

17         THE COURT:  All right.  Now seems to be an appropriate

18    time to break for the day, because tomorrow, refreshed and

19    ready, we will begin with the presentation of evidence and the

20    presentation of defendants' case.

21         So we're going to release you for the day.  As I've

22    told you, my day actually usually ends a little bit shorter,

23    but today we began at 11 a.m., so I -- let me note, first of

24    all, that I thank you for the attention that you paid during

25    the jury selection process this morning, because it made it go

FC7AJEN2ps

1    more quickly and we were able to get this piece of the trial

2    in.  What I will do, to the extent I am able to, is to talk to

3    you about where we are in the life cycle of this trial.  I

4    mean, it will take a day or so to start getting through the

5    witnesses.  But as I have a better sense of how long things

6    will take, I will let you know.  What I'm going to ask in

7    return that we see you no later than 8:45 tomorrow morning so

8    that we can begin at the crack of 9, that you not discuss this

9    case with anyone, including your fellow jurors, and that you

10   enjoy the rest of your day.  And please follow Mr. Lopez to the

11   jury room.  Thank you so much.

12            (Jury not present)

13            THE COURT:  May I just have the litigants be seated

14   for a moment.  Let me just talk about a few issues.  Thank you.

15            Mr. Boyle -- I'm sorry.  Do you need to talk to your

16   client?

17            MR. BOYLE:  Sorry.

18            MR. JENKINS:  Please, one moment?

19            THE COURT:  Yes.

20            (Pause)

21            MR. JENKINS:  Thank you.

22            THE COURT:  Mr. Boyle -- certainly.

23            I will talk to you tomorrow about the level-one

24   performance monitoring, the issue left over from this morning.

25   At the moment, although I am continuing to think about this, I

FC7AJEN2ps

1   think we should prepare to have in the OGA and the attempted

2   assault charges in the discussion of probable cause.  That's

3   what I'm going to go back and spend my evening thinking about.

4   But I had committed to you that I was going to give you

5   something tomorrow morning.  That also forces me to give you

6   something tomorrow morning.  So at least for now that may be in

7   there.  And I will reserve the right to change it if there's a

8   reason to take it out.

9           Are we beginning tomorrow morning with Mr. Jenkins,

10  sir?

11          MR. BOYLE:  Yes, your Honor.

12          THE COURT:  We don't know how long it will take.  But

13  can we imagine there will be another witness as well?

14          MR. BOYLE:  I'm going to try to see -- I don't mind

15  sharing this with the defense -- to see if we can have

16  Ms. Richman on board for when he would finish.  She is

17  intending to start trial.  And she has a subpoena from me in

18  state court, which the court will honor, of course, but I told

19  her I would make every effort to accommodate her, with the

20  approval of the court.  What time does your Honor usually take

21  the break, what we call the lunch hour, the lunch half hour?

22          THE COURT:  The lunch half hour?  About 12, 12:30, is

23  what I'm thinking.  Somewhere between 12 and 12:15 and 12:30.

24  It's really going to depend on when there is a convenient

25  breaking point in Mr. Jenkins' testimony.

FC7AJEN2ps

1          MR. BOYLE:  Subject to defense counsel being heard and
2     the Court's wishes, may I ask Ms. Richman if she could come
3     right after that break, even if Mr. Jenkins is not finished?  I
4     know that can be a bit of an inconvenience.  But it would allow
5     her to present -- I would like to give her a time certain.
6          THE COURT:  Yes.  Because she herself is on trial,
7     you're saying?
8          MR. BOYLE:  She is supposed to be starting a trial.
9     And I just got a message from her, which I haven't listened to,
10    but the one I got yesterday was, you sent me the subpoena, I
11    can't find it on the computer, I need the subpoena.
12         THE COURT:  Problem worth getting.
13         Mr. DeAtley and Mr. Passeser, can I understand that
14    you're not going to object too loudly if Mr. Jenkins's
15    testimony is interrupted to accommodate Ms. Richman's schedule?
16         MR. PASSESER:  Yes.  I think that's fine, your Honor.
17         THE COURT:  That's fine, OK.
18         MR. BOYLE:  Thank you.
19         THE COURT:  And which of you will be handling her
20    cross?
21         MR. DeATLEY:  I will be handling Ms. Richman's cross.
22         THE COURT:  Thank you very much.  So we will keep that
23    in mind tomorrow.  You will let me know.  Can we have the
24    parties in at 8:45 as well just in case there are any legal
25    issues they want to talk to me about?

FC7AJEN2ps

1          MR. DeATLEY:  Yes, your Honor.

2          MR. BOYLE:  Yes, your Honor.

3          There is one other issue I wanted to raise now.

4          THE COURT:  Yes.

5          MR. BOYLE:  This concerns plaintiff's Exhibit 6, which

6   is the mugshot photo.  I was going raise this anyway, but I

7   think from the openings the significance of it is even more

8   apparent.  This is the picture of Mr. Jenkins on the night of

9   the arrest at the precinct.  There's a face shot and then, on

10  the second page of the Exhibit, 587, a full-body view.  You can

11  see it's not the best -- in fact -- it's not the best

12  depiction.  This was printed off the computer.  We're asking

13  the defense if they have anything better to use because I think

14  it's a significant exhibit, because we want to see how he

15  looked and what he was wearing.

16          And we have discussed it, but I'll let the defendants

17  address maybe what they are able to get.

18          THE COURT:  OK.  Mr. DeAtley, sir.

19          MR. DeATLEY:  We have informed counsel that we will

20  print out a copy of what we have and see if it's a better copy

21  than they have.

22          THE COURT:  Sure.  Is it something that can be sent to

23  another computer -- I'm just trying to figure out, is there a

24  way to scan it on a monitor?

25          MR. DeATLEY:  We can certainly send, if it has not

FC7AJEN2ps

1    been sent, we can certainly send a PDF which includes the

2    Bates-stamped number.  Unfortunately, your Honor, this

3    document, the specific mugshot itself, is something that's no

4    longer available.  It's sealed once the charges are dismissed

5    against Mr. Jenkins.  The reason why we disclosed it to

6    counsel, the reason why we have it, is that it's part of the

7    internal affairs file.  It was actually printed on May 24,

8    2010.  So we don't have access.  And it's not even an access

9    thing.  It doesn't exist anymore.  It's deleted, for us to even

10   print out an additional copy.

11           THE COURT:  OK.  Mr. Jenkins, sir, I appreciate that

12   this is of concern to you.  But unfortunately I have good

13   peripheral vision, and I can't actually --

14           MR. JENKINS:  OK, I'm sorry, your Honor.

15           THE COURT:  I know you didn't mean to.  I just wanted

16   to give you that warning.

17           Mr. DeAtley, do you have the original of what you gave

18   to the defense?

19           MR. DeATLEY:  Yes.

20           THE COURT:  And have you shown that to them?

21           MR. DeATLEY:  I believe it's a -- I'm looking at their

22   photo right now.  The copy that we had is not as good as the

23   one that Mr. Boyle has in front of him, but I informed him that

24   I will send them the PDF that I scanned of the original, if

25   that's a better copy that they have.

FC7AJEN2ps

1          THE COURT:  If there is an original printout

2    somewhere, there is the scan of that original, and then that

3    scan, the PDF form, is what you sent to Mr. Boyle.

4          MR. DeATLEY:  Correct.  And I can bring the Court

5    tomorrow the original that I have do have.

6          THE COURT:  Let's please do that.  Let's try and get

7    the best thing you have.  And if it turns out that someone else

8    has it somewhere, in a better copy, I know you will look for

9    it.

10         MR. DeATLEY:  Of course.

11         THE COURT:  Thank you.

12         Mr. Boyle, is there anything else in that regard, sir?

13         MR. BOYLE:  No, your Honor.  Thank you.

14         THE COURT:  Anything else we should be talking about

15   today, gentlemen?  Because I want to let you get back to

16   preparing for this trial.

17         No.  Thank you very much for today.  Now we've been

18   very productive and I know it will be even more so tomorrow.

19   Thank you.  I'll see you then.

20         MR. DeATLEY:  Thank you, your Honor.

21         MR. BOYLE:  Thank you, your Honor.

22         (Adjourned to 8:45 a.m., December 8, 2015)

23

24

25