FC8AJEN1ps

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NORMAN JENKINS,

 4                   Plaintiff,

 5          v.                              13 Civ. 03405 KPF

 6   NEW YORK CITY POLICE
     DEPARTMENT, et al.,
 7
                     Defendants.
 8
     ------------------------------x
 9
                                            December 8, 2015
10                                          8:55 a.m.

11

12   Before:

13                   HON. KATHERINE POLK FAILLA,

14                                          District Judge
                                              and a jury
15

16                        APPEARANCES

17   ROBERT J. BOYLE,
     GIDEON ORION OLIVER,
18   ABRAHAM J. HASSEN,
          Attorneys for plaintiff
19
     MICHAEL A. CARDOZO,
20   Corporation Counsel for the
     City of New York
21        100 Church Street
          New York, New York  10007
22   DANIEL LOUIS PASSESER,
     TAVISH CORYELL DeATLEY,
23        Assistant Corporation Counsel

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

FC8AJEN1ps

```
 1                  (Trial resumed; jury not present)

 2             THE COURT:  I asked to begin a little bit early, and

 3    I'm sure counsel and Mr. Jenkins will join us momentarily,

 4    because I had a couple of questions for the parties, and I had

 5    a couple of issues regarding the charge that came up last

 6    evening.  I'm going to begin with the charge issues first.  And

 7    this is directed to my friends at the back table.  Mr. Passeser

 8    in particular, you mentioned to me a couple of defenses

 9    yesterday that were not in Mr. DeAtley's initial submission to

10    me.  And when I started to think about their inclusion in the

11    charge, the problem that I had is, I, if I may be so candid, I

12    wish not to do your work for you.  So I did notice -- and this

13    was the first thing that -- the first take that I had -- that

14    the offense of attempted assault on a police officer was found

15    by the Second Department in 2006 to be a legal impossibility.

16    So perhaps there is a change in the statute.  But if I may cite

17    to you the case of *People v. Carmona*, 27 A.D. 3d 574 -- and

18    you'll excuse me if it's been changed since then, but that was

19    the first thing that I saw.  So I just ask you to look at that,

20    please.

21             MR. PASSESER:  What was the year on that, your Honor?

22             THE COURT:  2006.

23             MR. PASSESER:  OK.

24             THE COURT:  Secondly, sir, on the issue of criminal

25    trespass in the third degree, there are a number of potential
```

FC8AJEN1ps

1    subdivisions, and I don't know which ones you think are

2    applicable.  I might know better at the end of this trial, and

3    perhaps you're not actually persisting with that, but I don't

4    know which one it is.

5         Thirdly, on the issue of obstructing governmental

6    administration, which if I sometimes mistakenly call

7    obstructing governmental authority you know what I'm talking

8    about, I understand that in order for there to be probable

9    cause for the offense, there must be an official function that

10   the plaintiff is alleged to have obstructed.  I don't know what

11   that function is.  I don't know whether it is approaching him

12   to ask for identification, an attempt to do something else.  I

13   simply don't know.  So that's when I said I should perhaps talk

14   with the parties.

15        MR. PASSESER:  Sure.  With respect to the last

16   question, the official function would be to stop the plaintiff.

17   We would argue that he obstructed it by shoving the officer and

18   trying to get away.

19        THE COURT:  All right.  So you're saying, the

20   defendants assert that the plaintiff intentionally obstructed,

21   impaired, or perverted an attempt to stop him to speak with

22   him?

23        MR. PASSESER:  Correct.

24        THE COURT:  I don't --

25        MR. PASSESER:  I mean, a lawful stop.

FC8AJEN1ps

```
 1            THE COURT:  Well, that's going to go into a lot of
 2    things, because that expression is going to be whether that
 3    stop was appropriate.
 4            MR. PASSESER:  Right.
 5            THE COURT:  OK.  I understand.
 6            OK.  Thank you very much.
 7            MR. PASSESER:  You're welcome.
 8            THE COURT:  All right.  I don't know whether
 9    Mr. Passeser or Mr. DeAtley is going to speak to the issues
10    raised in Mr. Boyle's letter of last evening.  First of all let
11    me ask you both, have you received it?
12            MR. PASSESER:  We have.
13            THE COURT:  OK.  That's you, Mr. DeAtley.  OK.
14            MR. DeATLEY:  I believe my colleague has spoken to
15    with Mr. Boyle about the issues addressed in his letter and
16    what we do not object to.  I think what we made an objection to
17    is the complaint report and the arrest report, simply because
18    it's confusing to present to a jury without having it brought
19    in through a police officer or having him be able to explain
20    what the document says.
21            THE COURT:  This is Exhibits 1 and 2?
22            MR. DeATLEY:  Exhibit 1 and 2, your Honor, the
23    complaint report and the arrest report.
24            THE COURT:  You're not objecting to the admission of
25    the other materials that are cited here.
```

FC8AJEN1ps

1           MR. DeATLEY:  No, your Honor.

2           MR. PASSESER:  Except for, I'm sorry, except for the

3    parole.  I'm not including the parole up to this point.  The

4    parole records, nos. 303 through 306 and 329 through 340 --

5           THE COURT:  Are what?  You object?

6           MR. DeATLEY:  We're not objecting to.  But 323 -- or

7    273 to 275, which is the chrono report --

8           THE COURT:  I'm awfully sorry, I'm only seeing 273 and

9    274 being cited.

10          MR. DeATLEY:  I don't believe they're cited, but

11   there's three pages, your Honor, included in the exhibit.

12          THE COURT:  So that you're objecting to.  What else,

13   please, sir?

14          MR. DeATLEY:  Just Exhibit 1 and Exhibit 2, your

15   Honor.

16          THE COURT:  I'm sorry.  I should have been more

17   precise.  With respect to the parole file, is it simply those

18   three pages?

19          MR. DeATLEY:  Correct.

20          THE COURT:  OK.  Thank you.  I have some questions

21   about those as well.

22          Can I hear a little bit more about your concerns about

23   Exhibits 1 and 2, please.  I don't know -- I shouldn't be glib.

24   I'll be serious.  They don't bother me.  If we're going to talk

25   about something where there is, at the very least, indicia of

FC8AJEN1ps

1    reliability, which is how I'm understanding courts examine

2    information of this type, or presentation of information of

3    this type, I hate to think that those are things that should

4    not be relied upon.

5           What I understood from yesterday was that your concern

6    was one of cumulativeness and confusion.  So I guess there will

7    be police officers testifying, correct?

8           MR. DeATLEY:  Yes, your Honor.  The concern about, if

9    I may address --

10          THE COURT:  Please.

11          MR. DeATLEY:  Your concern about the evidence being

12   cumulative is that plaintiff also has additional exhibits,

13   Exhibits 3 and 4, which are an arrest run and arrest data,

14   information that is present in a different manner, but is all

15   condensed into that original arrest report.  So our concern, as

16   addressed yesterday with plaintiff's counsel, was including all

17   of these exhibits and presenting them to the jury, because we

18   believe that all of them together would be cumulative and

19   confusing to the jury.

20          Specifically to the two that he addresses in his

21   letter, which is the complaint report and the arrest report,

22   Exhibits 1 and 2, our concern is simply that allowing

23   plaintiff's counsel to introduce it in any way without

24   introducing it through an officer would be confusing to the

25   jury.

FC8AJEN1ps

```
 1              THE COURT:  All right.  Let me speak to Mr. Boyle for
 2    a moment.  Thank you.
 3              Mr. Boyle, is it your intention to introduce these
 4    through your client?
 5              MR. BOYLE:  Your Honor, it's our position legally that
 6    they don't have to be really introduced through anyone --
 7              THE COURT:  I understand.
 8              MR. BOYLE:  -- because they -- but I will -- it was my
 9    intention this morning to offer them into evidence, with
10    Mr. Jenkins on the stand.  He doesn't necessarily even have to
11    address these documents.  They are authentic.  They fall within
12    the exception.  They come into evidence.
13              THE COURT:  OK.  May I stop you for a moment, sir.
14    Where is your client?
15              MR. BOYLE:  I was just looking to see if there was a
16    message from him, and I was going to go out and call him and
17    make sure he's nearby.
18              THE COURT:  All right.  Perhaps if Mr. Oliver can
19    handle that, because I want someone talking to me about legal
20    issues.
21              All right.  I am inclined, I will let in Exhibits 1
22    and 2.  And as to 273, 274, and 275, I'm still looking at that
23    issue.  Mr. Boyle, is it your intent, sir, that if I let in --
24    these other exhibits do not seem to be of concern to the
25    defense, in the sense that they're not objecting to their
```

FC8AJEN1ps

1    introduction.  Is it your intention, if I were to let in these

2    other three pages, to not call the parole officer as a witness

3    in the case, or are you still calling him?

4         MR. BOYLE:  It would make it far less likely to call

5    him.  I mean, we're thinking through it, but it would be far

6    less likely to have to call him.

7         THE COURT:  The reason that I ask, sir, is not that

8    it's going to impact my decision.  I'm not going to --

9         MR. BOYLE:  Of course not.

10        THE COURT:  -- introduce or not introduce something

11   just to limit the number of witnesses.  My issue is, I don't

12   actually know how these -- I see the words on the page.  I

13   don't actually understand their genesis.  I don't understand

14   whether -- it's not as obviously a public record to me because

15   I don't understand it as much as I understand other things that

16   you've shown to me, such as the disposition sheet or

17   certificate or the notices or the warrant.  Those are very

18   obviously public records to me.  So I am going to look a little

19   bit more carefully at the chron entries.  But that's the aspect

20   of your inquiry or your request that I have not decided yet.

21        MR. BOYLE:  Thank you.

22        THE COURT:  OK.  Thank you.  Also one other thing on

23   the issue of level one performance monitoring, I am not going

24   to allow that testimony.  Having spent a fair amount of time

25   last night thinking about it, I am concerned about confusion of

FC8AJEN1ps

```
 1    the issues because it is simply a number of complaints.  And I
 2    don't mean to suggest that -- well, I guess I mean to
 3    suggest -- that one might simply be unlucky and have three
 4    complaints.  I then have to explain to the jury what a
 5    substantiated complaint is.
 6              Now, off the record momentarily, please.
 7              (Discussion held off the record)
 8              THE COURT:  We are now back on the record.
 9              Mr. DeAtley.
10              MR. DeATLEY:  I wanted to inform the Court of two
11    issues.  First in terms of, at the end of yesterday's
12    conference, we discussed the mugshot issue that plaintiff
13    raised.
14              THE COURT:  Yes, sir.
15              MR. DeATLEY:  We provided plaintiff the original PDF
16    scan, as well as we showed plaintiff the original copy that we
17    have this morning.  Plaintiff indicates that his copy may be
18    just as good or, or -- fine.
19              The second issue, your Honor, that we would like to
20    raise is that, in plaintiff's opening yesterday, he did mention
21    that the defense attorney who would likely testify this
22    afternoon, will testify that the injuries that Mr. Jenkins
23    received were of a defensive nature, not of an offensive
24    nature.  We do not feel that she is capable of testifying in
25    such a manner.  She wasn't identified as an expert.  She has no
```

FC8AJEN1ps

1     qualifications to be able to indicate to the jury that the

2     wounds, or the injuries suffered by Mr. Jenkins, were of a

3     defensive versus of an offensive nature.

4              THE COURT:  All right.  Mr. Boyle, I was surprised

5     that you went that far in your opening.  Could you speak to

6     that issue, sir, because I myself -- whatever CSI shows I may

7     have watched in my lifetime, I'm not sure that I'm expert

8     enough to opine on whether something is defensive or offensive

9     or whether someone bruises easily or doesn't bruise easily, so

10    I'm not sure how she has the competence to speak to that issue.

11             MR. BOYLE:  Well, I believe she will testify that she

12    has -- she is an extremely experienced defense attorney and is

13    in the criminal law and has tried many cases, assault cases,

14    where the defenses are sometimes whether certain wounds are

15    defensive or offensive in nature.  And you make that argument

16    to the jury.  If someone puts up their arms -- and I'm holding

17    up now my forearm bent and my fists covering myself -- and the

18    wound in this case is on the far side, that certainly, in terms

19    of argument, is a defensive wound.

20             If the Court has a concern about it, I can certainly

21    speak to Ms. Richman before she takes the stand on that issue.

22             THE COURT:  Yes.  I want to just look at something,

23    sir.  I am aware that Ms. Richman is a criminal defense

24    attorney with significant experience.  I don't believe that she

25    was offered as someone who's going to speak to how her prior

FC8AJEN1ps

1    representation of individuals in cases of this type gave her

2    particular insights into whether a particular injury was

3    offensive or defensive.  So let me just look at this.

4              No.  She is listed as someone who will testify to her

5    representation of the plaintiff on the criminal charges and the

6    parole violation proceedings, and her observation of the

7    plaintiff as he appeared in court at the arraignment and

8    thereafter.  I did not understand that to be this issue.  What

9    she may testify to is what she saw and what she did not see.  I

10   don't want her to be connecting the dots in a way that suggests

11   that she has an expert -- or a specialized knowledge, based on

12   being a criminal defense attorney, in whether wounds or

13   injuries are defensive or offensive.  So if you could just

14   instruct her in that regard.

15             MR. BOYLE:  Yes, your Honor.

16             THE COURT:  OK.  Thank you.

17             All right.  Anything else?

18             MR. DeATLEY:  Nothing from defense, your Honor.

19             THE COURT:  All right.  Thank you.

20             Off the record.

21             (Discussion held off the record)

22             THE COURT:  Now we're back on the record.

23             MR. BOYLE:  And your Honor, just to make it complete

24   or more on this issue, which went to my hoping and not trying

25   to go beyond the scope:  In the arraignment transcript, when

FC8AJEN1ps                    Jenkins – direct

1   she is in front of the court, she says, "If I may have him

2   remove his jacket, your Honor, and note there was a defensive

3   wound which goes through his sweatshirt to his left forearm."

4   That is actually, when she was standing in the criminal court

5   at the arraignment, that's what she said.

6            THE COURT:  I am aware of that, sir.  But I guess I'm

7   drawing a distinction between advocacy and competence.  I don't

8   know that she can say that.  I know she did say it.  I don't

9   know whether she is competent to make that assessment.

10           All right.  Thank you very much.

11           I'm going to step off the bench momentarily.  We're

12   not going to have this happen again, with anyone showing up

13   late, I'm sure.  Thank you.

14           (Recess)

15           (Jury present)

16           THE COURT:  Off the record.

17           (Discussion held off the record)

18           THE COURT:  We're back on the record.

19           Good morning to each of you.

20           JUROR NO. 7:  Good morning.

21           THE COURT:  Welcome.  And we begin now with the

22   presentation of the plaintiff's case.

23           Mr. Boyle.

24           MR. BOYLE:  Thank you, your Honor.  For our first

25   witness, the plaintiff calls the plaintiff himself, Norman

FC8AJEN1ps                    Jenkins – direct

1    Jenkins.

2             THE COURT:  Yes.  Mr. Jenkins, please come forward.

3             THE CLERK:  Please step up near the witness box and

4    just remain standing for a moment, sir.

5     NORMAN JENKINS,

6         the plaintiff herein,

7         having been duly sworn, testified as follows:

8             THE COURT:  You may proceed, sir.  Thank you.

9             MR. BOYLE:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. BOYLE:

12   Q.  Good morning, Mr. Jenkins.

13   A.  Good morning.

14   Q.  I would just ask you to please speak slowly and not be

15   too -- be close to the microphone but not too close, so we can

16   all understand what you're saying.  Thank you.

17            Mr. Jenkins, are you the plaintiff in this action?

18   A.  Yes.

19   Q.  OK.  Now, directing your attention to May 22, 2010, what if

20   anything happened in the early morning lours?

21   A.  I was approached from behind, and I was hit in the back of

22   the head.  I was struck in the back of the head.

23   Q.  Were you arrested that night?

24   A.  Yes.

25   Q.  Were criminal charges eventually levied against you?

FC8AJEN1ps                    Jenkins - direct

1              THE COURT:  Counsel, lead less.  Thank you.

2   A.  Um, I was, I was arrested, and then consequently there was

3   charges brought.

4   Q.  What were those charges?

5   A.  Resisting arrest, possession of crack cocaine, possession

6   of marijuana, and assault on a police officer.

7   Q.  Now, were those charges true or false?

8   A.  They was false.

9   Q.  Now, directing your attention to the day of June of 2011,

10  what if anything happened with those charges?

11  A.  They, the prosecutor dismissed them.

12             MR. BOYLE:  May I have a moment, your Honor?

13             THE COURT:  Yes.

14             MR. BOYLE:  Your Honor, at this time plaintiff would

15  move into evidence Plaintiff's Exhibit 12, the certificate of

16  disposition.

17             MR. PASSESER:  No objection.

18             THE COURT:  It is admitted in evidence.

19             (Plaintiff's Exhibit 12 received in evidence)

20             THE COURT:  Counsel, do you wish to pass it to the

21  jury, or are you going to display it on the Elmo?

22             MR. BOYLE:  I'm going to -- maybe I'll make my first

23  attempt, your Honor, to use the Elmo.

24             THE COURT:  OK.  We'll see how that works out.

25             You'll excuse us for a moment as we get used to this

FC8AJEN1ps                    Jenkins - direct

1    lovely technical equipment.

2              Yes.  At the moment you're showing my forearm.  All

3    right.  Now -- you were almost there.  There.  Now you're --

4    right there, and then you go straight down, please.

5              All right.  Can the jurors see what is on the screen?

6    And I'm seeing nods and no one is saying they cannot.

7              OK.  And, Mr. Jenkins, do you see it, sir?

8              THE WITNESS:  Yes.

9              THE COURT:  Thank you.

10   Q.  Mr. Jenkins, were you present in court on the day the

11   charges were dismissed?

12   A.  Yes, I was.

13   Q.  And what was the -- to the best of your recollection, what

14   were the circumstances of the dismissal?

15   A.  It wasn't -- I -- there was no disposition given, but from

16   the letters that I was writing, I was asking to be --

17             THE COURT:  I'm sorry.  I want to -- I think his

18   question to you, sir -- excuse me -- is, that day, when you

19   were in court and they dismissed the charges, were you there?

20             THE WITNESS:  Yes, ma'am.

21             THE COURT:  OK.  And, Mr. Boyle, your question is,

22   what happened that day?

23   Q.  What happened in court?

24             THE COURT:  That day.

25   A.  Oh.  Um, I walked in.  My lawyer, me and my lawyer

FC8AJEN1ps                    Jenkins - direct

1    approached the bench.  And when the clerk read off my charges,

2    the DA stepped up and said she's filed a motion to dismiss.

3    Q.  What if anything did the court do after the district

4    attorney said that?

5    A.  They um, they said that, um, my -- that this would be

6    sealed and that, um -- and that, um, it would be eradicated off

7    my records.

8            MR. BOYLE:  I'm just going to try to turn it off, your

9    Honor.

10           THE COURT:  Here.  I'll just turn off the monitors.

11           MR. BOYLE:  Thank you.  Thank you, your Honor.

12           THE COURT:  Full service, counsel.

13   Q.  Mr. Jenkins, I'm going to ask you some questions about your

14   background.  How old are you?

15   A.  I'm 49.

16   Q.  And where were you born?

17   A.  I was born in Flower Fifth Hospital, New York, New York.

18   Q.  Do you have any brothers and sisters?

19   A.  I have four brothers, one deceased, and five sisters.

20   Q.  And could you please tell the Court and jury your

21   educational background.

22   A.  GED and 52 credits of college from Ulster Community

23   College.

24   Q.  Other than the GED, do you have -- did you have any

25   work-related training?

1   A.  Yeah.  Plumbing.

2   Q.  Are you currently employed?

3   A.  As of right now, no.

4   Q.  Could you please tell the Court and jury something about

5   your work history.

6   A.  From '08 to 2010, I formed my own business, called -- a

7   management business called We Do a Seven.

8           THE COURT:  I'm sorry.  What was the business called?

9           THE WITNESS:  We Do a Seven.

10          THE COURT:  We Do a Seven.

11          THE WITNESS:  Yes, ma'am.

12          THE COURT:  Got it.  OK.

13  A.  It was a management company, where I managed acts and

14  promoted shows.  But, you know, sometimes it's a hit-and-miss

15  with that, so I was -- odd jobs I worked for my father.  My

16  father owns a plumbing company, called JJ Piping, and like, you

17  know, when it's available, you know, he would send work my way.

18  He does that today too, for the day, like, you know, I do

19  boilers, six boilers, anything, stoppage, leaks.  You know, any

20  material, galvanized, black matter, black steam, anything.

21  Sweating, cast iron.  Anything that got do with plumbing I can

22  basically do.

23          THE COURT:  And, sir, I'm sorry.  Just the first thing

24  you said, you do boilers?  Is that what you were saying?

25          THE WITNESS:  Six series, one series boilers.

FC8AJEN1ps                    Jenkins - direct

1          THE COURT:  OK.  That's the word.  I wanted to -- OK.

2    Thank you.

3    Q.  Mr. Jenkins, do you have any children?

4    A.  Yes.  I have three.

5    Q.  And what are their names and ages, please?

6    A.  I have Quanisha Jenkins.  She's 33.  I have Diamond Matthew

7    Jenkins.  She's 14.  And I have a five-year-old son named

8    Mikaiel Jenkins.

9          THE COURT:  Could you please give the spelling.

10         THE WITNESS:  Oh, Quanisha, Q-u-a-n-i-s-h-a, Jenkins.

11   Diamond, D-i-a-m-o-n-d.  And Mikaiel, M-i-k-a-i-e-l, Jenkins.

12   Q.  Where do you currently reside?  Not the specific address,

13   but in what area do you reside?

14   A.  Harlem.

15   Q.  Now, directing your attention to May of 2010, where were

16   you residing then?

17   A.  Parkchester.  I had a condo there.

18   Q.  You're saying you had a --

19   A.  Yeah.  I live in a, I live in Parkchester, so condo houses.

20   Q.  Where is Parkchester?

21   A.  In the Bronx.

22   Q.  Do you have a specific address where you're residing?

23   A.  Yeah.  24 McGraw.  2054 McGraw.

24   Q.  Thank you.  And with whom are you residing?

25   A.  I'm living with my cousin, my cousin Jennifer Hamilton.

FC8AJEN1ps                    Jenkins - direct

1    Q.  Were you employed at that time, that is, May of 2010?

2    A.  No.

3    Q.  And what was going on in your life at that time, if

4    anything?

5    A.  At that time in my life I had, I -- I was -- We Do a Seven

6    and I was having a son, and my son, I was expecting a child.

7    Q.  When are you actually expecting that child?

8    A.  The due date was May 21, 2010.

9    Q.  How were you feeling about that impending birth?

10   A.  You know, due to the circumstances, my oldest child, we

11   kind of like, you know, fell apart because during her whole

12   life I was incarcerated.  So when I was having a son, I don't

13   know if it was jealousy on her part or whatever, but, you know,

14   we kind of like drifted apart, and then basically, on the 20th,

15   on the 20 -- on the 21st, she basically asked me, like, yo,

16   don't treat my little brother like how you treated me.  And,

17   you know, basically that was the best thing.  At that moment

18   right there, you know, my kid forgave me, you know, saying I'm

19   having another child.  So I was, you know, I was in clouds.

20   Q.  Let me stop you there.  You indicated you were incarcerated

21   for most of your daughter's life.  Do you have a criminal

22   conviction?

23   A.  Yes.

24   Q.  Is that a conviction for a felony?

25   A.  Yes.

FC8AJEN1ps                    Jenkins - direct

1    Q.  And were you on parole in May of 2010?

2    A.  Yes.

3    Q.  Are you on parole today?

4    A.  Yes.

5    Q.  And directing your attention to May of 2010, were you on

6    any kind of parole restrictions?

7    A.  Yes.  I was on parole restriction that I couldn't leave the

8    state, I couldn't drink, I couldn't own a firearm, I couldn't

9    have no inter-reaction with police.  I couldn't have drugs on

10   me.  And I had a curfew.

11   Q.  What was that curfew?

12   A.  The curfew was that I can't leave my house from 7 to -- I

13   got -- I could leave my house from 7 in the morning, and I have

14   to be back in my house by 9 o'clock at night.

15   Q.  Did you have a parole officer in May of 2010?

16   A.  Yes.  I had -- my parole officer name was P.O. Watkins.

17   Q.  What kind of relationship if any did you have with Parole

18   Officer Watkins?

19   A.  He was -- he was my parole for almost -- for almost 18

20   months.  I was out on parole for two years.  So basically our

21   relationship was, you know, parolee and supervisor

22   relationship.  It kind of extended to a friendship.

23          But he was very impressed with my, um, my adapt -- how

24   I adapted to supervision.

25          MR. PASSESER:  Objection, move to strike the last

FC8AJEN1ps                        Jenkins – direct

1    part.

2              THE COURT:  Yes.  That is stricken.  That wasn't part

3    of the question at all, so it isn't appropriate for him to

4    testify to that.

5              MR. BOYLE:  OK.

6              THE COURT:  So the jury will disregard the very last

7    thing about Officer Watkins' views regarding how well or poorly

8    the defendant was doing.  Thank you.

9    Q.  Did you ever discuss the impending birth with Parole

10   Officer Watkins?

11   A.  He supervised me.  I discussed everything with my parole

12   officer, everything in life, that, you know, they supervised

13   me, so anything that goes on in my life when I'm employed, you

14   know, I share that with them.

15   Q.  What did you tell him?

16   A.  You know, I tell him I was having a son, you know, and I,

17   you know, I feel great about starting a family, you know.  He

18   knew the situation between me and my daughter.  He knew that,

19   he knew that my son was –– due date was May 21.  He knew that.

20   He knew that, that, um, the, um –– the hospital that he was

21   supposed to be born in, that, you know, we did our preparation,

22   was in Hackensack, New Jersey, same hospital that my girlfriend

23   was born in.  So he knew everything about me.  That was nothing

24   that he didn't know.

25   Q.  Now, directing your attention to May 21st of 2010, what did

FC8AJEN1ps                    Jenkins - direct

1    you do that day?

2    A.  Well, May 20th --

3    Q.  May 21, 2010.

4    A.  May 21, 2010, I went to work.  My father, he had a job for

5    me, and he picked me up, you know, about 7:30, and we went to

6    the site.

7    Q.  Was that 7:30 in the a.m.?

8    A.  7:30 in the a.m.

9    Q.  OK.  What if anything happened while you were working?

10   A.  Nothing happened while I was working.

11   Q.  Did there come a time when you left work?

12   A.  Yeah.  There came a time where I was leaving work, and I

13   got a call from Shaquala, who was at, you know, pregnant at

14   that time.

15             THE COURT:  I'm sorry, sir.  Could you spell her name,

16   please.

17             THE WITNESS:  S-h-a-q-u-a-l-a.

18             THE COURT:  Thank you.  And this is the mother of your

19   child?

20             THE WITNESS:  Yes.  Yes, ma'am.

21             THE COURT:  Thank you.

22   A.  So she calls and she, she's telling me that she's having a

23   lot of pain.  And it's like she, she -- actually she had called

24   the day before complaining about the same thing on the 20th.

25   And what happened on the 20th was I, um, I called my parole

FC8AJEN1ps                           Jenkins - direct

1   officer, and I basically explained to him -- I was supposed to

2   report that day.  So ba --

3   Q.  That was on the 20th you were supposed to report.

4   A.  That's on the 20th, that's the 20th.

5         I called them, and I basically explained to them,

6   like, you know my son about to be born, you know, like I'm, I'm

7   going to call out of work and this and that.  So he was like,

8   you know what, come in on the 27th.  This was over a phone

9   conversation.  I didn't know when my son was going to be born

10  and when we was going to be -- see, I just knew that that was

11  the due date.  He was actually born six days later, after, six

12  days later, of the 21st.  He was born on -- I mean, seven days

13  later he was born, on the 28th.

14  Q.  Getting back to the 21st, you indicated you received a

15  telephone call from Shaquala.  Is that right?

16  A.  Yes.

17  Q.  What did you do, if anything, as a result of that call?

18  A.  I was with my father, so he pulled up to -- he was -- he

19  lives in Concord Village, and he pulls up to his parking space.

20  And I call upstairs, and my pa had extra keys to my brother's

21  truck.  I call upstairs, I get in my brother's truck, a

22  Durango, and I drive to Parkchester to get, to get Shaquala.

23  Q.  What was your intention, if any, driving to Parkchester to

24  get Shaquala?

25  A.  I was going to take her to the hospital.  I was expecting

FC8AJEN1ps                        Jenkins - direct

1    my son to be born.

2    Q.  Did you in fact pick her up in Parkchester?

3    A.  Yes, I did.

4    Q.  And where if anywhere did you go?

5              THE COURT:  I'm sorry.  Can I just hear that?  She was

6    picked up in Parkchester?

7              MR. BOYLE:  Parkchester.

8              THE COURT:  Thank you.

9    A.  Me and my -- my cousin brought her downstairs.  We got in

10   the truck.  And we headed, we headed towards Hackensack

11   Hospital.

12   Q.  What is the name of your cousin?

13   A.  Jennifer Hamilton.

14   Q.  Did there come a time when you got to the hospital in

15   Hackensack?

16   A.  Yes.

17   Q.  Approximately what time did you get there?

18   A.  Maybe 7, 8.  7, 8 o'clock.  6 o'clock.  From -- anywhere

19   between 6 to 8.

20             THE COURT:  Evening or morning, sir?

21             THE WITNESS:  P.m.

22   Q.  Did she in fact give birth that night?

23   A.  No, she didn't.  It was, um, it was gas.

24   Q.  Now, did there come a time when you left the Hackensack

25   Hospital area?

1    A.  Yes.

2    Q.  Where if anywhere did you go?

3    A.  I went to -- she, she's from Elizabeth, New Jersey.  So it

4    was like a 20-minute drive.  She wanted to grab some stuff from

5    my mother and she wanted to see her sisters and all that, so we

6    drove over to Elizabeth, New Jersey.

7    Q.  Did you in fact go to Elizabeth?

8    A.  Yes, I did.

9    Q.  How long did you remain in Elizabeth?

10   A.  40 minutes, the top.

11   Q.  And after leaving Elizabeth, where did you go?

12   A.  We -- I was headed back towards Parkchester.  I was headed

13   home.  And I got a call from my daughter, Quanisha -- at that

14   time we didn't speak for like about nine or ten months.  And

15   she knew that my -- somebody -- it went through the family

16   that -- she found out that I, you know, that -- might be giving

17   birth.  So she called me, and I said, no, this is a false

18   alarm.  And she was like, dad, I want to talk to you.  So I was

19   like, OK, cool, you know what I'm saying, because we, we

20   haven't talked in like, basically eight months at that time.

21   She wasn't returning my calls.  She wouldn't even say nothing

22   to me at all.

23   Q.  OK.  And you indicated you were in the car, leaving

24   Elizabeth.  Who was in the car?

25   A.  In the car was my cousin, Jennifer Hamilton, and Shaquala

1    Mitchels, my son's mother.

2    Q.  As a result, did you -- you had a conversation with

3    Quanisha.  What if anything did you do after that conversation?

4    A.  Well, I, first of all, I told her I was driving and that I,

5    you know, I'm coming over there, you know, like you know what

6    I'm saying, I know like this is important, you know.

7    Q.  And when you say "going over there," where was she?

8    A.  She was in 310 East 102nd Street, Apartment 4D.  That's

9    her -- that's where she was at at the time.  That's where she

10   lived at.

11   Q.  Is that in Manhattan?

12   A.  Yes, in Manhattan.

13   Q.  Did you in fact get there?

14   A.  Yes, I did.

15   Q.  Approximately what time did you arrive at Quanisha's

16   apartment?

17   A.  Anywhere from like 10 to 11.

18   Q.  That would be at night?

19   A.  That would be at night.

20   Q.  What if anything happened when you were there?

21   A.  Um, you know, we, we went upstairs.  You know, I hugged my

22   daughter.  And she basically told me, like, yo, pops, you know

23   what I'm saying, you gone for, you know, large part of my life,

24   you know.  And, you know, I don't want you to do that to my

25   little brother.  I don't want you to, you know what I'm saying,

FC8AJEN1ps                    Jenkins - direct

1    that's how -- don't treat my little brother the same way.  So I

2    told her, you know, Quanie, I love you man, you see what I'm

3    doing out here, you know, I'm trying to do what -- you know,

4    like, it was 30 years ago.  You know.  This is what I'm doing

5    right now.

6              And I hugged her, her, and I told her like, yo, listen

7    man, I got you and your little brother, and your little sister.

8    You know.  So it was like, you know, at that time, that moment

9    right there, like it was the best time in my life, because, you

10   know, I started there with my, you know, my relationship with

11   my kids, you know.  And that's all that matters.  And we went

12   through a lot, like it wasn't just like that day we popped up

13   and had this conversation.  Like we screamed, we yelled.  I

14   came home.  She had her fists balled, you know.  I mean, I

15   spent 20 years of my life in the penitentiary, not back and

16   forth, just 20 straight.  She grew up as a little girl without

17   her pops.  So now she's saying like, you know, you doing it

18   again?  And it wasn't more so the way that I was living.  She

19   didn't ever take the time to see the type of person, you know,

20   that I came home and was aspiring to be.  She was just basing

21   it on, you know, the fact that -- her pains.  And I couldn't be

22   a father to her no more.  I told her that.  You're a grown

23   woman now.  You know what I'm saying.  Ain't daddy girl no

24   more.  So it was heartfelt.

25             But I gave her my word that what happened with her

FC8AJEN1ps                    Jenkins - direct

1    little brother -- like from the time he come out all the way

2    to, I got to let his hand go, I'm going to be there.  And I was

3    there this morning.  I was there the morning, yesterday

4    morning, like, true to my word.  When he wake up in the

5    morning, I'm there.  When he go to sleep at night, I'm there.

6    Q.  Does Mikaiel live with you now?

7    A.  Yes.

8    Q.  Now, after your conversation with Quanisha, what if

9    anything happened?

10   A.  You know, we talked.  It got kind of late.  I was tired.  I

11   was up.  I got up.  I was working all day.  I had to drive out

12   to New Jersey.  You know, I was kind of tired.  So, you know,

13   it's not like I never slept there before.  This was, like,

14   right next door where I grew up.  It's actually where I'm

15   sleeping in the room that she was conceived in.  So I fell

16   asleep.

17   Q.  Now, other than yourself and Quanisha, who else was in the

18   apartment?

19   A.  Me, Jennifer, and Shaquala.

20   Q.  I'm sorry.  Shaquala, Mikaiel's mother.

21   A.  Mikaiel's mother, yes.

22   Q.  Your cousin, Jennifer Hamilton.

23   A.  Yes.  And Quanisha.

24   Q.  And your daughter, Quanisha.

25   A.  Yeah.

FC8AJEN1ps                          Jenkins - direct

1    Q.  And you fell asleep?

2    A.  Yeah, I fell asleep.

3    Q.  Did there come a time that you woke up?

4    A.  I woke up.  My cousin Jennifer woke me up.  And she

5    basically telling me that she was going home, and that she

6    wanted to sleep in her own bed.  And, you know, and you got to

7    tell her this, thinking that she would be real difficult, you

8    know, tired.  She knows that I'm not going to let her go to

9    Parkchester by herself.  That's, you know, a very dangerous

10   neighborhood, you know, and basically I wasn't going to allow

11   her to walk through that neighborhood by herself to go home.

12   Plus, on top of that, you know, I had a curfew.  You know what

13   I'm saying.  If my PO shows up and I'm not there, it would mean

14   that I would explain the situation to him, but still if I

15   had -- I could possibly even get there.  So I'm like saying,

16   all right, cool, let's go home.  Quala's feet were swollen, so

17   she stayed at my daughter's house.

18   Q.  Let me stop you there.  You indicated earlier that you had

19   a curfew.  And that meant that you had to be in your assigned

20   place by 9 p.m. at night.

21   A.  Mm-hmm.

22   Q.  Were you in your home by 9 p.m. at night on May 21?

23   A.  No, I wasn't.

24   Q.  Did you make any effort at all to call your parole officer?

25   A.  Bad judgment on my part, but no, I didn't.

FC8AJEN1ps                        Jenkins - direct

1   Q.   So after the conversation you had with Jennifer, what if

2   anything did you do?

3   A.   I went downstairs.  I don't know if I went down to smoke a

4   cigarette, but I went downstairs.  I was kind of like heated at

5   her, you know, because it was like, you know, it's 2 o'clock in

6   the morning, you want to head out to Parkchester, you know, the

7   6 Train at that time.  So I was like, come on, let's go.  And

8   she was saying, she was talking to Quala.  And then she was

9   talking to Quanisha.  I went downstairs and I wait, and waited

10  for her.  And when she came out the building, I headed towards

11  the train station.  It had to be like, like about a quarter

12  after 2.

13  Q.   Did you walk with her?

14  A.   No.  I was, I was kind of like in front of her.  You know,

15  she, she, still kind of like, you know, antsy, about, you know

16  what I'm saying, this happening, us leaving this early, you

17  know what I'm saying, late at night to go home.

18  Q.   Let me stop you there again.  Quanisha's apartment

19  building, could you please just state on what street it was and

20  between what avenues.

21  A.   Quanisha's building is from between First and Second

22  Avenue, on 102nd Street.  It's on the south -- it's on the

23  south-bound side of the street, facing west, going west.

24  Q.   And you indicated you were going to the 6 Train.  Did you

25  have a particular station of the 6 Train in mind?

FC8AJEN1ps                    Jenkins – direct

1   A.  Um, excuse me?

2   Q.  What 6 Train station were you headed to?

3   A.  Oh.  6 Train, on 103nd and Lexington.

4   Q.  So there came a time when Jennifer came downstairs.

5   A.  Mm-hmm.

6   Q.  And then what's the next thing that happened?

7   A.  I, I, I started walking to the train station.  I walked it

8   up, I took it, you know, over a thousand times.  Started

9   walking to the train station.

10  Q.  OK.  By the way, Mr. Jenkins, how were you dressed that

11  night?  Particularly how were you dressed when you began the

12  walk to the train station?

13  A.  Um, I had a, I had a thermal -- a thermal T-shirt on and a

14  hood, and a black hood.  I had all black on.  Black sneakers,

15  black jeans, a black thermal shirt, and a black hood.

16  Q.  Were you wearing a winter coat?

17  A.  No.

18  Q.  Are you familiar with the term "snorkel"?

19  A.  Never own one.

20         THE COURT:  Wait.  That's a different question.  He's

21  asking you if you're familiar with the term.

22         THE WITNESS:  Yes.

23         THE COURT:  OK.  What is it?  Because I don't have

24  one.

25         THE WITNESS:  OK.  A snorkel is a large coat.  And

1   they got fur around the hood, and we used to call it German

2   shepherd hair back in the day.  It actually like this young

3   lady coat right there, has the fur like that, and it's -- has

4   like, you know, like pockets right here.  This is big coat,

5   this is big snow.

6   Q.  Were you wearing a snorkel that night?

7   A.  No, I wasn't.

8   Q.  Are you familiar with the term "bubble jacket"?

9   A.  Bubble jacket, yes.

10  Q.  And what's your understanding of what a bubble jacket is?

11  A.  A bubble jacket is a jacket that they -- either be filled

12  with cotton or feathers.

13  Q.  Were you wearing a bubble jacket that night?

14  A.  No, I wasn't.

15  Q.  OK.  What if anything were you carrying on your person?

16  A.  I had $200 in my left pocket and I had my wallet in my back

17  pocket, and I had my phone in my hand.

18  Q.  Other than the phone and the money and the wallet, did you

19  have anything else in your pockets?

20  A.  I had nothing else in my pocket.

21  Q.  Did you have any crack cocaine in your pockets?

22  A.  I never had no crack cocaine in my pockets.

23  Q.  Did you have any marijuana in your pockets?

24  A.  I didn't have no marijuana in my pocket.

25  Q.  OK.  So you started walking towards the subway.  Could you

FC8AJEN1ps                    Jenkins - direct

1    just describe the route that you took.

2    A.  I walked up 102nd Street.  I crossed the street on Second

3    Avenue.

4    Q.  Were you walking with Ms. Hamilton?

5    A.  She wasn't too far behind me.  It wasn't like -- she was

6    like maybe four or five cars behind me.  Could be six cars.

7    Q.  When you say "four or five cars," what do you mean?

8    A.  Like the length of the cars, like four or five cars, the

9    length, the six, the length of the car.

10   Q.  And so you crossed Second Avenue.  Is that right?

11   A.  Yes.

12   Q.  OK.  What if anything happened next?

13   A.  I got across the street.  And I maybe got like, maybe a

14   quarter in the block, maybe 30 steps.  And I was struck from

15   behind.

16   Q.  When you say "struck from behind," what do you mean?

17   A.  I was hit in the back of the head.

18   Q.  What did that feel like?

19   A.  It felt like I was hit with a pipe.  I fell down.  I passed

20   out.

21   Q.  What if anything happened as a result of being struck?

22   A.  I fell to my -- I fell to one knee.

23   Q.  What's the next thing that happened?

24   A.  I blacked out.  And I felt somebody like go through my

25   pockets.  And then I heard somebody say, yo, he paying for

1    dinner.  And then --

2    Q.  What did you think was happening?

3    A.  I thought I was being robbed.  And --

4    Q.  Did you see any person prior to being struck?

5    A.  No.

6    Q.  OK.  And you indicated you fell down to your knee.

7    A.  Yeah.

8    Q.  What's the next, very next thing that happened?

9    A.  Um, some -- I felt somebody go in my pockets, like, like

10   pat me, like if they was patting me down.  Somebody went in my

11   pocket.  And I heard someone say, oh, he paying for dinner.

12   Then I heard someone say, he don't got a gun on him.

13           And kind of like when I heard "gun," I kind -- I, I, I

14   tried to stand up.  And when I tried to stand up, I was just

15   being punched, kicked.  I was being hit with something.  I

16   tried to cover up.  And I was still being kicked, punched.  And

17   I mean, this sound funny, but you ever see the cartoon, like

18   there's big smoke and everybody's fighting and the guy that's

19   really getting hit kind of like steps out the crowd and they're

20   still hitting each other.  And that's exactly what happened.

21   Like they was beating me so bad that I actually literally like

22   walked away from them like, and they was still swinging wild

23   and everything, so I tried to run.  And somebody grabbed me by

24   the neck and grabbed me from behind and slammed me on the back

25   of my head.  And I was still being punched, kicked, you know,

FC8AJEN1ps                    Jenkins - direct

1    beaten.  I tried to cover up like this.  And then one of then

2    grabbed my legs, grabbed me by my legs and dragged me in

3    between cars.  And first when he grabbed me, my pants, my

4    drawers and everything came off me.  I was butt naked.  And

5    they dragged me to the car.  One of them is trying to stomp me.

6    The other one is beating me with something.  I don't even know

7    what he's hitting me with.

8              So when I get in between the cars, I hear, I hear

9    somebody basically say, yo, we call the police.  And then I

10   heard one of them say, yo, we *are* the police.  At this time,

11   now I'm like, this is when I find out that they're police.

12   Q.  Let me stop you there.  You indicated when you were first

13   describing this incident that "they" struck you.  Did you see

14   anyone at that time?

15   A.  No.  But at this time I, I could make who they are now.

16   Like I'm in between the cars now.  I --

17   Q.  Going back, going back to the -- when incident started.

18   You said "they."  Did you see anyone?

19   A.  I didn't see nobody.

20   Q.  Did you -- do you know how many --

21   A.  No.

22   Q.  -- persons were there?

23   A.  No.  I, I know it was more than one.  I didn't, I didn't

24   know how many.

25             THE COURT:  And, sir, I'm just going to ask you, so

FC8AJEN1ps                    Jenkins - direct

1    the record is clear, wait until he finishes his question,

2    please, before you answer.

3              THE WITNESS:  OK.  I'm sorry.

4              THE COURT:  That's OK.  Thank you.

5              All right.  Thank you.

6    Q.  And you indicated at some point that you were able to

7    separate yourself somewhat and try and run.

8    A.  Yeah.

9    Q.  Did you see anyone at that point?

10   A.  I, I seen the figures, but I didn't -- I didn't know who

11   they -- I didn't know -- no, just seeing the people that was

12   attacking me, like fists, handcuffs.  I, I made a -- you know,

13   at that time, you know what I'm saying, like I didn't know who

14   like -- I couldn't look and see who they was.

15   Q.  Where on your body were you struck?

16   A.  In the head.  Mostly it was in the head.  I was punched.  I

17   was kicked.  I was hit in the body too, like with the, with

18   the -- with whatever the -- you know what I'm saying at the

19   time, I didn't know what it was, was hitting me with.  And they

20   was just beating me.  There was no, we the police, you did

21   this, you did that.  It was just an assault.

22   Q.  You indicated you tried to run.  Where were you running?

23   A.  The precinct is, it's right in front of me, the pre -- the

24   23rd Precinct is right in front of me.  I mean, to the left of

25   me is the school that I went to, like right to the left of me.

FC8AJEN1ps                        Jenkins - direct

1    I went from prekindergarten to the sixth grade at that school.

2    I know the whole area, like, it's my cradle.

3    Q.  Where did you grow up, what neighborhood?

4    A.  I grew up in that neighborhood right there.  Like actually

5    the apartment that I left, my daughter was conceived in that I

6    apartment right there.  I lived right next door from 1971 to

7    1987.

8    Q.  Now you indicated that the precinct is right there.  Where

9    is the precinct located?

10   A.  Right on the corner.

11   Q.  On the corner of what?

12   A.  On, I mean, it's further up on -- on Third Avenue.

13   Q.  So you indicated you were able to try and run.  What's the

14   very next thing that happened?

15   A.  Um, one of them grabbed me real hard by the -- they had me

16   by the neck, like putting their nails in me and everything.  So

17   when they -- when somebody grabbed me by the neck, they, they

18   got me in a great -- in a good bear hug.  When they got me in a

19   good bear hug they kind of like pulled a wrestling move.  They

20   call it a suplex.  And he suplexed me backwards.  And when he

21   suplexed me backwards, I fell on my neck.  And he was kind of

22   like under me too.

23       And somebody grabbed me by my legs.  Somebody

24   literally grabbed me by my legs and started dragging me.  My

25   drawers came off, everything, and they got me in between cars.

FC8AJEN1ps                    Jenkins - direct

1   So somebody still hitting me with something.  So like I kind of

2   like did a little move, and then -- I, I know who these are now

3   due to, you know, me finding out -- officer with the asp, he

4   tried to like stab me with it.  He tried to stab me with the

5   asp, because he had the asp.  The point of it was sharp.  You

6   know.  First I thought it was a knife.  For a long time I

7   thought it was a knife.  But it was actually the asp.  And when

8   he hit me with it, it stuck in my forearm.  It got --

9   Q.  Could you describe -- you are in between cars at this

10  point.  Is that right?

11  A.  Mm-hmm, yeah.

12  Q.  And you indicated that someone tried to stab you.

13  A.  Yeah, somebody tried to stab --

14  Q.  Could you describe exactly what happened.

15  A.  Well, they both, they, all three of them can't really get

16  at me.  One officer trying to kick me in my face.  Right.  He's

17  coming over me, with another officer -- he's on me with the asp

18  and trying to stab me.  I put my arm up like this, and it hit

19  me like a few times.  And then it got stuck in my arm.  When it

20  got stuck in my arm, I grabbed him.  And basically I'm hearing

21  like, yo, what are you doing, we calling the police.  And

22  somebody say, I -- we are the police.  And then the officer is

23  like telling me to let him go, let me go.  And I'm like, yo,

24  what are you doing, like you're trying to kill me.  And then

25  that's when he's like, yo, let him go, let him go, and he's

FC8AJEN1ps                    Jenkins - direct

1   trying to come over to the other officer who kicked me in my

2   face.  And when he pulled the spray out, and I was like, yo, I

3   got asthma, man, you know what I'm saying, don't spray me with

4   that.  And he just sprayed me in my face, all in my face, and

5   he kept on beating me and everything.  So that's when the other

6   officer came behind.  He was behind me now.  I'm in between

7   cars.  My pants is down.  I got an officer on me.  I'm holding

8   him.  And I got another one spraying me, and he's like, you

9   know, be easy, a flatfoot, something like that, like, to let

10  him know that a blue-and-white pulled up.

11          So when the blue-and-white pulled up, they exhausted,

12  like, like, they are sweating, I'm blood -- my blood is all

13  over them.  And none of them bleeding.  Every blood that's

14  everywhere is my blood.

15          So now I'm trying to make sense of them, like I'm

16  asking them, like, you know, what did I do, you know what I'm

17  saying, what's going on.  And, you know, I could tell like, you

18  know, that they basically, they overstepped their boundaries

19  with this one.  So I'm basically like, yo, just let me go.  You

20  know what I'm saying.  Let me go.

21  Q.  Let me stop you there.  Did you, from the time you were

22  knocked in the head until the time you're describing right now

23  between the cars, did you yourself initiate any physical

24  contact with the officers?

25  A.  I never, I never even threw a punch, because I didn't know

1   if they had guns on them.  Like I didn't know what to do.  I

2   didn't know why I was down there, if somebody was, you know,

3   putting a hit out on me.  I didn't know what was going on.

4   Q.  Before the time that you knew that the attackers were

5   police officers, did you do anything?

6   A.  Nothing.  I went down.  I was hit in the back of the head.

7   I was -- there was nothing I could do.  I was, I was like -- I

8   was knocked out.

9   Q.  Did you say anything?

10  A.  Uh-uh, I didn't say anything.

11  Q.  Did the attackers say anything?  Did you hear them say

12  anything?

13  A.  I heard them saying I'm paying for dinner and that I don't

14  have a gun on me.

15  Q.  OK.  Now, going back to the way you're in between the cars

16  and you indicated that you were -- you thought you were trying

17  to be -- someone was trying to stab you.

18  A.  No, somebody --

19  Q.  At that point.

20  A.  Yeah.  Somebody *did* stab me.

21  Q.  What happened?

22  A.  Well, like I said like -- when they -- whoever dragged me

23  in between the -- like they dragged me in between the cars and

24  dragged my clothes off, right now I know what officers did

25  what.  But when they dragged me in between cars because they --

1    somebody, I guess, even then, you know, somebody was screaming

2    out the window like, yo, what are you all doing, what are you

3    all doing.  So they tried to put me in a blind spot between the

4    cars.  So when they got me like in between the cars, I did a

5    little flip thing with my leg, and I landed the other way.  And

6    that's when the other officer that had the thing that was

7    hitting me -- when I did the little flip thing he was trying to

8    hit me in my head.  And I spin't around, like I got my foot up.

9    And then he, like he started stabbing me with it.  And then I'm

10   like, I blocked it a few times.  It hit me in my arm a few

11   times.  Then it lodged in my arm.  It went inside my arm.  And

12   I kind of like grabbed him.  But while I'm grabbing him, his

13   partner is like coming, trying to come, bring me -- I'm in

14   between cars.  He's coming over him trying to like, with his

15   heel, trying to like hit me in my face.  And I'm like, you

16   know, I'm trying to make sense of it.

17            Then when I hear that they're police, I'm really, I'm

18   actually scared now.  I'm like, you're the police.  You know,

19   you know, what's going on.  But when the blue-and-white pulled

20   up and the other officer came and they sprayed me, one of them

21   turned me around, my pants is still down.  My, my, my -- all my

22   stuff is out.  And handcuffs me from behind.  Handcuffs me from

23   behind.  I'm sitting there on the floor.  And they pick me up.

24   And when they picked me up, they like kind of like apologetic

25   in a kind of way.  Now they see the gray in my beard.  You know

FC8AJEN1ps                    Jenkins - direct

```
 1    what I'm saying.  I'm not no young black male that you're
 2    looking for, or that you like to target.  That's not me.
 3    A.  You know what I'm saying.  So he's looking.
 4              MR. PASSESER:  Objection.
 5              THE COURT:  Yes.
 6    A.  Victor Charles says, like I know --
 7              THE COURT:  Stop, stop, stop.  I'm striking the
 8    testimony about men they like to target, which is not at all
 9    responsive to the question you're asking.  You may ask another
10    question.
11    Q.  You indicated a blue-and-white.  What do you mean?
12    A.  A regular blue-and-white, a marked car, that somebody
13    called the police.  Somebody -- the police showed up because
14    somebody called them and said somebody was being assaulted
15    outside.
16    Q.  And so what happened after that police car, you saw that
17    police car?
18    A.  They, they, they stopped beating me.  They stopped beating
19    me.  And then they started doing damage control.  They, they
20    literally started doing damage control.  They, you know, it was
21    no more hitting me, no more -- now they trying to assist me on,
22    um, Victor Charles went to go look for my phone because I was
23    like, yo, my phone was in my hand.  So he went, because it was
24    so black, and he went and got my phone and gave me my phone
25    back.  He gave me my phone.
```

FC8AJEN1ps                         Jenkins – direct

1    Q.  With respect to when you're in between the cars, did you

2    have any injuries at this point?

3    A.  I'm bleeding all over the place, man.  My eye is closed.

4    My head is swollen.  My arm is bleeding.  I got scratches all

5    over my neck.  I'm plunging.

6    Q.  How did you feel?

7    A.  I felt badly.

8    Q.  OK.  So after the blue-and-white came and you had some

9    interaction, verbal interaction with the men who you now knew

10   now were police officers, what's the next thing that happened?

11   A.  The next thing that happened, the officer in the

12   blue-and-white puts me in the back of the vehicle.  When he

13   puts me in the back of the vehicle, Agate gets in the back of

14   the vehicle with me, you know what I'm saying.  He gets back

15   there with me and he basically starts telling me, like, you

16   know, listen, this is what we going to do now.  The ride seems

17   longer than what it should be, because I know the precinct is

18   right here.  So I'm in the car for about 15, 20 minutes.

19   Q.  Let me stop you there again.  Earlier you mentioned, you

20   stated the name Victor Charles.

21   A.  Yeah.

22   Q.  Do you see Victor Charles in the courtroom?

23   A.  I see Victor Charles, Ruiz, and Agate.

24   Q.  Did you see any of them on May -- during the early morning

25   hours of May 22 when you were on 102nd Street?

FC8AJEN1ps                    Jenkins - direct

1    A.  Yes.  I seen their boot, seen their sticks, seen their

2    spray.  I ain't see their badge.

3    Q.  You were placed in what you called the blue-and-white.  Is

4    that right?

5    A.  Mm-hmm, yeah.

6    Q.  And you were ultimately taken to the precinct.

7    A.  Yes.

8            MR. BOYLE:  Your Honor, may I have a moment?

9            THE COURT:  You may.

10           MR. BOYLE:  Thank you.

11           THE WITNESS:  When I got to the precinct --

12           THE COURT:  No, no, sir, you have to only answer after

13   there's a question asked.  Thank you.  He's taking a moment to

14   go through stuff.

15           MR. BOYLE:  May I show some exhibits to counsel?

16           THE COURT:  Yes.

17           MR. BOYLE:  May I approach the witness, your Honor?

18           THE COURT:  You may.

19   Q.  Showing you what's been marked as Plaintiff's 31 and 32 for

20   identification.

21           MR. PASSESER:  I think it's 32 and 33.

22           MR. BOYLE:  31 and 32.

23           MR. PASSESER:  OK.

24   Q.  Directing your attention to Plaintiff's 31 --

25           THE COURT:  May I stop you for a moment, sir.

FC8AJEN1ps                    Jenkins - direct

```
 1              MR. BOYLE:  Yes, your Honor.

 2              THE COURT:  Do you object to their introduction?

 3              MR. PASSESER:  Are they being introduced right now?

 4              THE COURT:  I assume they are.

 5              MR. BOYLE:  Yes.

 6              THE COURT:  He was going to ask a series of questions.

 7    I didn't know if we could short-circuit that.

 8              MR. PASSESER:  Yes.

 9              THE COURT:  They are admitted into evidence.  Thank

10    you.

11              MR. BOYLE:  Move Plaintiff's Exhibit 31 and 32 into

12    evidence.  Thank you, your Honor.

13              THE COURT:  OK.

14              (Plaintiff's Exhibits 31 and 32 received in evidence)

15    Q.  What is depicted in Plaintiff's 31?

16    A.  That's southbound, 102nd Street, south, going from Second

17    to Third Avenue.  That's the path that I was walking up, going

18    towards the train station.  This, this heads to the train

19    station.

20              I mean, minus the construction.  The construction

21    wasn't there at that time.

22    Q.  And what's in Exhibit 32?

23    A.  Exhibit 32 is basically where the, where the -- where the

24    path starts at.  You cross the street and you have to, you got

25    to walk up this way to get to the avenue.  You got to.  Then --
```

FC8AJEN1ps                   Jenkins - direct

1    or you're trespassing when you walking up.

2               MR. BOYLE:  Your Honor, can I -- I'm going to ask

3    Mr. Jenkins some questions about the photos.  Is it all right

4    if he steps in front of the -- comes in front of the jury?  I

5    want him to point to certain locations on them.  But we can try

6    it from here.

7               THE COURT:  Yes.  Do you have a copy --

8               MR. PASSESER:  Use the Elmo?

9               THE COURT:  That was the thought.  But I don't know if

10   he should stay here.  Is there another version of the exhibit

11   that you can place on the Elmo?

12              THE WITNESS:  I can mark it and I can show it to him.

13              MR. BOYLE:  May I consult with Mr. Oliver, your Honor?

14              THE COURT:  Of course.

15              MR. BOYLE:  We can start with that.

16              THE COURT:  OK.

17              MR. BOYLE:  Maybe if I can step to the -- I don't want

18   to put my back to the Court.

19              THE COURT:  That's all right.  I'm more concerned

20   about defense counsel not being able to see.

21              MR. PASSESER:  I can alleviate that, your Honor.

22              THE COURT:  All right.  We'll see how this works.

23   Q.  OK.  Directing your attention to Plaintiff's Exhibit 31.  I

24   would ask you to hold it up.  Is there anything different about

25   what's depicted in that photo than the way the sidewalk

FC8AJEN1ps                    Jenkins – direct

1    appeared on the early morning hours of May 22, 2010?

2            THE COURT:  He mentioned construction.  Is that what

3    we're seeing?

4    Q.  So this construction on the far right side, that was not

5    there?

6    A.  And this parking place right here wasn't there either.  The

7    parking.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FC8JJEN2                          Jenkins - direct

1    Q.  Indicating the yellow barrier?

2    A.  That wasn't there, either, and this wasn't there.  This is

3    the Second Avenue train station.  They were building a train

4    station there.

5    Q.  Is the area where you were struck in the head depicted on

6    that photograph, Plaintiff's 31?  Could you just point to where

7    you were?

8    A.  Right here, right here, right here.

9    Q.  About how many feet from the yellow barrier were you when

10   you were struck in the head?

11   A.  Maybe 20 feet, maybe 20 feet, 30 feet.

12           MR. BOYLE:  Thank you, your Honor.

13   BY MR. BOYLE:

14   Q.  And showing you Plaintiff's Exhibit 32, is the area where

15   you were struck in the head depicted in that photograph?

16   A.  Yes.

17   Q.  Where is it?  Could you point to it.

18   A.  It is right here.

19   Q.  Indicating the far-right side of the photograph?

20   A.  Yes.

21   Q.  I just want to show you Exhibit 31 again.

22           Directing your attention to about three quarters of

23   the way to the top of the photograph, do you see this little

24   opening --

25   A.  Yes.

FC8JJEN2                          Jenkins – direct

1   Q.   –– there?

2   A.   Yes.

3   Q.   Where does that lead?  Where does that lead?

4   A.   You can go to 230.

5          THE COURT:  By "230," are you speaking of building?

6          THE WITNESS:  Building, yes.  It is a pathway you cut

7   through, and say you want to go through 101st Street, you cut

8   through there.

9   BY MR. BOYLE:

10  Q.   Any time in the early morning hours of May 22nd, 2010, did

11  you enter that pathway?

12  A.   No, I didn't.

13          MR. BOYLE:  Your Honor, may I consult.

14          THE COURT:  Yes.

15          (Off-the-record discussion)

16          MR. BOYLE:  Your Honor, plaintiffs move Exhibit 33, a

17  photograph, into evidence.

18          MR. PASSESER:  No objection.

19          THE COURT:  It is admitted.

20          (Plaintiff's Exhibit 33 received in evidence)

21          MR. BOYLE:  Your Honor, with the court's permission, I

22  will give a try at the Elmo.

23          THE COURT:  Okay.

24          (Pause)

25  BY MR. BOYLE:

FC8JJEN2                        Jenkins - direct

1   Q.  Mr. Jenkins, does the photograph appear on your monitor?

2   A.  Yes, it do.

3          MR. BOYLE:  Your Honor, if I could ask the jurors if

4   it appears on the monitor?

5          THE COURT:  Yes, they have nodded.

6   BY MR. BOYLE:

7   Q.  Are you familiar with what is depicted in this photograph?

8   A.  Yes, it is 102nd Street, the southbound side from the

9   Second and Third Avenue.  That is the way the cars park there,

10  the parking.

11  Q.  On the early morning hours of May 22, 2010, were the cars

12  parked in the manner depicted in this photograph?

13  A.  Yes.

14  Q.  You're not saying, of course, that this photo was taken on

15  May 22, 2010.  Is that right?

16  A.  Yes.

17  Q.  You indicated in your testimony that you were at one point

18  dragged between cars?

19  A.  Yes.

20  Q.  Were the cars parked similarly to where they are in this

21  particular exhibit before you?

22  A.  Yes.

23  Q.  Now, directing your attention back to when you were placed

24  in what you call the blue and white --

25  A.  Ah-huh.

FC8JJEN2                        Jenkins – direct

1   Q.   -- what is the next thing that happened?  Were you taken to

2   the precinct?

3   A.   I was taken to the precinct.

4   Q.   What, if anything, happened when you got to the precinct?

5   A.   When I got to the precinct, I was brought in and I was --

6   prior to that I was told basically that if I wanted a DAT.

7   Q.   What do you mean by DAT?

8   A.   Desk offense ticket for disorderly conduct.  I was told

9   basically when I see the desk sergeant, tell the desk sergeant

10  I -- (inaudible) This is how the police found me.

11  Q.   Who told you that?

12  A.   Agate

13  Q.   You're referring to the defendant Agate?

14  A.   Agate.

15  Q.   What happened after you were told that?

16  A.   I was brought in front of the sergeant where I was

17  basically told that I was being arrested for resisting arrest,

18  and then he asked me what happened.  I said well, some Spanish

19  guys jumped me and the police came along.  That was basically

20  it.  Then I was taken.

21  Q.   Let me stop you there.

22          MR. BOYLE:  May I have a moment, your Honor?

23          THE COURT:  Yes.

24          (Pause)

25          MR. BOYLE:  May I consult.

FC8JJEN2                          Jenkins - direct

1          (Off-the-record discussion)

2          MR. BOYLE:  Your Honor, plaintiffs move Plaintiff's

3   Exhibit 6 previously marked for identification into evidence.

4          MR. PASSESER:  No objection.

5          THE COURT:  It is admitted.

6          (Plaintiff's Exhibit 6 received in evidence)

7          MR. BOYLE:  May I approach the witness?

8          THE COURT:  You may.

9   BY MR. BOYLE:

10  Q.  Mr. Jenkins, directing your attention to the picture in

11  that exhibit, does that fairly and accurately show what you

12  looked like on May 22, 2010?

13  A.  Yes.

14         (Pause)

15         THE COURT:  Mr. Hassen, I do it, not you.

16         (Pause)

17  BY MR. BOYLE:

18  Q.  Mr. Jenkins, when was this photo taken on the first page of

19  Plaintiff's Exhibit 6?

20  A.  That was taken right after the police brought me to the

21  precinct, when they brought me there.

22  Q.  Was that before or after you saw the desk sergeant?

23  A.  This is after I was pedigreed.

24         THE COURT:  Sorry?

25  BY MR. BOYLE:

FC8JJEN2                         Jenkins - direct

1    Q.  What do you mean by "pedigreed"?

2    A.  Tell me what I'm being arrested for, like they got a

3    pedigree when you come in, tell you why you are being arrested

4    and they ask you if you need medical attention.

5              THE COURT:  Can I ask you a question.  When you came

6    in, they asked you questions about your name, yes?

7              THE WITNESS:  Yes.

8              THE COURT:  Your address and things of that nature, is

9    that what you understand to be pedigree information, your

10   information about yourself and your personal information?

11             THE WITNESS:  Yes.

12             THE COURT:  At that same time, are they taking your

13   photograph?

14             THE WITNESS:  Yes.

15             THE COURT:  Did that take place before or after you

16   met with the sergeant?

17             THE WITNESS:  That took place around the same time.

18   He was questioning me while they were putting me up against the

19   gate.  So it could have been before or after.  I couldn't

20   remember.  I know during that time all that was being asked,

21   pictures were being taken.

22             THE COURT:  Is that in the early on when you were

23   brought to the precinct?

24             THE WITNESS:  Yes.

25             THE COURT:  Thank you, Mr. Boyle.

FC8JJEN2                        Jenkins - direct

1              MR. BOYLE:  Thank you, your Honor.

2    BY MR. BOYLE:

3    Q.  Showing you now what is on the Elmo, the second page of

4    Plaintiff's Exhibit 6, do you see the photo depicted,

5    Mr. Jenkins?

6    A.  Yes.

7    Q.  When was that taken?

8    A.  That picture was taken on May 22, 2010.

9    Q.  Was that taken also just around the time you spoke to the

10   desk sergeant?

11   A.  Yes.

12   Q.  Does that show what you were wearing on the night of May

13   22, 2010?

14   A.  No, it doesn't.

15   Q.  You are wearing some outerwear there, correct?

16   A.  I can't see it.  It is blacked out.  I can't see what I'm

17   wearing.

18   Q.  Was that what you had on on that night?

19             MR. PASSESER:  Objection.

20   A.  I can't see the picture.

21             THE COURT:  Let me ask you this, sir.  Is it --

22             (Multiple voices)

23             THE COURT:  I get to speak.  What you're saying is you

24   can't tell from the quality of the picture --

25             THE WITNESS:  Right.

FC8JJEN2                        Jenkins - direct

1              THE COURT:  -- whether it shows what you were wearing

2       that night or not?

3              THE WITNESS:  That is what I am saying.

4              THE COURT:  Fine.  That is your answer.

5              MR. BOYLE:  Thank you, your Honor.

6       BY MR. BOYLE:

7       Q.  Now, directing your attention to the left side of the

8       monitor, Mr. Jenkins, you indicated that you were told you were

9       being arrested for resisting arrest?

10      A.  Yes, when I first entered the precinct, yes.

11      Q.  It indicates on this exhibit that the top charge against

12      you was resisting arrest.  Is that right?

13      A.  Yes.

14      Q.  That was told to you on the night of May -- early morning

15      hours of May 22, 2010.  Is that right?

16      A.  It was about when I was brought to the precinct.

17      Q.  By this time, and now directing your attention to the time

18      when these photographs were taken and you're appearing with the

19      desk sergeant, were you ever told that you were being charged

20      with possession of crack cocaine?

21      A.  No.

22      Q.  Were you ever told that you were being charged with assault

23      of a police officer?

24      A.  No.

25      Q.  Were you ever told that you were being charged with

FC8JJEN2                      Jenkins - direct

1    possession of marijuana?

2    A.  No.

3    Q.  After saw the desk sergeant and what you described as your

4    pedigree was taken, what happened next?

5    A.  I was put in a cage and standing in behind or standing in

6    front of, they put me in a cage.  I didn't see Officer Ruiz any

7    more and I didn't see Officer Charles any more.

8           Agate kept coming back and he basically was like, you

9    know, we just going to get you for DAT, man, like yo, you're a

10   big guy.  It took us a while to get at you, know what I am

11   saying?  Yo, what kind of push ups?  I am, basically I am

12   afraid, you know what I am saying because I'm like, like I got

13   beat up by a gang and they took to their clubhouse.

14          What am I going to do, you know?  It stated to the

15   point where I am not -- (inaudible) to it, either.

16   Q.  How were you feeling at this point?

17   A.  Man, like, like, like, like, like my true feelings at the

18   time like bothered me, you know what I am saying.  I kept

19   telling the officers, yo, man what did I do?  I am about to

20   have a son.  I kept saying that, I am about to have a son, you

21   know?  They didn't care.  I am talking about the part where

22   they beat me.  You trying to kill me, man, you're trying to

23   kill me.  They're trying to kill me for nothing.

24   Q.  Did you have any injuries at this time?

25   A.  Yeah, my head was swollen.  You see the pictures, my face

FC8JJEN2                         Jenkins - direct

1    was swollen, my head was big.  I am bleeding all over the

2    place.

3    Q.  Showing you once again Plaintiff's Exhibit 6, the first

4    page.  You indicated earlier that your eye was swollen.  Is

5    that your left eye was swollen?  Does that indicate in this

6    picture, does that show your left eye?

7            MR. PASSESER:  Objection.

8            THE COURT:  Sir, he never testified what eye was

9    swollen.  Please don't testify for him.

10           MR. BOYLE:  I am sorry, your Honor.  You're quite

11   right.

12   BY MR. BOYLE:

13   Q.  You indicated an eye, an eye was swollen.  Which eye was

14   swollen?

15   A.  My left eye.

16   Q.  In Plaintiff's Exhibit 6, does that show your eye after the

17   incident on the street on May 22nd, 2010?

18   A.  Yes.

19   Q.  You indicated earlier there came a time when your phone was

20   returned to you?

21   A.  Yes.

22   Q.  Did you make any phone calls?

23   A.  Yes, I did.  I made -- I called -- well, Agate brought my

24   phone.  Well, he was trying to give me my phone in the police

25   car.  I was handcuffed from behind.

FC8JJEN2                          Jenkins – direct

1          When I got in, he put my phone back together and gave

2     it to me and he said yo, call your PO and tell him that you are

3     basically jumped by some Spanish guys and that we came along.

4     He was standing right there.  I called my PO and exactly what I

5     told my PO what he told me to tell him, I told my PO that.

6          My PO, I told him on voicemail.  His voicemail picked

7     up.  After that he left, he left me with my phone.

8          THE COURT:  He who, sir?

9          THE WITNESS:  Officer Agate.  Agate, he left and tell

10    me like, we going to get you out of here and he keeps telling

11    me to refuse EMS because they get me out quicker if I said no

12    to everything.

13         So I don't know, my son is being born, she is going

14    into labor.  I telling him everything, that is cool.  I called

15    a friend of mine.  When I called a friend of mine, I get his

16    answering machine, but I tell him, look, police beat me up,

17    wild on me, and they got me up in the precinct.  They're acting

18    like they're not trying to let me go.  I left that on his

19    voicemail, and I think I tried to call my cousin because I

20    wanted to check on her because she was out there.

21         Like she didn't pick her phone up because her phone

22    was dead.

23    Q.  What cousin?

24    A.  Cousin Hamilton.

25         MR. PASSESER:  I move to strike because her phone was

FC8JJEN2                         Jenkins - direct

1   dead.

2            THE COURT:  Exactly.  That is not for you to say.

3   Strike the last part.

4            JUROR:  May I go to the bathroom?

5            THE COURT:  Just give us a moment.  Can you finish

6   this little section so we can take a moment?

7            MR. BOYLE:  Yes.

8            THE COURT:  Please do and we'll take a brief morning

9   break.

10  BY MR. BOYLE:

11  Q.  While you were at the precinct, did you request any medical

12  attention?

13  A.  No.

14  Q.  Why not?

15  A.  I get beat up by a gang and they take me to their

16  clubhouse.  I don't seek refuse nothing there.  My thing is I

17  am trying to do everything exactly.  I want to leave.  At that

18  time I just wanted to leave.  I would have accepted assault and

19  everything to let me go.

20           THE COURT:  All right.  Let's take a break.  Thank

21  you.  Five minutes.

22           (Jury excused)

23           THE COURT:  All right.  You have five minutes as well.

24  Mr. Boyle, lead less.  Thank you.  Your adversaries are not

25  opposing to the very long narrative answers; and, therefore, I

FC8JJEN2                              Jenkins - direct

 1    am not stopping.  I think they can be a little bit more

 2    bite-sized.  I think you want to lead to finish the testimony?

 3               MR. BOYLE:  Yes.

 4               THE COURT:  I am noting the length of the answers.

 5               MR. BOYLE:  Yes.  I understand the court's question on

 6    leading.  That is in part trying to move it along and I am

 7    aware of it and I will do my best not to overstep those bounds.

 8               THE COURT:  Okay.  All right.  See you in five

 9    minutes.  Thank you.

10               (Recess)

11               (Jury present)

12               THE COURT:  Mr. Jenkins, why don't you come back to

13    the witness stand, please.

14               THE CLERK:  Please be seated.

15               THE COURT:  Thank you, Mr. Boyle.  You may proceed.

16               MR. BOYLE:  Thank you, your Honor.

17    BY MR. BOYLE:

18    Q.  Going back for a moment to back on the scene on 102nd

19    Street, at any time after you were handcuffed were you

20    searched?

21    A.  No.

22    Q.  Did anyone go through your pockets?

23    A.  No.

24    Q.  Did there come a time that night -- jumping ahead now --

25    when you left the 23rd Precinct?

FC8JJEN2                          Jenkins - direct

1    A.   Yes.

2    Q.   Where?  Where did you go?  You're in custody now at this

3    point.  Is that right?

4    A.   Yes, sir.

5    Q.   Where were you taken?

6    A.   I was taken to Manhattan tombs.

7            MR. PASSESER:  Objection.

8            THE COURT:  Exactly.

9            Manhattan Detention Center, sir?

10           THE WITNESS:  Pardon me.  Yes, Manhattan Detention

11   Center, yes, Manhattan Detention Center for men.

12   BY MR. BOYLE:

13   Q.   What, if anything, happened there?

14   A.   When I got there, I seen the CJA, criminal justice agency.

15   Q.   Then what happened?

16   A.   Then they told me my charges, they told me what I was being

17   charged with.

18   Q.   What did they tell you you were being charged with?

19   A.   I told me I was being charged with resisting arrest,

20   possession of crack cocaine and assault on a police officer and

21   possession of marijuana, those were the charges.

22   Q.   Then what happened after that?

23   A.   The wind was let out of me.

24           THE COURT:  I will ask you to speak a little slower

25   and a little louder.  Thank you, sir.

FC8JJEN2                        Jenkins - direct

1              THE WITNESS:  This is my first time here.

2     BY MR. BOYLE:

3     Q.  Did there come a time when you saw a lawyer?

4     A.  Yes.

5     Q.  Who did you see?

6     A.  I said when I had my former -- I called a friend of mine.

7              THE COURT:  Sir, I am sorry.  You are going to answer

8     the question he asked.  He asked who was the lawyer you saw?

9              THE WITNESS:  Stacey Richman.

10    BY MR. BOYLE:

11    Q.  Under what circumstances did you see Stacey Richman?

12             THE COURT:  Could you be more specific?

13             MR. BOYLE:  Sure.

14    BY MR. BOYLE:

15    Q.  Where did you see Ms. Richman?

16    A.  She came in in the back and I had a private prior to being

17    arraigned, and a lawyer-client with her.

18             THE COURT:  This was at MDC or at a courthouse?

19             THE WITNESS:  This was at the courthouse at the time.

20             MR. BOYLE:  Thank your Honor.  That was my next

21    question.

22             THE COURT:  Excuse me.

23    BY MR. BOYLE:

24    Q.  You spoke to Ms. Richman?

25    A.  Yes.

FC8JJEN2                          Jenkins - direct

1    Q.  Without telling -- okay.  Did there come a time when you

2    appeared in front of a judge?

3    A.  Yes.

4    Q.  What happened when you appeared in front of a judge?

5    A.  When I appeared in front of a judge, they read out the

6    charges, they called out the charges that I was being charged

7    with resisting arrest, possession of crack cocaine, possession

8    of marijuana and assault on an officer.

9              MR. BOYLE:  A moment, your Honor?

10             THE COURT:  Yes.

11             (Pause)

12             MR. BOYLE:  May I consult with counsel?

13             THE COURT:  Yes.

14             (Off-the-record discussion)

15             MR. BOYLE:  Plaintiff moves Plaintiff's Exhibit 8

16   previously marked for identification into evidence.

17             MR. PASSESER:  No objection.

18             THE COURT:  It is admitted.

19             (Plaintiff's Exhibit 8 received in evidence)

20             MR. BOYLE:  I will go straight to the Elmo, with the

21   court's permission?

22             THE COURT:  Yes, sir.

23             (Pause)

24             THE COURT:  Do you see that, sir?

25             THE WITNESS:  Yes.

FC8JJEN2                        Jenkins – direct

1    BY MR. BOYLE:

2    Q.  Showing you the first page of Plaintiff's Exhibit 8,

3    Mr. Jenkins -- and I understand you don't see the whole

4    thing -- have you ever seen this document before?

5    A.  Yes.

6    Q.  What is it?

7    A.  It is my felony complaint.

8    Q.  When did you first see it?

9    A.  When my lawyer showed it to me.

10   Q.  When did your lawyer show it to you?

11   A.  Prior to me being arraigned, when she came to see me.

12   Q.  At that time it was Ms. Richman?

13   A.  That was Stacey Richman, yes.

14   Q.  To your understanding, does this set forth the charges that

15   were levied against you as a result of the May 22nd incident?

16              MR. PASSESER:  Objection.

17              THE COURT:  Sorry?  I want to hear your objection.

18              MR. PASSESER:  Leading.

19              THE COURT:  Yes.

20   BY MR. BOYLE:

21   Q.  What does this document set forth, if anything?

22   A.  A felony complaint is basically -- this instrument is

23   basically used to start to --

24              MR. PASSESER:  Objection.

25              THE COURT:  I am not going to have him testify as an

1   expert witness on felony complaints.  The document speaks for

2   itself and can be shown to the jury if need be.  Thank you.

3           MR. BOYLE:  Okay.

4   BY MR. BOYLE:

5   Q.  This document, directing your attention to the paragraph

6   exhibited on the screen after the word "circumstances:" it

7   says, "Deponent observed the defendant place the defendant's

8   hands on the body of police, PO Ramiro Ruiz, Shield 7987, and

9   push PO Ruiz with the defendant's hands."

10          MR. PASSESER:  That is not a question.

11          MR. BOYLE:  I will pose a question.

12          THE COURT:  Please don't read the entire complaint

13  into the record.  Thank you.

14  BY MR. BOYLE:

15  Q.  The deponent in this document is Victor Charles.  Is that

16  right?

17          MR. PASSESER:  Objection.

18          THE COURT:  Now you have to stop.  Sir, do you see

19  this document?  Do you know what a deponent is?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  You understand the deponent is the person

22  makes the statements contained in the complaint?

23          THE WITNESS:  Yes.

24          THE COURT:  Who is the deponent in this case.

25          THE WITNESS:  Victor Charles.

FC8JJEN2                          Jenkins – direct

1            THE COURT:  You may continue.

2    BY MR. BOYLE:

3    Q.  Did you place your hands on the body of Police Officer Ruiz

4    on the night of May 22nd, 2010 as alleged in this complaint?

5    A.  No, I didn't.

6    Q.  Directing your attention to the second page –– when you're

7    ready, your Honor –– directing your attention to the first

8    paragraph, it is not a complete paragraph, on the evening of

9    the night of May 22nd, 2010 on 102nd Street, did you strike

10   Victor Charles, Officer Ruiz and Police Officer Agate about the

11   body?

12           MR. PASSESER:  Objection.

13           THE COURT:  I will let him ask that question.

14           MR. PASSESER:  Compound.

15           THE COURT:  Fair enough.

16           MR. BOYLE:  I will break it up.

17           THE COURT:  Yes.

18   BY MR. BOYLE:

19   Q.  Did you ever, on the evening of May 22nd, 2010 on 102nd

20   Street, did you strike Victor Charles about the body?

21   A.  No.

22   Q.  Did you strike Officer Ruiz about the body?

23   A.  No.

24   Q.  Did you strike Sergeant Agate about the body?

25   A.  No.

FC8JJEN2                         Jenkins - direct

1    Q.  Did you strike Victor Charles with your feet?

2    A.  No, I didn't.

3    Q.  Did you strike Officer Ruiz with your feet?

4    A.  No, I didn't.

5    Q.  Did you strike Sergeant Agate with your feet?

6    A.  No, I didn't.

7    Q.  Did you resist arrest that night?

8    A.  No, I didn't.

9            MR. BOYLE:  Thank you.

10           (Pause)

11   BY MR. BOYLE:

12   Q.  Now directing your attention back to when you're appearing

13   in front of the judge at arraignment.  You indicated you saw

14   the felony complaint.  What else happened?

15   A.  At arraignment?

16   Q.  At the arraignment?

17   A.  I was called into the court to be arraigned by the judge.

18   Q.  Then what happened?

19   A.  And then when I got in front of her, the charges were read,

20   the full charges that I was being charged with for resisting

21   arrest and possession of crack cocaine and marijuana and

22   assaulting an officer.

23   Q.  After the charges were read to you, did anything else

24   happen?

25   A.  Stacey Richman, my lawyer --

FC8JJEN2                          Jenkins - direct

1              MR. PASSESER:  Objection; hearsay.

2              THE COURT:  Was there an effort made to get you bail,

3      sir?

4              THE WITNESS:  Yeah, there was --

5              THE COURT:  That is yes or no?

6              THE WITNESS:  Yes.

7              THE COURT:  Were conditions set for bail?

8              THE WITNESS:  Yes.

9              THE COURT:  Okay.

10     BY MR. BOYLE:

11     Q.  What were those conditions?

12     A.  30,000 and 10,000.

13     Q.  What does that mean?

14     A.  Meaning that my bail is 30,000, equivalent of 30,000 on the

15     out, but 10,000 is the percentage that would need to be paid in

16     cash to come out.

17     Q.  Did you remain in custody under those conditions?

18     A.  Yes.

19     Q.  After you left the courtroom that night, did you see Ms.

20     Richman again that night?

21     A.  Yes, I did.

22     Q.  Under what circumstances did you see Ms. Richman?

23     A.  She came back in to check and see how I was doing with my

24     injuries because --

25     Q.  Without saying what Ms. Richman said to you, did you do

FC8JJEN2                        Jenkins – direct

1   anything after speaking to Ms. Richman?

2   A.  She asked me --

3           THE COURT:  No, no.  The point is we don't want to get

4   into your conversations with her because she is your lawyer.

5   There may be a privilege in those communications.

6           After your conversation with Ms. Richman, what did you

7   do, if anything?

8           THE WITNESS:  I gave her my wallet.

9   BY MR. BOYLE:

10  Q.  Where did you get your wallet from?

11  A.  From my back pocket.

12          MR. BOYLE:  May I consult with counsel for a moment?

13          THE COURT:  Yes.

14          (Off-the-record discussion)

15          MR. BOYLE:  May I approach the witness, your Honor?

16          THE COURT:  Yes, you may.

17          (Pause)

18  BY MR. BOYLE:

19  Q.  Showing you what has been marked as Plaintiff's Exhibit 10

20  for identification, Plaintiff's 10 for identification, and it

21  is a multipage document which appears to be photocopied.  Do

22  you recognize what is depicted in that document?

23  A.  Yes, my wallet and the contents that was in it.

24  Q.  From when?

25  A.  From the time that I gave it to Stacey.

FC8JJEN2                          Jenkins - direct

1   Q.  Was that on the night of May 22nd, 2010?

2   A.  Yes, the last time I seen the wallet.

3   Q.  Does the exhibit -- understanding it is photocopies --

4   fairly and accurately depict the contents of your wallet on May

5   22nd, 2010?

6   A.  Yes.

7           MR. BOYLE:  I move Plaintiff's Exhibit 10 into

8   evidence.

9           MR. PASSESER:  I am not sure what the relevance is.

10           THE COURT:  I will allow it.  It is admitted.

11           (Plaintiff's Exhibit 10 received in evidence)

12           MR. BOYLE:  Thank your Honor.  I will retrieve the

13   exhibit and go over to the Elmo again.

14           THE COURT:  Do you have any questions about the

15   exhibit?

16           MR. BOYLE:  I just want to show him one.

17           THE COURT:  One?

18           MR. BOYLE:  One.

19           (Pause)

20           THE COURT:  Do you have that in that orientation, sir?

21           MR. BOYLE:  If I can figure out how to move it.

22           THE COURT:  I didn't know if you could move the page.

23   That is why I am the Judge, yes.

24           MR. BOYLE:  Thank you, your Honor.

25           THE COURT:  Do you see it on the screen, sir?

FC8JJEN2                          Jenkins – direct

1              THE WITNESS:  Yes.

2              THE COURT:  Thank you.

3    BY MR. BOYLE:

4    Q.  Directing your attention to one of the photocopies from

5    Plaintiff's Exhibit 10, do you recognize that document,

6    Mr. Jenkins?

7    A.  Yes.

8    Q.  What is that document?

9    A.  That is my driver's license.

10   Q.  Was that on your person in your wallet on May 22nd, 2010?

11   A.  Yes.

12             MR. BOYLE:  Thank your Honor.

13             (Pause)

14   BY MR. BOYLE:

15   Q.  Did there come a time that you left the courthouse building

16   that night on May 22nd?

17   A.  Yes, I was being transferred from the courthouse to go to

18   the tombs.

19             MR. PASSESER:  Objection.

20             THE WITNESS:  I go to Manhattan Men's Detention.

21             THE COURT:  MDC, sir?

22             THE WITNESS:  MDC, Manhattan detention for men.

23   BY MR. BOYLE:

24   Q.  Did you get to the Manhattan Detention Center for men?

25   A.  At that time I was stopped.

FC8JJEN2                        Jenkins - direct

1    Q.  What happened when you were stopped?  What do you mean by

2    that?

3    A.  Because the court officers, they transfer you over to the

4    taking officers.  That is the COs, you have court officers and

5    COs that they --

6    Q.  What do you mean by CO?

7    A.  They're all correction officers, but one is a court officer

8    and the other one is a guard.  So after you being arraigned,

9    you will be held on bail, you don't make the bail, they have to

10   transfer you over to the officer that will detain you.

11            THE COURT:  You're with the court officer, and he

12   hands you off to another officer?

13            THE WITNESS:  Yes, you walk to a bridge and they give

14   you your court papers and they process you into the detainment

15   where you will be detained until you go to trial.

16   BY MR. BOYLE:

17   Q.  Did that happen to you that night?

18   A.  Yes.

19   Q.  What, if anything, happened?

20   A.  I got to Manhattan Detention Center and they refused to

21   take me.

22   Q.  Did anyone refuse to -- they refused to take you.  Then

23   what happened?

24   A.  A supervisor was summoned and the EMS was called.

25   Q.  What is the next thing that happened?

FC8JJEN2                         Jenkins - direct

1   A.   I was rushed by the ambulance to Bellevue Hospital.

2   Q.   What, if anything, happened when you got to Bellevue

3   Hospital?

4   A.   When I got to Bellevue Hospital, Internal Affairs were

5   waiting for me.

6   Q.   When you say "Internal Affairs," what do you mean?

7   A.   Internal Affairs, any time --

8   Q.   What is it?

9            THE COURT:   What is it?  Not why are they there.

10           What is it?

11           THE WITNESS:   Internal Affairs, I can tell you what

12   Internal Affairs is.

13           THE COURT:   Are they part of the NYPD, sir?

14           THE WITNESS:   Yes, part of the NYPD.

15   BY MR. BOYLE:

16   Q.   Did you speak to them?

17   A.   Yes, I did.

18   Q.   Prior to speaking to who you understood to be from Internal

19   Affairs at Bellevue, did you receive any medical attention?

20   A.   Internal Affairs has the nurses there and they were

21   cleaning me up.  They made me think that is what they wanted --

22           THE COURT:   Sir.

23           MR. PASSESER:   Objection.

24           THE COURT:   The jurors are advised to disregard that

25   answer.  I want you to answer the question he is asking.  Did

FC8JJEN2                          Jenkins - direct

1    you receive medical attention?

2            THE WITNESS:  No.

3    BY MR. BOYLE:

4    Q.  Did you see any medical personnel?

5    A.  I seen a nurse.

6    Q.  What, if anything, did the nurse do?

7    A.  She just cleaned my wounds.

8    Q.  What do you mean, cleaned your wounds?  Would you describe

9    what she did.

10   A.  She wiped the blood off my head as best she could.  She

11   wiped the blood off my neck and then she wiped the blood off my

12   arms to clean me up.  That is what she did.

13   Q.  Then what happened?

14   A.  Then Internal Affairs started taking pictures.

15           MR. BOYLE:  May I have a moment, your Honor?

16           THE COURT:  Yes.

17           (Pause)

18           MR. BOYLE:  May I consult?

19           THE COURT:  Yes.

20           (Off-the-record discussion)

21           MR. BOYLE:  Your Honor, at this time plaintiffs move

22   into evidence plaintiff's exhibits previously marked for

23   identification 23, 24 and 25.

24           MR. PASSESER:  No objection.

25           THE COURT:  They are admitted.  Thank you.

FC8JJEN2                        Jenkins - direct

```
 1              (Plaintiff's Exhibits 23, 24 and 25 received in
 2     evidence)
 3              MR. BOYLE:  With the court's permission, I will go to
 4     the Elmo.
 5              THE COURT:  Yes, sir.
 6              (Pause)
 7              (Off-the-record discussion)
 8              THE COURT:  Counsel, it might be easier to pass the
 9     pictures to the jury.
10              MR. BOYLE:  It might be, your Honor.  I am sorry.  I
11     am trying to eliminate some of the glare.
12              MR. BOYLE:  May I approach the witness?
13              THE COURT:  You may, of course.
14     BY MR. BOYLE:
15     Q.  I am showing you Plaintiff's Exhibit 25 first.  Do you
16     recall when was that taken?
17     A.  It was taken when I was at Bellevue, when Internal Affairs
18     took my picture.
19     Q.  That is a picture of you?
20              THE COURT:  Speak up, sir.
21     A.  Yes, that is a picture of me.
22     BY MR. BOYLE:
23     Q.  What does it depict?
24     A.  A hooded jacket that I had on and I had -- (inaudible) and
25     it shows the puncture wound when the object went through my
```

FC8JJEN2                         Jenkins - direct

1   arm.

2            MR. BOYLE:  May the exhibit be published to the jury,

3   your Honor?

4            THE COURT:  It may.

5            (Pause)

6   BY MR. BOYLE:

7   Q.  I am showing you now Plaintiff's Exhibit 24.  Is that also

8   a picture of yourself, Mr. Jenkins?

9   A.  Yes.

10  Q.  What does it depict?

11  A.  It depicts the back of my head.

12  Q.  When was that picture taken?

13  A.  This was taken at Bellevue Hospital, too.

14           MR. BOYLE:  May that be published to the jury, your

15  Honor?

16           THE COURT:  Yes, sir.

17           (Pause)

18  BY MR. BOYLE:

19  Q.  I am showing you now, Mr. Jenkins, Plaintiff's Exhibit 23.

20  What does that exhibit depict, Mr. Jenkins?

21  A.  It shows the puncture wound in the arm, my left arm.

22           MR. PASSESER:  Objection.

23           THE WITNESS:  I'll show you the --

24           THE COURT:  I will let the jury look at it.  It is

25  your left arm, correct?

FC8JJEN2                          Jenkins - direct

1              THE WITNESS:  Yes.

2              THE COURT:  Thank you.

3              MR. BOYLE:  May that be published to the jury, your

4    Honor?

5              THE COURT:  It may be, sir.

6              (Pause)

7              MR. BOYLE:  Your Honor, may I question about one of

8    the exhibits which I think the last juror is looking at.

9              (Pause)

10             MR. BOYLE:  Thank you.

11   BY MR. BOYLE:

12   Q.  I am showing you once again Plaintiff's Exhibit 25.  You

13   indicated there is an item of clothing to your immediate left

14   as is depicted in the photograph?

15   A.  Yes, it is -- (inaudible).

16   Q.  Can you speak --

17   A.  A sweater that I have on.

18   Q.  Other than that, and please turn it so the jury can see it,

19   can you point to where the sweat hood as you described it is.

20   A.  It is right there.

21   Q.  Other than that article of clothing, the sweat hood and the

22   thermal and what you described as the black shirt, were you

23   wearing any other upper body outer clothing that night?

24   A.  No, I wasn't.

25   Q.  I'll retrieve the exhibit.

FC8JJEN2                        Jenkins - direct

1           Did there come a time when you left Bellevue Hospital

2    that night?

3    A.  Yes.

4    Q.  Where did you go?

5    A.  I was taken back to the tombs.

6           THE COURT:  Sir!

7           THE WITNESS:  I was taken back to MDC, Manhattan

8    Detention Center for men.

9    BY MR. BOYLE:

10   Q.  Did you seek medical attention there?

11   A.  I was -- should -- they wiped my arm.

12          THE COURT:  Sir, sir.

13          THE WITNESS:  No, I didn't.

14          THE COURT:  Yes or no?

15          THE WITNESS:  No, I didn't.

16   BY MR. BOYLE:

17   Q.  Did there come a time when you were moved from the

18   Manhattan Detention Center for men?

19   A.  Yeah, I was sent to Rikers Island.

20   Q.  How long after you were arrested were you moved to Rikers

21   Island?

22   A.  I was moved to Rikers Island that Saturday morning.

23   Q.  This would be the Saturday after May 22nd?

24   A.  It would be the 29th.

25   Q.  Now, what, if anything, happened on May 28th?

FC8JJEN2                          Jenkins - direct

1                  THE COURT:  Lead less, counsel.  You may answer the

2       question, sir.

3       A.  My son was born.

4       BY MR. BOYLE:

5       Q.  Now, you were still on parole, is that right, on May 22nd?

6       A.  Ah-huh.

7       Q.  What, if anything, happened concerning your parole status?

8       A.  On the 25th, May 25th, my parole officer came to see me.

9       When he came to see me, he announced he was violating me --

10                 MR. PASSESER:  Objection.

11                 MR. BOYLE:  I'll do it differently.

12                 THE COURT:  A different way, you're saying?

13                 MR. PASSESER:  Yes.

14                 THE COURT:  Yes.

15                 MR. BOYLE:  I'll try it a different way.  May I have a

16      moment?

17                 THE COURT:  Yes.  The jury is to disregard that last

18      answer.  Thank you.

19                 (Pause)

20                 MR. BOYLE:  May I have a moment, your Honor?

21                 THE COURT:  Yes.

22                 (Off-the-record discussion)

23                 MR. BOYLE:  This would need to be marked.

24                 THE COURT:  This is an excerpt from an earlier

25      exhibit?

FC8JJEN2                        Jenkins - direct

```
 1              MR. BOYLE:  Yes.

 2              THE COURT:  That is fine.

 3              MR. BOYLE:  I have some stickers, but --

 4              THE COURT:  What do you want?  Write something on

 5   there.  Let's give it a number.

 6              MR. BOYLE:  Yes.

 7              THE COURT:  Mr. Oliver, what is the next number?

 8              MR. OLIVER:  It will be 34.

 9              MR. BOYLE:  No.  It is 35.

10              MR. OLIVER:  It is 35.

11              (Plaintiff's Exhibit 35 was marked for identification)

12   BY MR. BOYLE:

13   Q.  Mr. Jenkins, showing you what has been marked for

14   identification as Plaintiff's 35 and 36 --

15              MR. BOYLE:  And for the record, your Honor, this would

16   be Bates No. 331 and 303.

17              THE COURT:  Okay.  My friends in the back table, is

18   there an objection?

19              MR. PASSESER:  No.  I want to make sure 331 is 35 and

20   303 is 36?  I am asking which?

21              MR. BOYLE:  Yes.

22              MR. PASSESER:  Yes.

23              THE COURT:  They are admitted into evidence.  Thank

24   you.

25              (Plaintiff's Exhibits 35 and 36 received in evidence)
```

FC8JJEN2                          Jenkins - direct

1  BY MR. BOYLE:

2  Q.  Showing you what has been marked as Plaintiff's 35 and 36,

3  Mr. Jenkins, have you ever seen those documents before?

4  A.  Yeah, I seen them before.

5  Q.  Under what circumstances did you see them?

6  A.  The paperwork is more than this.

7  Q.  Under what --

8          THE WITNESS:  It was given to me like this.

9          THE COURT:  That is not my question.  Did your parole

10  officer --

11          THE WITNESS:  My parole officer gave them to me.

12  BY MR. BOYLE:

13  Q.  In general, what do those documents refer to?

14  A.  This is not what he gave me when he came to see me.

15  Q.  Directing your attention to those documents which are

16  before you, what do they refer?

17  A.  He didn't give me that when he came to see me.  That wasn't

18  part of the documents he gave me.  I seen them before.  Talking

19  about the time the parole officer came to see me in the tombs,

20  there was more documents than this.

21          THE COURT:  The jury is instructed to disregard that.

22  Sir, let me try this.  That do you have in your hand?  What is

23  it?

24          THE WITNESS:  That is a bureau report.

25          THE COURT:  May I see it?  Does it indicate a

1    suggestion of a violation?

2                THE WITNESS:  Yes, ma'am.

3                THE COURT:  And is that something you got from your

4    parole officer?

5                THE WITNESS:  That is what happened.  I am saying this

6    is not what he gave me.  He gave me a bunch of piece of papers,

7    arrest record, felony complaint, he gave me this, he gave me a

8    whole lot of piece of papers.  It is not like he gave me this.

9                THE COURT:  I understand that.

10               THE WITNESS:  He didn't give me this.

11               THE COURT:  That came later?

12               THE WITNESS:  I got this through discovery.

13               THE COURT:  Okay.  The issue, sir, is the Federal

14   Rules of Evidence limit in some ways or restrict in some ways

15   the ability that you have to talk about what someone else said.

16               So rather than doing that and running afoul of the

17   rules of evidence, what we're asking you is would this public

18   document, does it indicate there was an intent or an effort

19   made to violate you or to suggest you had violated the

20   conditions of your parole?

21               THE WITNESS:  You asked me a question.  Can I answer

22   it outside of the jury?  It is way more complicated.  What he

23   is asking me is did he give me this document right here and did

24   he give me this document right here.  I am saying no, these are

25   not the documents he gave me.  That is why I am vague right now

FC8JJEN2                          Jenkins – direct

1   under oath.

2              THE COURT:  I understand.  My question to you is --

3              THE WITNESS:  Were these one of --

4              THE COURT:  You have to let me ask the question.

5         My question to you is did your parole officer give you

6    documents and materials that indicated you were going to be

7    charged with or someone is going to allege you had violated the

8    conditions of your parole?

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.

11   BY MR. BOYLE:

12   Q.  Did you have a conversation with Mr. Watkins -- without

13   saying what Mr. Watkins said -- did you have a conversation

14   with him?

15   A.  He served as my parole officer.

16   Q.  As a result of that, did your parole status change?

17   A.  Yes.

18   Q.  How did it change?

19   A.  The law gets me because of my arrest.

20             MR. PASSESER:  Objection.  I move to strike that.

21             THE COURT:  Yes, that answer will be stricken.

22             MR. BOYLE:  I am just marking another exhibit to show

23   counsel.

24             (Off-the-record discussion).

25             (Continued on next page)

FC8AJEN3ps                    Jenkins

1    Q.  Showing you, Mr. Jenkins --

2               MR. BOYLE:  May I approach the witness, your Honor?

3               THE COURT:  You may, sir.

4    Q.  -- what's been marked as Plaintiff's Exhibit -- for

5    identification only -- 37.  Have you ever seen that document

6    before, Mr. Jenkins?

7    A.  Yeah, I've seen this document before.

8    Q.  Who gave you that document?

9    A.  My parole officer.

10              MR. BOYLE:  Your Honor, I move Plaintiff's 37 into

11   evidence.

12              THE WITNESS:  How you going to -- how you going to put

13   this in evidence when it's not even a complete document?

14              MR. PASSESER:  Objection.

15              THE WITNESS:  This is not the document that he --

16              MR. PASSESER:  I object.

17              THE COURT:  We're going to --

18              THE WITNESS:  This is not the document he gave me.

19              THE COURT:  Stop.

20              THE WITNESS:  He didn't give me --

21              THE COURT:  Sir, I'm going to ask the jury to step out

22   now, please.  We're going to take a break for about five

23   minutes.  Thank you.

24              (The jury left the courtroom)

25              THE COURT:  Mr. Jenkins, you're going to have a moment

FC8AJEN3ps                    Jenkins

```
 1    to discuss this with your counsel, but I'm going to explain
 2    something to you right now.  There are rules of evidence -- and
 3    the fact that you're not looking at me doesn't affect me at
 4    all.  But let me make sure you understand something.  There are
 5    rules of evidence that do not permit you to tell the story in
 6    the way that you want to.
 7              THE WITNESS:  I'm under oath.  I'm under oath.  He
 8    start to tell me to lie about something.
 9              THE COURT:  No, he's not going to tell you to lie.
10              THE WITNESS:  I --
11              THE COURT:  Sir, sir --
12              THE WITNESS:  I said that's not the document that he
13    gave me.
14              THE COURT:  That's fine.
15              THE WITNESS:  OK.  So then, what's the problem?
16              THE COURT:  The problem is that you are erupting in
17    front of my jury and your jury, and having conversations with
18    them about things, and suggesting that someone is trying to
19    hide things from them.
20              THE WITNESS:  We went over this --
21              THE COURT:  Why are you interrupting me?  You do not
22    get to do that.
23              Sir, you can take the time that you need to talk to
24    your attorney about the rules of evidence.
25              THE WITNESS:  I talked to him for five years about
```

FC8AJEN3ps                    Jenkins

1    this.  The same thing.  He going to get up here and play the

2    same thing with me?  This document that he gave me, all these

3    documents been falsified.  When my officer, when my PO gave it

4    to me, it had the wrong officer's name on it.  He knows that,

5    my lawyer.  I've been telling him for five years.  Then he's

6    going to come -- we had a big argument last night about this

7    whole thing.  You going to ask me to say that my PO gave me

8    this document.  And he didn't.  He gave me this document, a

9    police report, of the date we supposed to have, have made out.

10   It had the wrong officer's name on it.  I went to a hearing and

11   everything.  They called the wrong officer and everything.  And

12   it also has false charges on it.

13          So you want me to -- you want to put this in evidence.

14   And I'm telling you that I didn't get the document like that.

15   The document in its whole, in its whole -- if you want me to

16   say this is what he gave me, give it to me in its whole.  Don't

17   give me one piece of a document, and you going to say you going

18   to put in evidence, and then they only going to get half of the

19   truth -- when he gave me this document right here.  This

20   document got the reasons.  It has all their cell phones'

21   numbers on it.  There is another piece to where it says the

22   arresting officer is Hamad.  Hamad never even worked for the

23   23rd Precinct.  So when I got this document right here, I got

24   piles of letters I could show you that I wrote everybody,

25   Obama, everybody.  I have letters over there, about this

FC8AJEN3ps                    Jenkins

1    document right here.  How you going to give me a document, for

2    parole?  The documents that they turned over right here are for

3    parole.  And it has the wrong arresting officer name on it.

4              THE COURT:  All right.

5              THE WITNESS:  And that needs to be said.

6              THE COURT:  Sir --

7              THE WITNESS:  How am I going to legitimize this

8    document right now by saying -- this is a false document --

9              THE COURT:  Sir, sir, sir --

10             THE WITNESS:  The same documents you've been killing

11   me for the last five years.

12             THE COURT:  Sir, sir.

13             THE WITNESS:  They violated my parole twice with this.

14             THE COURT:  Sir.  Let me see.

15             THE WITNESS:  Let me do this.  I'm just going to read.

16   I'm not going to have all this.

17             THE COURT:  No, no.  Sir --

18             THE WITNESS:  I'm gone.  Not going to have this.  Take

19   that as a gift.

20             MR. BOYLE:  No, no.  Your Honor, may we have a recess?

21             THE WITNESS:  Take that as a gift, man.  They are not

22   my advocate.  Read my paperwork.

23             MR. BOYLE:  Can we just take a minute?

24             THE WITNESS:  Hey, listen, I ain't going to sit up

25   here.  I'm fighting you all.  You still going to -- after we

FC8AJEN3ps                    Jenkins

```
 1   talked about that last night.
 2              I see you in court.  You wasn't trying to do nothing,
 3   man.  There's why you come with that, no, you -- please, let me
 4   go, man.  Let me go.
 5              THE COURT:  Mr. Boyle --
 6              THE CLERK:  He's a plaintiff in a civil case.
 7              A MARSHAL:  All right.  He's a plaintiff in a civil
 8   case.
 9              THE COURT:  Mr. Jenkins?
10              THE WITNESS:  Keep that.  Dismiss it.
11              THE COURT:  Mr. Jenkins, Mr. Jenkins, I'm asking you
12   to take five minutes before you leave this courtroom.  And I'm
13   asking you to talk to your --
14              THE WITNESS:  Why you do this.  I'm trying to tell
15   you -- it's not you, Judge.  I'm telling this man, those
16   documents are false.  They violated me three times, man.  They
17   can't process me with the same document.  He trying to lock me
18   up now.  And have a court to tell the jurors the same thing.
19   These same documents.  They're trying to pass me the wrong sort
20   of crap, OK, the same documents.  The same documents.  Those
21   are the same documents.  Now you going to try to stick it into
22   evidence, with the false, the wrong officer's name on it.
23              THE COURT:  Mr. Jenkins, I want --
24              THE WITNESS:  I'm not giving you nothing.  You find
25   it.  You find it.
```

FC8AJEN3ps                     Jenkins

1            THE COURT:  Mr. Jenkins, Mr. Jenkins --

2            THE WITNESS:  I won't do it.  I'm going pro se.

3            THE COURT:  Sir, you are not going pro se in the

4    middle of this trial.  You're not going pro se in the middle of

5    the trial.  I want you to take a few moments and just --

6            THE WITNESS:  They trying to set me up.

7            THE COURT:  No one is trying to set you up.

8            THE WITNESS:  They're trying to do the same job as 30

9    years ago.  That's what someone is doing.  30 years ago.  They

10   killing me.

11           THE COURT:  Mr. Jenkins, I do want you to calm down,

12   because if you leave the courtroom now, I will dismiss the

13   case, and I don't --

14           THE WITNESS:  I'm not going to get no witness here.

15           THE COURT:  Why not?

16           THE WITNESS:  He gave me a document that's false.

17           THE COURT:  All right.

18           THE WITNESS:  What else going to bring it up?  I'm in

19   the federal court.  Who else going to do it in front of a

20   federal judge?

21           THE COURT:  I am a federal Judges, and that's why I'm

22   trying to understand.  That's why we've been having this

23   conversation.

24           THE WITNESS:  That's why I explained it.  If it gets

25   thrown under the rug --

FC8AJEN3ps                    Jenkins

1            THE COURT:  Not a thing here has been swept under the

2    rug.  I'm trying to have a conversation with you, sir, so that

3    I can understand your opposition and your concerns about these

4    documents.  You yelling at me does not help me understand that.

5    I would like you to take a few minutes, and if you want to stop

6    this, we can stop this.  But don't ever suggest that something

7    is being swept under the rug or that you're not getting your

8    fair day in this court, because that's why I'm indulging you in

9    the way that I am.  So that's why, if you want to take a few

10   minutes just to collect your breath, take a bottle of water or

11   something, I can offer you a minute.  I want you to just calm

12   down.  Because what you're getting upset about is not worth

13   getting upset about.  And you're suggesting that people are

14   operating against you, in a way that they simply are not.  I

15   will tell you this, sir, from the bottom of my heart, I don't

16   care who wins.  I don't.  It doesn't matter to me.  I care that

17   this trial proceeds without ever -- I care that this trial

18   proceeds in accordance with the rules of evidence, which are

19   not always things that are intuitive and are not always things

20   that people appreciate.  But I'm not going to have you yell at

21   me in court, sir.  That's not the way this works.

22           THE WITNESS:  I apologize, your Honor.

23           THE COURT:  I understand, sir.  And I understand why

24   you're heated.  Sir, what I understand -- and you don't realize

25   I understand it -- those rules of evidence, they're not always

FC8AJEN3ps                    Jenkins

intuitive and people who do not practice law for a living don't understand why we have to do it in this way.  But we do.

THE WITNESS:  I can explain to you 2255.  I know -- I studied law for 35 years.  I've done 1983s, I've done 440s, I know the law like the back of my hand.  I can tell you about probable cause.  I did 24 years in the penitentiary.  I did most of that in the law library, trying to get home, to my family.

THE COURT:  Yes.  Which is why you know an awful lot law.  But I'm not sure how much you know about the federal rules of evidence as they pertain to hearsay.

THE WITNESS:  I know about the authenticity of a document before you enter it into evidence.  I know that for a fact.  You can't just come up with a document, saying, I'll put it into evidence, and the authenticity hasn't even been proven yet.  And I've been telling this man that for the last five years.  We need to prove the authenticity of the document.  I can show you right here, I can show you how many times they using the case against me.  This is after it had been sealed, where parole violated because of these same charges.  I did three violations before because of the same charges.  And now I have to deal with these charges that were sealed until now.  Then I showed them, step by step, I said look, I know it was changed.  I could show you that, why my FBI number was changed, was changed, has been changed.  Who ever heard of that.  I only

FC8AJEN3ps

1    pull out one FBI.  I got two now.

2              THE COURT:  OK.

3              THE WITNESS:  Two.  He won't even investigate it.  He

4    won't even look at the fact.  I tell him to check the

5    authenticity of it, that parole made these documents.  Where

6    you see they got the trespassing charge at, I was never charged

7    with trespassing.  That ain't what I was charged with.

8              THE COURT:  OK.  All right.  Sir.

9              THE WITNESS:  Parole gave me that charge.

10             THE COURT:  Do you want to take a few moments to talk

11   with your attorneys?

12             THE WITNESS:  That might be fine.

13             THE COURT:  I'm not going to let you fire them in the

14   middle of the case.  So that's my question.  Do you want to

15   talk to them, do you want to us find you -- can you speak in

16   the back of the courtroom and we'll stay away?

17             All right.  I want all three of his counsel back

18   there.

19             (Pause)

20             THE COURT:  Counsel and everyone, I am also going to

21   step off the bench.  If you need to use the facilities, go

22   ahead.  Thank you.

23             (Recess)

24             (In the robing room)

25             THE COURT:  I am putting on the record what I have

1    just spoken about with the parties, and that we are here in the

2    robing room and here's what we have indicated.  I want to make

3    sure I have their assent to this.

4            In light of the concerns and the changing behavior of

5    Mr. Jenkins, I believe it best for him, for the parties, for

6    the case that he and his counsel meet for the remainder of the

7    day so that they can explain and discuss with him the

8    evidentiary issues that have sparked so much concern for him.

9    And if it turns out that tomorrow he is in the same state of

10   mind and is of sort of the same combative nature in dealing

11   with me, I will consider very strongly ending the case at this

12   time.

13           However, in light of the fact that he has gone back

14   and forth in terms of his emotions and how upset or not upset

15   he is, I don't want to cause further concern to him, and I

16   don't want to cause further concern to the litigants by

17   formally bringing back the jury, telling them that they are

18   done for the day, and then letting them go.  So what I'm going

19   to do instead is, I'm going to tell the parties here and get

20   their assent to this, that we're going to break for the day.

21   I'm going to then tell the jury myself, and I'll solicit input

22   from the parties as to what they would like me to say.  I'll

23   let the jury go for the day.  And we'll talk about who gets to

24   leave first, whether the litigants would like to take

25   Mr. Jenkins home or to their offices and to deal with him, or

FC8AJEN3ps

1    whether I should let the jury out and when they're gone,

2    they -- because what we're trying to do, let's be clear, is to

3    minimize any stressors on Mr. Jenkins at this time.

4              All right.

5              MR. OLIVER:  Thank you, your Honor.

6              A MARSHAL:  Your Honor?

7              THE COURT:  Off the record.

8              (Discussion held off the record)

9              THE COURT:  We're back on the record.

10             Mr. DeAtley.

11             MR. DeATLEY:  I would just note that our officers are

12   sitting outside of the courtroom, so before either the jury is

13   released or Mr. Jenkins leaves, that we let our officers in the

14   room.

15             THE COURT:  Exactly.  We'll find a place.  Exactly.

16   Thank you for letting me know.

17             Do you have any issue or concern with what I have just

18   proposed?

19             MR. DeATLEY:  No, your Honor.

20             MR. OLIVER:  Could we have 40 seconds off the record?

21             THE COURT:  Off the record.  Is this to discuss what

22   is to be discussed with the jury?

23             MR. OLIVER:  Yes, your Honor.

24             THE COURT:  OK.  Yes.  You have your 20 seconds.  Go

25   ahead.

FC8AJEN3ps

```
1              (Pause)
2              THE COURT:  Gentlemen, we are now on the record.
3              Mr. Oliver, yes.
4              MR. OLIVER:  Thank you, your Honor.  Just, we would
5    request that when you speak with the jury, you perhaps say
6    something to them like, the parties need to deal with some --
7    attempt to deal with some evidentiary issues --
8              THE COURT:  Evidentiary issues.
9              MR. OLIVER:  -- or something along those lines, to
10   perhaps try and deal with the prejudice that might result from
11   what's happened today.
12             THE COURT:  Yes.  And I'm sorry; is there a
13   contradiction from this side?
14             MR. DeATLEY:  I think if you say it's an evidentiary
15   issue it may seem like, based on what the jury last heard, that
16   either defendants disclosed something to plaintiff's counsel
17   and that there is an issue as to --
18             MR. BOYLE:  How about "legal issue"?
19             MR. PASSESER:  It's not really a legal issue.
20             THE COURT:  It is if I terminate the case.
21             MR. OLIVER:  There are certain legal issues from our
22   perspective.
23             THE COURT:  OK.  I will speak with the jury.  You are
24   not in disagreement with my decision not to formally bring them
25   back and let them go from the courtroom, correct?
```

FC8AJEN3ps

1          MR. OLIVER:  We agree with that decision, your Honor.

2          THE COURT:  I think that is fine.  Who goes first?  Am

3     I telling Mr. Jenkins what I've just done, or are you telling

4     Mr. Jenkins what I've just done?

5          MR. BOYLE:  Despite what just happened, I've known the

6     man for many years now, and I believe if I go out there --

7     first he was, you know, going to go out and I got him to sit

8     down and talk.  Let me go then and see whether we could --

9          THE COURT:  Leave.

10          MR. BOYLE:  -- leave, what the court just did, that we

11     would like to leave, and go back to my office and talk.

12          THE COURT:  All right.  Will you communicate to him at

13     some point today that if he is like this tomorrow, it may be

14     bad things for his case.  I'm not going out there to say it,

15     because you're telling me you would prefer to speak to him than

16     I.  But that has to be communicated to him, that if he shows up

17     tomorrow morning and this happens, I am not going to stand for

18     it.  Would you prefer I say that?

19          MR. BOYLE:  The only thing I -- there's part of me

20     that would like that, but the other thing is, if he's calmed

21     down right now, that might have the opposite effect.  And --

22          THE COURT:  It nonetheless needs to be communicated to

23     him.  I don't care which of us does it.

24          MR. BOYLE:  I will represent to the Court that unless

25     he refuses to talk to me and refuses to talk to any counsel,

FC8AJEN3ps

1    that that's what we were informed of by the Court, that if we

2    could not proceed tomorrow because the behavior persisted, the

3    case would be dismissed.

4              THE COURT:  The case may well be dismissed.

5              MR. BOYLE:  May well be dismissed.

6              THE COURT:  Yes.  OK.  You'll tell him that.

7              MR. BOYLE:  If --

8              MR. OLIVER:  And if he can't, then I'll certainly try

9    to.

10             THE COURT:  Well, I can, but I'm going to have a

11   marshal next to me as I do it, and I'm not sure -- again, I'm

12   trying to calm him down.

13             MR. BOYLE:  We may be trying to do that, but --

14             THE COURT:  Well, have the conversation now.  Do that

15   now.  And then come back here with us.

16             MR. OLIVER:  Thank you.

17             THE COURT:  Officers go home?  Send them home.

18   Tomorrow morning, on time for them.  I know they were.  8:45.

19             MR. PASSESER:  They were here.

20             MR. DeATLEY:  We'll talk to them afterward.  Thank

21   you.

22             (Recess)

23             (In the robing room)

24             THE COURT:  We're going back on the record.

25             Is everything resolved?

FC8AJEN3ps

1          MR. BOYLE:  I had a conversation.  We both had a

2     conversation, and Mr. Hassen as well, with Mr. Jenkins.  The

3     first thing is, we agreed we'll all leave right now together.

4          THE COURT:  Good.

5          MR. BOYLE:  We informed him that the Court would see

6     the jury on its own, without any of the parties present, and

7     explained that there are -- and I think I used the term

8     "issues" or "legal issues," and that would take a substantial

9     amount of time, and that it's best if the jury came back

10    tomorrow.

11         THE COURT:  Yes.

12         MR. BOYLE:  I also explained, asked him to -- for us

13    to have a conversation, and stated the Court's intention that

14    if there was something similar tomorrow or if for some reason

15    we didn't go forward, the Court may, and I underlined "may,"

16    consider dismissing the case.  And he was fine, not with

17    dismissing the case, but he was fine with the procedure that we

18    said and that we would all leave together right now.

19         THE COURT:  OK.

20         MR. BOYLE:  And that was --

21         THE COURT:  Then I'm going to let you do that.  And

22    then you guys will follow.

23         Perhaps you can explain to him that the hearsay issue

24    that caused us to want to break out the parole materials, which

25    is I think what started him -- he seemed to want all the parole

FC8AJEN3ps

```
 1  materials introduced as a unit, which they weren't going to be.
 2  No?  There are other issues.  Fine.  Off the record.
 3           (Discussion held off the record)
 4           THE COURT:  May we let the court reporter go?  With
 5  our thanks.
 6           MR. OLIVER:  With our thanks, yes.
 7           THE COURT:  I'm going to talk to the jury.  The
 8  parties have agreed that I may dismiss the jury, without their
 9  presence and without being in open court.  What we're going to
10  do instead is make sure that the litigants all leave.  So the
11  first wave to leave --
12           MR. OLIVER:  Good-bye.
13           THE COURT:  Plaintiff and counsel.  Very well.  8:45
14  tomorrow morning.
15           MR. PASSESER:  Thank you.
16           THE COURT:  One other thing to you folks: I want your
17  jury charges.
18           MR. DeATLEY:  Yes, your Honor.
19           THE COURT:  The OGA charge.
20           MR. DeATLEY:  Yes, your Honor.
21           THE COURT:  I'm not going to think it up myself.
22  Thank you.
23           MR. DeATLEY:  We've got it.
24           THE COURT:  And then in a few moments you all may
25  leave.  If you want to stay here, if it's easier to leave
```

FC8AJEN3ps

1   from –– I don't care.  That's fine.

2           And then I'm going to go meet with the jury.  But,

3   yes, and I'll give you guys enough time to all head out.

4           Thank you.

5           (Adjourned to 8:45 a.m., December 9, 2015)

6

7                    INDEX OF EXAMINATION

8   Examination of:                        Page

9   NORMAN JENKINS

10  Direct By Mr. Boyle  . . . . . . . . . . . . .83

11                   PLAINTIFF EXHIBITS

12  Exhibit No.                          Received

13   12   . . . . . . . . . . . . . . . . . .84
     31 and 32   . . . . . . . . . . . . . . 115
14   33   . . . . . . . . . . . . . . . . . 119
     6   . . . . . . . . . . . . . . . . . . 122
15   8   . . . . . . . . . . . . . . . . . . 133
     10   . . . . . . . . . . . . . . . . . 140
16   23, 24 and 25   . . . . . . . . . . . . 145
     35 and 36   . . . . . . . . . . . . . . 150

17

18

19

20

21

22

23

24

25