G5GQJENc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     NORMAN JENKINS
 3

 4               Plaintiff

 5        v.                          13 CV 3405 (KPF)
                                      Telephone Conference
 6   POLICE OFFICER VICTOR CHARLES,
     et al.,
 7

 8            Defendants

     ------------------------------x
 9                                    New York, N.Y.
                                      May 16, 2016
10                                    10:00 a.m.

11   Before:

12                 HON. KATHERINE POLK FAILLA

13                                       District Judge

14                 TELEPHONIC APPEARANCES

15   NORMAN JENKINS, Pro Se

16   NEW YORK CITY LAW DEPARTMENT
          Attorney for Defendants
17   TAVIS C. DEATLEY
     DANIEL L. PASSESER
18

19

20

21

22

23

24

25
```

G5GQJENc

1           (In chambers; case called)

2           THE COURT:  Good morning, Mr. Deatley and

3    Mr. Passeser.  This is Judge Failla.  Do I have you both on the

4    line?

5           MR. DEATLEY:  You do.  Good morning, your Honor.

6           MR. PASSESER:  Good morning, your Honor.

7           THE COURT:  I think Mr. Deatley was relaying

8    information to my deputy.  At the risk of making you repeat

9    yourself, I'm wondering, sir, if you could tell me what you

10   told him.  I have a court reporter here making sure it's all

11   being taken down.

12          MR. DEATLEY:  Of course, your Honor.  Thank you.

13   Mr. Passeser and I around 9:58, 9:59 called the Department of

14   Corrections to the number provided by legal to contact an

15   individual by the name of Ms. Mora, who is the social services

16   coordinator for ENTC, which is the building that plaintiff

17   Norman Jenkins is housed on on Rikers Island.

18          Speaking to Ms. Mora, she informed us that plaintiff

19   was unavailable for the conference at this time as he had

20   gotten into some sort of altercation, whether that be only

21   verbal or also physical, with corrections officers on Rikers

22   Island who were attempting to take him to the conference.

23          She informed us that a captain was being sought, and

24   in possibly the next 10 to 15 minutes she would call us back or

25   we could call her if they hadn't heard from her with an update

G5GQJENc

1    as to whether or not Mr. Jenkins was willing or available for

2    the conference, your Honor.

3              THE COURT:  Mr. Deatley and Mr. Passeser, let me let

4    you know that in the last week, I believe Thursday, Friday of

5    last week -- wait.  I'm going to interrupt myself because

6    Mr. Lopez has news for me.

7              THE DEPUTY CLERK:  It's my understanding that

8    Mr. Jenkins is on the line with Ally.

9              THE COURT:  Well, that is going to be interesting.  We

10   have apparently Mr. Jenkins on the other line.  Gentlemen, let

11   me let you know what I was going to say while my law clerk

12   keeps Mr. Jenkins occupied.  That is, that both Mr. Jenkins'

13   girlfriend and Mr. Jenkins' cousin separately reached out to me

14   last week to let me know that he believed that he was being

15   harassed by Rikers Island officials, that he was being abused

16   by them, and that he believed they were going to prevent him

17   from participating in this call today.

18             I did not take this to you.  I was going to bring it

19   up at today's call because I did not know if he was going to be

20   prevented, but he is now on the line.  So perhaps the thing for

21   me to do, gentlemen, is to put you on hold, and I will do that.

22   So stay there.  We'll get right back to you.

23             MR. DEATLEY:  Yes, your Honor.  Thank you.

24             (Pause)

25             THE COURT:  Gentlemen, this is again Judge Failla.

G5GQJENc

```
 1    Thank you for your patience.  What my law clerk just relayed to
 2    me was that Mr. Jenkins had said to her that he had only
 3    approximately three minutes remaining on his permissible call
 4    time, that he's being harassed by individuals at Rikers Island,
 5    and that he asked that I try and find some way of permitting
 6    him to participate in this call.
 7              Immediately thereafter, as that information was being
 8    relayed to me, the line on which his call came in went dead,
 9    which suggests he's not on the phone any more.  We're looking
10    to see whether he calls back.  I don't really know what to do.
11              Mr. Deatley, the woman, Ms. Mora, with whom you spoke,
12    is she akin to a unit counselor or someone who helps facilitate
13    phone calls of this type?
14              MR. PASSESER:  The latter, your Honor.  At least, yes,
15    she does help facilitate phone calls of this type.
16              THE COURT:  And that's Mr. Passeser, correct?
17              MR. PASSESER:  Yes.
18              THE COURT:  Perhaps I should try and speak with
19    Ms. Mora so we can perhaps find a time, which may not be today,
20    when we can have this call because I am concerned about
21    Mr. Jenkins for the same reasons I was concerned when he was
22    last before me in December.  I will tell you that the phone
23    calls I am receiving suggest information being relayed by
24    someone with some emotional issues.
25              MR. PASSESER:  Your Honor, we can provide you the
```

G5GQJENc

1  number that Ms. Mora provided us to reach out to her if you

2  would like to speak with her directly.

3       THE COURT:  Yes, please.

4       MR. PASSESER:  (718) 546-5803.  Unfortunately, we do

5  not know her first name, but it's Mora, M-O-R-A.

6       THE COURT:  I presume, gentlemen, you will be around

7  this week.  Is that correct?

8       MR. PASSESER:  Unfortunately, your Honor, I am out of

9  the office Thursday and Friday, but I'm available all day on

10  Tuesday and Wednesday.

11       THE COURT:  And I begin a trial tomorrow so we will

12  see what we can do.  I am not sure we can reconstitute

13  everybody today for a call, although we'd certainly like to.

14  Let me find out what's going on.

15       Please know that these allegations are out there; that

16  he is being consistently harassed at Rikers because the guards

17  at Rikers are aware of this case.  Now, there are a number of

18  perhaps logical jumps that one has to make, but that is what's

19  been relayed to me in two very frantic calls by individuals

20  close to Mr. Jenkins.

21       MR. DEATLEY:  Yes, your Honor.

22       MR. PASSESER:  Understood.

23       THE COURT:  Thank you both for participating in the

24  call.  Could you please get a transcript of this call so we

25  have a record of this proceeding?

G5GQJENc

1          MR. DEATLEY:  Yes, your Honor.  If your Honor prefers,

2     Dan and I, Mr. Passeser and I, will stand by for the next 30

3     minutes to an hour or so if your Honor is able to get

4     Mr. Jenkins on the line.

5          THE COURT:  I do appreciate that.  Thank you.

6          MR. DEATLEY:  Thank you, your Honor.

7          (Recess)

8          THE DEPUTY CLERK:  In the matter of Norman Jenkins v.

9     Police Officer Charles, et al.  If the parties could state

10    their names, please.

11         THE COURT:  Mr. Jenkins, are you on the line?

12         MR. JENKINS:  Yes, ma'am.

13         THE COURT:  Good morning, sir.  This is Judge Failla.

14    Is it Mr. Deatley and Mr. Passeser for the corporation counsel?

15         MR. DEATLEY:  Yes, it is, your Honor.  Good morning.

16         MR. PASSESER:  Good morning.

17         THE COURT:  Good morning to all of you.  I wanted to

18    have this call, and I thank you for participating in it because

19    I wanted to address a motion for reconsideration and relief

20    from final judgment that Mr. Jenkins has filed with me.

21         Let me remind the parties that there is some

22    procedural history here.  I did dismiss the case that

23    Mr. Jenkins had brought on December 11 of last year based on

24    failure to prosecute.

25         On February 10 of this year, Mr. Jenkins filed a

G5GQJENc

1    motion for reconsideration for dismissal of the case.  I am

2    interpreting this as a motion for relief from judgment under

3    Rule 60(b) of the Federal Rules of Civil Procedure.

4          I reviewed the parties' briefing, I've looked at the

5    arguments; and for the reasons I am about to outline, I am

6    granting Mr. Jenkins' motion, and I am restoring this case to

7    the docket.

8          Mr. Jenkins, I am construing this as a motion for

9    relief from judgment pursuant to Federal Rules of Civil

10   Procedure 60(b).  Because it's been filed more than 14 days

11   after the entry of my judgment, I am also, sir, because I must,

12   broadly construe the allegations and the claims you are making

13   because of your pro se status.

14         Now, the defendants have argued, understandably, that

15   this matter is untimely under Local Rule 6.3, which is a motion

16   for reconsideration.  I have not seen a similar argument that

17   this motion when construed under Rule 60(b) is considered

18   untimely.  The standard here is that motions be filed within a

19   reasonable time, and because this is @60(b)(1), (2) or (3), no

20   more than one year after judgment.

21         Under the particular facts of this case, I am finding

22   that this period does not exceed the reasonable period that is

23   required by Rule 60(b).  I am balancing here the interest in

24   the finality of the judgments versus the reasons for the delay.

25   I am also mindful of the fact that Rule 60(b) motions are not

G5GQJENc

```
1    to be used as an end-run around, for example, notices of appeal

2    deadlines which are 30 days out or the reconsideration

3    deadlines that are 14 days out.  I am understanding this to be

4    a motion under excusable neglect, which is a more flexible

5    standard.

6         The plaintiff has contended to me that his attorneys

7    remained engaged as his counsel after I dismissed the case but

8    then abandoned the litigation, and he filed the motion pro se

9    after which his counsel finally withdrew.  In light of the

10   broken relationship between Mr. Jenkins and his counsel -- and

11   I certainly saw that firsthand at trial -- and counsel's

12   failure to proceed or withdraw, I am inclined to consider the

13   delay as excusable neglect.  I have not seen a suggestion that

14   the delay in filing this motion brings prejudice to the

15   defendants.

16        Now, there is a second level, and a more important

17   level, of excusable neglect that is being argued by

18   Mr. Jenkins.  He is arguing to me that when he arrived late in

19   the courthouse on that day of trial, that that itself was

20   excusable neglect.  Given that, I'm looking at the elements the

21   Second Circuit considers which are the danger of the prejudice

22   to the non-movant, the length of the delay and its possible

23   effect on court proceedings, the reason for the delay and

24   whether the movant here, Mr. Jenkins, acted in good faith.

25        I am looking in particular at the Second Circuit's
```

G5GQJENc

decision in *American Express Financial Advisors Securities*

*Litigation*, a 2011 decision that's reported at 672 F. 3d 113,

and that in turn comes from or is based on, I think, the case

that sort of started it all, *Pioneer Investment Services*

*Company v. Brunswick Associated Limited Partnership*, a Supreme

Court decision from 1993.

On the issue of prejudice, the defendants have argued

to me that the plaintiff's delay at trial significantly

prejudiced them as he twice failed to appear on time and that

his outburst in court resulted in the second day of trial being

adjourned.  I agree, but ultimately this amounts to a minor

inconvenience.  The behavior of Mr. Jenkins, at most, would

have added a day or so to the trial schedule, and I don't

believe I can say that that caused prejudice to the defendants

sufficient to warrant the very extreme dismissal under Rule 41

that I adopted.  Also, though plaintiff was tardy, and he was

on the 8th of December, I was able to address with the parties

legal matters thereby defraying some of the loss of time and

lessening some of the prejudice to the defendants.

The same with the delay on the 9th of December.

The next, and perhaps bigger issue, is the length of

the delay.  The tardiness on the first day really didn't alter

the trial day, but on the third day of trial he was 45 to 50

minutes late, and that did throw off the trial schedule.  But

I'm not sure that I can say it was so bad that the Second

G5GQJENc

1   Circuit would agree with me that it is a basis for dismissal.

2   More than that, I am aware that at the moment I was getting

3   ready to dismiss the case, I received word from counsel,

4   Mr. Oliver, for the plaintiff that he was on his way and caught

5   in a subway in transit.  The defendant has also asserted that

6   the plaintiff has not presented a good reason for the failure

7   to timely appear, as he's asserted only the parole curfew and

8   family responsibilities, and neither of these would have

9   prevented him from appearing on time.

10          I guess the issue is, on the day in question when I

11   dismissed the case, I had moved the start time up to 8:30 upon

12   receiving notice the preceding afternoon that plaintiff's

13   counsel intended to move to withdraw.  At the time I set this

14   earlier time, I was not aware of the nature of Mr. Jenkins'

15   parole conditions and the fact that he had gotten permission to

16   assist or to take his son to school but not necessarily to come

17   early to court, and that he was already struggling to arrive at

18   court in a timely manner.  I believe Mr. Jenkins had

19   communicated this information to his counsel.  I don't know

20   that they had really effectively relayed that information to

21   me.

22          To be clear, the attorneys' mistake or the inability

23   to efficiently manage the case load is not necessarily grounds

24   for excusable neglect, but here, there was a real problem

25   between counsel and the client at this time.  There was an

G5GQJENc

1    outburst in the court on the 8th of December.  There was the

2    expressed intention to move to withdraw.  There was a motion on

3    this regard, and, very clearly, relations had broken down

4    between Mr. Jenkins and his counsel.  I do not think that the

5    failure of his counsel to tell me this information about his

6    child obligations until the moment I was dismissing the case, I

7    don't think that was an error of law.  I don't think it was a

8    legal strategy.  I think it was a failure to communicate

9    information that I probably should have had beforehand, and I

10   think it is indicative of the breakdown of the relationship.

11        I also am not fully clear as to when Mr. Jenkins was

12   made aware of the 8:30 starting time, and the submissions to

13   the Court that he has made in connection with this motion

14   indicate that he believed the start time to be at 9:00 a.m.,

15   and then he thought maybe it was an 8:45 time, but that he

16   tried his hardest to get there, and he was.

17        So, in summary, a combination of the lack of advance

18   notice of the precise start time, the parole conditions and

19   certain, but not entire, exceptions to them, which the Court

20   was only belatedly made aware of, provide some justification

21   for plaintiff's delay.  When viewed alongside the lack of

22   prejudice to defendants, comparatively speaking, and the

23   insubstantial duration of the delay, this factor too weighs in

24   favor of relief.

25        Let me put this more clearly.  At the time I dismissed

 1    this case, I believed I had much broader discretion than I had.

 2    I have looked at a number of Second Circuit cases, and they

 3    make very clear to me that when someone is late by less than an

 4    hour, and particularly where the judge knows where he is and

 5    knows where he is going, that the judge errs and abuses her

 6    discretion in dismissing the case on that basis.  And so in

 7    addition to finding a basis in the law to grant relief under

 8    60(b) based on the arguments that Mr. Jenkins has made to me, I

 9    am on some level saving the parties an appellate issue that is

10    very likely to be decided in Mr. Jenkins' favor.  I am not

11    going to say, and there is no evidence, that Mr. Jenkins has

12    acted in bad faith.

13            For all of these reasons, I am restoring the case to

14    the docket; but lest there be any appearance of partiality or

15    impropriety, particularly given the nature of the outburst on

16    the 8th of December and the fact that a portion of that

17    outburst was directed at me, I am going to transfer the case to

18    another judge.

19            So let me end with this:  I will not have this case in

20    the next day or so.  It will be restored to my calendar and

21    transferred to someone else, and at that time, Mr. Jenkins can

22    figure out when it makes sense to talk about a retrial in this

23    matter, and the other things attendant to that.  But I want to

24    speak to Mr. Jenkins not as a judge, because I will no longer

25    have this case, and I am not speaking as someone with an

G5GQJENc

1    interest in this case.  I am speaking to him as a human being.

2           Mr. Jenkins, that trial was very stressful for you,

3    sir.  I know it was, and I saw how much of a strain it was on

4    you.  When this case comes back before a different judge, I

5    would ask you -- I cannot instruct you -- I am simply asking

6    you to think about whether you want to proceed with the trial

7    because it was such a strain on you.  I will also suggest to

8    anyone -- anyone being the judge -- who receives this case from

9    me, that they determine whether it is appropriate to appoint

10   pro bono counsel to assist you in this case.  That may not be

11   appropriate, but I leave it to their discretion.

12           I am saying, sir, I actually thought on some level I

13   did you a favor in dismissing this case.  I know you want it

14   back, but I want you to think about whether that's the best

15   thing for your mental and emotional health.

16           With all of that, gentlemen, I thank you for listening

17   to me.  I will ask Mr. Deatley and Mr. Passeser to get a

18   transcript of this.  Again, I thank you for the work you did on

19   the case and the work that I know you will do on the case and

20   for your time this morning.  Thank you all

21           MR. DEATLEY:  Thank you, your Honor.

22           MR. PASSESER:  Thank you, your Honor.

23           MR. JENKINS:  Can I say something?

24           THE COURT:  Yes, Mr. Jenkins.

25           MR. JENKINS:  Yeah, basically parole is still

G5GQJENc

1    harassing me.  You know, this was the whole thing that I was

2    basically trying to point out in the reconsideration that after

3    you dismissed it, they basically were going to put disclaimers

4    on me and all that.  I'm going from through the same thing that

5    was being hid from you.  Like everything that I sent to you was

6    being hid.  What happened on August 16 when my retainer lawyer

7    went inside a parole hearing and hid the fact that they called

8    the wrong police officer that wouldn't show, the fact that the

9    police report that was used was a fake police report.

10          Now, after it was dismissed, I'm locked up again.  I

11   haven't committed a crime.  They locking me up for failure --

12   for saying I failed to report, and that I -- I tested positive

13   for cocaine.  I have proof from a drug program that I didn't

14   use cocaine.  And they harassing me here.  They try to prohibit

15   me now just to try to get the phone just now.  It's like

16   everybody's in my business.  It's like I'm in harm's way right

17   now.  And this parole has no jurisdiction over me.  What they

18   did back then, for them to continue to even try to supervise me

19   and sanction me or anything is a violation of my constitutional

20   rights.

21          And I understand that you walking away -- you want to

22   walk away from this case, but I'm being prosecuted right now

23   for what happened on August 10 -- I mean, pardon me, on May 22,

24   2010.  I have two parole officers that threaten my liberty and

25   threaten me not to pursue what I'm pursuing right now.  And I'm

G5GQJENc

1   in the Department of Corrections, and they basically harassing

2   me.  Officers, they took my ID from me, took my money out of my

3   account, illegally they took the money out of my account, took

4   my ID and they told my I'm not going to make this call Monday,

5   they're going to make sure I don't make this call Monday.

6            When I went to the parole hearing, you said that you

7   inquired whether or not this had anything to do with my case.

8   I'm in front of the same people, the same judge that did that.

9   The parole specialist is now the deputy chairman.  She did the

10  exact same thing.  She's altering the documents.  I have proof.

11  I have all the documents she gave to me.  They switched judges

12  on me.  I have one judge that was going to allow to see the

13  parole officer to come in because I have pictures to show that.

14           THE COURT:  Mr. Jenkins, Mr. Jenkins, I need you to

15  slow down, sir.  You are going so fast.  I'm not taking down

16  everything you're saying.  Go a little bit slower.

17           MR. JENKINS:  All right.  So when I was arrested, I'm

18  doing the preliminary hearing.  So when I went to the

19  preliminary hearing, I was in front of a judge.  When the judge

20  asked me, I said I want to talk to the parole officer, so he

21  adjourned it so I could see the parole officer.  Leila Short,

22  the same one on August 16 comes in on my parole where she

23  switches up and sends the same judge back that doesn't allow

24  for me to call this witness and basically finds me guilty of

25  not reporting.  One time -- out of being on parole for eight

G5GQJENc

1    years, I don't report not one time, and you find probable cause

2    saying that they come back with the other charges.  They done

3    switch judges on me three times, a presiding judge where I

4    already pointed out to them, yo, listen, this is illegal.  Now

5    the Judge Landis that I pointed out to him, like, yo, listen,

6    you illegally sat on my final hearing when you wasn't supposed

7    to.  It was supposed to be the Judge Vilitrani.  I showed him

8    the civil rules of why you can't just come on a case and

9    qualify the case, and a judge can't substitute himself.  He

10   basically pushed my date all the way back to the 31st and

11   started asking me questions, am I going to sue him?  Am I going

12   to sue him?  I was like this has nothing to do with it.  This

13   has something to do with parole.  And right now every

14   proceeding that you're doing is illegal, and I'm asking them to

15   cut me loose, to cut my loose.  You don't have no jurisdiction

16   over me no more, none whatsoever.  You relinquished that.  You

17   can't continue to supervise me -- you can't say you didn't

18   see -- August 16, admitted right there, that's what the

19   defendants and my lawyers was hiding from me.  I didn't get

20   that until attorney Gideon gave me a hard drive.  When I

21   downloaded the hard drive, it had all these minutes in it that

22   I been saying for the longest -- I didn't even have a chance to

23   present it in a writ of habeas corpus and a Article 78 because

24   they hid it.  I didn't get it to Oliver.  He gave it to me.  It

25   was Boyle's hard drive.  They knew that.  Then on top of that

G5GQJENc

when they requested me for the deposition and asked me did I

file a 50-h hearing, I said no.  Boyle was right there that I

didn't have a 50-h hearing, but then when I get his paperwork,

when he gives me paperwork, I see where they did call me for a

50-h and he put in a lawsuit and he muted it by saying that I

was locked up on Rikers Island.  Rikers Island delivers.  They

produce who you need to go to a 50-h hearing, and he never told

me about that.

        THE COURT:  Mr. Jenkins.  Mr. Jenkins.  Mr. Jenkins.

Again, sir, I want you to slow down, but let me speak for a

moment.  What I am understanding you to say is that right now

you believe you should not be at Rikers Island because you

believe that your term of parole was discharged and they had no

basis to violate you.  Do I understand that correctly, sir?

        MR. JENKINS:  That's what I'm saying, ma'am.  They had

no basis to violate me.  None.  They made up all that stuff.

They made up everything, and they've been harassing me since

I--

        THE COURT:  Two different things.  Not whether they

had a basis to violate you.  I understood you to be saying that

they don't even have -- that your time of supervision is done.

Is that correct?

        MR. JENKINS:  OK.  I want to explain why I said that,

why I'm saying that.

        THE COURT:  Yes, sir.

G5GQJENc

1          MR. JENKINS:  OK.  Why I'm saying that, right, is that

2     when -- when they locked me -- when they maliciously prosecuted

3     me, right, and pushed me past the three years that I supposed

4     to have, that when you do three years of unprovoked parole,

5     they got to cut you loose, right.  They got to cut you loose.

6     And the fact that they was involved in illegally incarcerating

7     me, they can't make me do another three years of unprovoked

8     parole because you deny me equal protection of the law.  You

9     deny me my constitutional rights.  The only remedy that they

10    have is to discharge me on parole, but they continue to

11    sanction me.  They continue to parole me, and I've been

12    bringing this to their attention since 2011.

13         THE COURT:  Slow down, sir.  Slow down, sir.

14         Mr. Deatley or Mr. Passeser, do you have knowledge of

15    the maximum expiration date of Mr. Jenkins' parole term?

16         MR. DEATLEY:  Yes, we do, your Honor.  On the DOCCS

17    inmate lookup website, which I'm pulling up at the moment, I

18    could provide you with the exact date; but upon information and

19    belief from looking this morning, it's sometime in 2017, your

20    Honor.

21         THE COURT:  I see.  So, your position, sir, is that if

22    there is a basis to violate Mr. Jenkins -- and I'm not

23    necessarily saying there is -- they have the ability to do

24    that.  It's not as though they lack jurisdiction because his

25    time of supervision has ended.

G5GQJENc

1              MR. DEATLEY:  The DOCCS inmate lookup -- that's

2     correct, your Honor, the inmate lookup page we just logged onto

3     says the maximum expiration date for Mr. Jenkins' parole is

4     July 27, 2017.

5              THE COURT:  Thank you.

6              MR. DEATLEY:  Now, whether that date is correct or --

7     that's not something we're aware of.

8              THE COURT:  I understand.

9              Mr. Jenkins, sir, I understand what you're saying.

10    You're saying a couple of things.  Number one, you feel that

11    your time of supervision should have ended by now.

12             The second thing you're saying is the basis for your

13    current violation and the incarceration that comes with it is

14    not legitimate.  This I understand.

15             And then you've also said that while you have been

16    housed at Rikers, people have treated you unfairly because of

17    the case before me.

18             Do I understand that correctly, sir?

19             MR. JENKINS:  Yes, ma'am.

20             THE COURT:  Sir, I understand that.  I am going to

21    look into it to the extent that I can.  I did talk to people at

22    the time you were surrendering for this violation, and I will

23    also be attuned to whatever judge gets this case, I will make

24    sure that I have a very detailed conversation with them about

25    what we're talking about today, and I will make sure they get a

G5GQJENc

1    copy of the transcript that is being prepared as we speak.  I

2    do understand your issues, sir, so I will look into that.

3              MR. JENKINS:  Thank you.

4              THE COURT:  Thank you all.

5              MR. DEATLEY:  Thank you, your Honor.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25